# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **In re** | Chapter 11 |
| **IMERYS TALC AMERICA, INC., _et al._**[1] | Civ. Action No. _____ |
| | Bankr. Case No. 19-10289 (LSS) |
| **Debtors.** | Jointly Administered |

## MEMORANDUM OF LAW IN SUPPORT OF JOHNSON & JOHNSON'S AND JOHNSON & JOHNSON CONSUMER INC.'S MOTION TO FIX VENUE FOR CLAIMS RELATED TO IMERYS'S BANKRUPTCY UNDER 28 U.S.C. §§ 157(b)(5) AND 1334(b)

WEIL, GOTSHAL & MANGES LLP
Diane P. Sullivan
Marcia L. Goldstein
Ronit J. Berkovich
Rachel A. Farnsworth
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

DRINKER BIDDLE & REATH LLP
Steven K. Kortanek (Del. Bar No. 3106)
Patrick A. Jackson (Del Bar No. 4976)
Joseph N. Argentina, Jr. (Del. Bar No. 5453)
222 Delaware Ave., Suite 1410
Wilmington, DE 19801-1621
Telephone: (302) 467-4200
Facsimile: (302) 467-4201

_Attorneys for Johnson & Johnson and Johnson & Johnson Consumer Inc._

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Imerys Talc America, Inc. (6358), Imerys Talc Vermont, Inc. (9050), and Imerys Talc Canada Inc. (6748). The Debtors' address is 100 Mansell Court East, Suite 300, Roswell, Georgia 30076.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................1

STATEMENT OF FACTS ....................................................................................3

I.      THE SUPPLY RELATIONSHIP BETWEEN THE DEBTORS AND J&J ......................3

        A.      Historically The Debtors Have Been J&J's Sole Supplier of Cosmetic
                Talc...................................................................................3

        B.      The Indemnification Provisions ..........................................................3

                1.      The Debtors' Indemnification Obligations to J&J ....................................3

                2.      ITA's Demand On J&J's Indemnification Obligations ..............................4

        C.      The Shared Insurance Agreements ......................................................5

II.     J&J IS REMOVING THE STATE COURT TALC CLAIMS. ...........................................6

ARGUMENT ....................................................................................................6

I.      THE TALC CLAIMS SHOULD BE TRANSFERRED TO THIS COURT
        UNDER 28 U.S.C. § 157(b)(5). ..........................................................6

II.     THIS COURT HAS JURISDICTION OVER THE TALC CLAIMS. ...............................8

        A.      Under the Parties' Contractual Indemnification Rights and Obligations,
                the Talc Claims Immediately Impact the Debtors' Bankruptcy Estates. ..............10

        B.      Shared Insurance Further Impacts the Debtors' Estates.....................................12

        C.      The Parties Share an Identity of Interest Because a Claim Against J&J is,
                in Essence, a Claim against Imerys.....................................................13

III.    THIS COURT SHOULD HEAR THE STATE COURT TALC CLAIMS......................15

        A.      A Mandatory Abstention Analysis Does Not Apply Here.................................15

        B.      This Court Should Decline To Permissively Abstain. .........................................16

                1.      The Effect on the Efficient Administration of the Estate Favors
                        Transfer.........................................................................17

                2.      The Talc Claims are Integrally Related To The Debtors'
                        Reorganization. ..................................................................18

                3.      Risk of Inconsistent Results, Waste, and Delay Favors Transfer. ............18

     4.      Settled State Tort Law and Jury-Trial Rights Do Not Require Abstention. ............................................................................................19

     5.      Debtors, Not J&J, Chose This Forum.......................................................19

IV.    UNDER SECTION 157(b)(5), THIS COURT MAY FIX VENUE FOR CLAIMS OR CAUSES OF ACTION, EVEN IF THEY HAVE ALREADY BEEN REMANDED. ..........................................................................................................20

CONCLUSION....................................................................................................................20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A.H. Robins Co., Inc. v. Piccinin*,
   788 F.2d 994 (4th Cir. 1986) .............................................................. 7, 13, 14, 20

*Abbatiello v. Monsanto Co.*,
   No. 06 CIV. 266 (KMW), 2007 WL 747804 (S.D.N.Y. Mar. 8, 2007)................................15

*Beck v. Victor Equip. Co., Inc.*,
   277 B.R. 179 (S.D.N.Y. 2002).............................................................17

*Berry v. Pharmacia Corp.*,
   316 B.R. 883 (S.D. Miss. 2004) ............................................................15

*In re Combustion Eng'g, Inc.*,
   391 F.3d 190 (3d Cir. 2005) ..................................................... 9, 10, 12

*In re Dow Corning Corp.*,
   113 F.3d 565 (6th Cir. 1997) ..................................................... 17, 18

*In re Dow Corning Corp.*,
   86 F.3d 482 (6th Cir. 1996) ............................................................*passim*

*In re Federal-Mogul Global, Inc.*,
   300 F.3d 368 (3d Cir. 2002) ................................................. 9, 10, 12, 14

*Hopkins v. Plant Insulation Co.*,
   342 B.R. 703 (D. Del. 2006) (Farnan, J.) ...................................... 7, 15, 20

*In re Lower Bucks Hosp.*,
   488 B.R. 303 (E.D. Pa. 2013), *aff'd*, 571 F. App'x 139 (3d Cir. 2014).................... 10, 11, 12

*In re LTC Holdings, Inc.*,
   587 B.R. 25 (Bankr. D. Del. 2018) ........................................... 10, 11

*MacArthur Co. v. Johns-Manville Corp.*,
   837 F.2d 89 (2d Cir. 1988) .................................................................13

*In re Marcus Hook Dev. Park, Inc.*,
   943 F.2d 261 (3d Cir. 1991) ................................................................9

*In re Millennium Lab Holdings II, LLC*,
   591 B.R. 559 (D. Del. 2018)................................................................11

*In re Montreal Maine & Atl. Ry., Ltd.*,
  No. 1:13-MC-00184-NT, 2014 WL 1155419 (D. Me. Mar. 21, 2014) ....................... 8, 12, 13

*In re New England Compounding Pharmacy, Inc. Prod. Liab. Litig.*,
  496 B.R. 256 (D. Mass. 2013) .................................................................................. 7, 15, 18

*In re Nutraquest, Inc.*,
  No. 03-5869 (GEB), 2004 U.S. Dist. LEXIS 29143 (D.N.J. Mar. 5, 2004) ................ 8, 15, 17

*Nuveen Mun. Tr. ex rel. Nuveen High Yield Mun. Bond Fund v. WithumSmith
  Brown, P.C.*,
  692 F.3d 283 (3d Cir. 2012) ........................................................................................... 9, 11

*Pacor, Inc. v. Higgins*,
  743 F.2d 984 (3d Cir. 1984) ........................................................................................... 9, 10

*In re Pan Am. Corp.*,
  950 F.2d 839 (2d Cir. 1991) ..................................................................................... 15, 17, 19

*In re Quigley Co., Inc.*,
  676 F.3d 45 (2d Cir. 2012) ............................................................................................. 9, 12

*In re Resorts Int'l, Inc.*,
  372 F.3d 154 (3d Cir. 2004) ................................................................................................. 8

*Royal Indem. Co. v. Admiral Ins. Co.*,
  No. 07-2048 (RBK), 2007 U.S. Dist. LEXIS 85991 (D.N.J. Nov. 19, 2007) ....................... 11

*In re SemCrude, L.P.*,
  428 B.R. 82 (Bankr. D. Del. 2010) ...................................................................................... 11

*Steel Workers Pension Tr. v. Citigroup, Inc.*,
  295 B.R. 747 (E.D. Pa. 2003) ............................................................................................. 12

*In re Twin Labs.*,
  300 B.R. 836 (S.D.N.Y. 2003) .................................................................................... 8, 17, 19

*In re W.R. Grace & Co.*,
  315 B.R. 353 (Bankr. D. Del. 2004) ...................................................................................... 9

*In re W.R. Grace & Co.*,
  386 B.R. 17 (Bankr. D. Del. 2008) .............................................................................. 9, 10, 14

*In re W.R. Grace & Co.*,
  591 F.3d 164 (3d Cir. 2009) .................................................................................................. 9

*Zambelli Fireworks Mfg. Co. v. Wood*,
  592 F.3d 412 (3d Cir. 2010) ................................................................................................ 16

**Statutes**

28 U.S.C. § 157 ................................................................................................................ 19, 20

28 U.S.C. § 157(b)(2)(B) ....................................................................................................... 15

28 U.S.C. § 157(b)(4) ........................................................................................................ 15, 17

28 U.S.C. § 157(b)(5) .................................................................................................... *passim*

28 U.S.C. § 1334 ................................................................................................................ 16, 17

28 U.S.C. § 1334(b) .......................................................................................................... 1, 6, 8

28 U.S.C. § 1334(c) ........................................................................................................... 15, 16

28 U.S.C. § 1334(c)(1) ...................................................................................................... 16, 19

28 U.S.C. § 1452 ..................................................................................................................... 6

Johnson & Johnson and Johnson & Johnson Consumer Inc. ("JJCI") (collectively, "J&J") move for an order under 28 U.S.C. §§ 157(b)(5) and 1334(b) fixing venue in this Court for the personal injury and wrongful death claims identified in Exhibit 1 to J&J's Motion (collectively, the "Talc Claims"). These include claims brought against J&J in (1) state trial courts (the "State Court Talc Claims") and (2) federal courts (the "Federal Talc Claims"),[2] all alleging that exposure to talc supplied by Imerys Talc America, Inc. ("ITA") (collectively with Imerys Talc Vermont, Inc. and Imerys Talc Canada Inc., the "Debtors") to J&J caused the plaintiffs' injuries.

## PRELIMINARY STATEMENT[3]

Beset by an avalanche of claims brought by over 14,000 plaintiffs across the country alleging personal injury and wrongful death, the Debtors sought chapter 11 protection in the United States Bankruptcy Court for the District of Delaware. Each plaintiff alleges that exposure to the Debtors' talc—through products like Johnson's Baby Powder—caused the plaintiff to develop cancer, primarily mesothelioma or ovarian cancer.[4] Because the Debtors have historically been J&J's sole supplier of cosmetic talc, J&J is named as a co-defendant in most or all of these actions.[5] In all cases, J&J asserts that its products are safe, do not contain asbestos as some plaintiffs have alleged, and do not cause cancer.

---

[2] The Federal Talc Claims exclude the 11,060-plus ovarian cancer-related cases already consolidated in, or to be transferred to, the multi-district litigation ("MDL") before the Honorable U.S. District Judge Freda L. Wolfson in the District of New Jersey. *See* Case No. 3:16-md-02738 (D.N.J.). *Daubert* hearings on threshold causation issues are scheduled for July 22-31 and August 19, 2019 in the MDL.

[3] Unless otherwise noted, all emphasis is added and internal citation and quotations are omitted. Citations to Exhibits to the Declaration of John J. Nolan, Esq. are abbreviated as "Ex.__". Citations to the Declaration of John H. Denton are abbreviated as "Denton Decl.__".

[4] The State Court Talc Claims are brought in roughly 2,400 actions, involving approximately 1,400 ovarian cancer actions and 980 non-ovarian cancer actions (predominately mesothelioma-related injuries). The State Court Talc Claims exclude, in the interest of judicial economy, claims on appeal of final judgments or subject to post-trial motions, as well as those in which a trial is ongoing or scheduled to begin forthwith. The Federal Talc Claims involve seven actions alleging mesothelioma-related injuries. All ovarian cancer claims against J&J in federal court are either already consolidated in, or have been designated for transfer to, the MDL.

[5] *See* Ex. 1 (First Day Decl.) ¶ 18. For economy, J&J refers to the manufacturer of cosmetic talcum powder. The J&J entity manufacturing these products has changed over time and currently, it is JJCI. With the filing of this motion, J&J does not make any concessions or waive any rights to challenge the appropriateness of the party named as a defendant or responsible for judgment in any of the Talc Claims or other actions against J&J.

The Talc Claims, asserted in approximately 2,400 actions across the country, allege that products containing the Debtors' talc caused the plaintiffs' injuries. Because the claims raise common questions of fact, law, and science, the current nationwide scheme of disparate discovery processes is duplicative, unpredictable, and wasteful. Inconsistent rulings on overlapping threshold issues threaten to place the Debtors' creditors on unequal footing. In need of efficient resolution of common threshold issues, and as recognized by the Judicial Panel for Multidistrict Litigation for over 11,060 like actions, the Talc Claims should be consolidated in one forum at this time.

28 U.S.C. §§ 157(b)(5) and 1334(b) provide the vehicle to accomplish this. Under these provisions, this Court has "related to" jurisdiction over, and may fix venue for (and effectively transfer), all personal injury and wrongful death claims that affect the Debtors' estates. Because supply agreements between the Debtors and J&J contain cross-contractual indemnifications triggered upon the filing of the Talc Claims without regard to findings on underlying liability, the claims affect the Debtors' estates. Similarly, the Debtors have claimed rights to J&J's insurance for expenses incurred in defending against the thousands of talc-related lawsuits; this claimed shared insurance could increase or decrease the pool of assets available for creditors.[6]

This Court should not abstain from hearing the State Court Talc Claims. Despite the state courts' best efforts, these claims are overwhelming nationwide state courts, to the detriment of the Debtors' estates and creditors, including plaintiffs. Fixing venue in this Court will streamline the adjudication of claims integrally related to (indeed, the impetus for) the Debtors' bankruptcy. This latter outcome is consistent with the statutory purposes of the laws enacted to further the goals of bankruptcy—laws which so favor consolidation that they empower this Court to transfer

---

[6] Because the Talc Claims assert liability on the basis of exposure to the Debtors' talc, and for the reasons further explained below, "related to" jurisdiction exists regardless of whether: (1) the Debtors were ever named as co-defendants with J&J in a particular case; or (2) plaintiffs' claims against Debtors have been stayed and/or severed.

the Talc Claims, even those remanded by other district courts while this motion is pending. Over 80% of talc cases against J&J have already been consolidated and are well along in the process of efficient adjudication by the MDL court. For the remaining Talc Claims, it is through *this* single, centralized forum that the interests of all creditors can best be served and harmonized.

## STATEMENT OF FACTS

## I.    THE SUPPLY RELATIONSHIP BETWEEN THE DEBTORS AND J&J

### A.    Historically The Debtors Have Been J&J's Sole Supplier of Cosmetic Talc.

"Although there are other talc suppliers in the market, the Debtors have historically been the sole supplier of cosmetic talc to J&J." Ex. 1 (First Day Decl.) ¶ 18. Thus, J&J is routinely named as a co-defendant in lawsuits alleging injury from the Debtors' cosmetic talc. *See id.* But even when the Debtors are not named, every bottle of J&J's talcum powder products manufactured since 1989 contains talc mined by one of the Debtors.[7]

### B.    The Indemnification Provisions

#### 1.    *The Debtors' Indemnification Obligations to J&J*

Under exclusive supply agreements, the Debtors owe J&J contractual indemnification for expenses it begins to incur from the very filing of the Talc Claims. These obligations will decrease the size of the estates available to satisfy the Debtors' creditors, including plaintiffs, and arise out of two principal agreements. ***First***, as a condition precedent to J&J's sale of Windsor Minerals, Inc. ("Windsor")[8] to Cyprus Mines Corporation ("Cyprus"), Windsor and the entity now known as JJCI entered into a 1989 requirements talc agreement (the "1989 Agreement").[9] As part of the 1989 Agreement, which does not cap liability, Windsor (now Debtor ITV) agreed

---

[7] *See* Ex. 2 (1989 Agreement) § 3(a) (requirements contract); Ex. 3 (2001 Supply Agreement) § 1(a) (requirements contract); Ex. 4 (2010 Material Purchase Agreement) at 1 (requirements contract); Ex. 5 (2011 Material Purchase Agreement) at 1 (requirements contract).

[8] Windsor is now known as Imerys Talc Vermont, Inc. ("ITV"), a Debtor. *See* Ex. 1 (First Day Decl.) ¶¶ 12-14. Since Cyprus's purchase of Windsor, Windsor has been owned by multiple entities, including RTZ America, Inc. (later known as Rio Tinto America, Inc.) and Imerys Group. *See id.* ¶¶ 12-13 & n.5.

[9] *See* Ex. 7 (Jan. 6, 1989 Stock Purchase Agreement ("SPA")) § 8.5; Ex. 1 (First Day Decl.) ¶ 12; Ex. 2 (1989 Agreement) preamble, § 3(a); Ex. 8 (Am. Suppl. Response to Pls. Supp. Rogs) p.35.

that it "shall indemnify, defend and hold harmless [JJCI], and its affiliates . . . from and against all liabilities arising out of *any violation* by [Windsor] of any law [or] regulation . . . ." Ex. 2 (1989 Agreement) § 10. Notably, many of the Talc Claims naming J&J and Debtors as co-defendants allege *violations* of state product liabilities acts, state laws and regulations defining *per se* negligence, and/or civil conspiracy statutes. Through a series of later agreements, the parties extended the 1989 Agreement through the 2001 calendar year.[10] Under its plain terms, Windsor's (now Debtor ITV's) indemnification obligations to J&J (specifically JJCI) survive its termination. *See id.*

**Second**, on April 15, 2001, JJCI and Luzenac America, Inc. (now Debtor ITA) terminated their then-existing relationship and entered into another requirements contract (the "2001 Agreement"). *See* Ex. 3 (2001 Agreement) § 1(a); Ex. 1 (First Day Decl.) ¶ 12. Under this new contract, ITA agreed that it "shall indemnify, defend and hold harmless [JJCI] and its Affiliates . . . from and against all liabilities arising out of any violation by [ITA] of any law [or] regulation . . . ." Ex. 3 (2001 Agreement) § 7(a)(iv). There is no liability cap for this provision. *See id.* The parties extended the 2001 Agreement through the end of 2006. *See* Ex. 6 (2004 Amendment) ¶ 12. ITA's indemnification obligations, though, survive termination. *See* Ex. 3 (2001 Agreement) § 7(b).

### 2.    *ITA's Demand On J&J's Indemnification Obligations*

Before filing for bankruptcy, ITA demanded indemnification from J&J in the form of, *inter alia*, legal defense costs and reasonable attorneys' fees arising out of the "numerous lawsuits . . . in various jurisdictions alleging bodily injury as a result of the long-term use of certain talc-based body powders manufactured by J&J with talc delivered by Imerys/Luzenac"—

---

[10] *See* Ex. 9 (1992 Agreement) (assigning rights to RTZ America, Inc.); Ex. 10 (1996 Amendment) (extending 1989 Agreement through December 31, 1999); Ex. 11 (2000 Termination) (memorializing Luzenac America, Inc.'s assumption of RTZ America, Inc.'s responsibilities for calendar year 2001).

*i.e.*, the Talc Claims. *See* Ex. 12 (Demand Letter). ITA demanded indemnification under the

1989 Agreement's product liability provision, which provides that JJCI "shall indemnify, defend

and hold harmless [Windsor], and its affiliates . . . from and against all liabilities arising out of

any product liability-based claim, suit, demand or cause of action directed against [Windsor] or

any of [Windsor]'s affiliates" under two scenarios: (1) retrospectively, arising out of the sale of

cosmetic talc products manufactured prior to January 6, 1989, and (2) prospectively:

> [F]or which [JJCI] is directly or indirectly responsible as a result of
> [its] possession, use or processing of Talc delivered to [JJCI]
> pursuant to this Agreement, or as a result of [JJCI]'s manufacture,
> shipment and sale of Talc-containing product (including without
> limitation, baby powder and adult powder) derived from Talc
> delivered to [JJCI] pursuant to this Agreement.

Ex. 2 (1989 Agreement) § 11. In its letter, Imerys also demanded indemnification under a 2011

agreement between JJCI and ITA. *See* Ex. 12 (Demand Letter). That agreement provides that

JJCI "shall indemnify, defend and hold harmless [ITA] for any third party claims brought against

[ITA] based on the use of Materials by [JJCI]." *See* Ex. 5 (2011 Agreement) ¶ 6.[11]

### C.    The Shared Insurance Agreements

J&J and the Debtors each maintain that they share insurance under one of two types of

policies, claims against which will also impact the size of the Debtors' estates. ***First,*** for more

than twenty years, certain of J&J's commercial general liability ("CGL") insurance policies

extended coverage to certain affiliated or subsidiary companies as named insureds or insureds.

*See* Denton Decl. ¶¶ 6, 8. During this time period, J&J owned 100% of Windsor. *See id.* ¶ 9; Ex.

7 (SPA) at 1. Under the 1989 Stock Purchase Agreement and as the result of later acquisitions

and changes in names, Windsor is now the Debtor ITV, *see* n.8, *supra*, and is responsible for

historical Windsor liabilities. *See, e.g.*, Ex. 7 (SPA), §§ 5.1, 5.9. The Debtors have claimed

---

[11] ITA also sought indemnification under section 11.2 of the SPA. *See* Ex. 12 (Demand Letter); Ex. 7 (SPA)
§ 11.2(vi) (describing indemnity for any product liability-based claim, suit, demand or cause of action arising out of
the sale of talc or talc-containing products manufactured before closing).

entitlement to proceeds under J&J's CGL Policies. *See* Denton Decl. ¶¶ 13-16. Indeed, they have represented before the Bankruptcy Court that they "have the right to seek proceeds from various insurance policies issued to J&J and its subsidiaries with total aggregate limits of approximately *$2 billion*." Ex. 1 (First Day Decl.) ¶ 42.

*Second*, from 2001 to 2006, Debtor ITA supplied talc to JJCI under the 2001 Agreement. That agreement required the Debtor to "procure and maintain . . . valid and collectible insurance policies," naming JJCI as an additional insured. *See* Ex. 3 (2001 Agreement) ¶ 12, Annex C. Specifically, it required ITA to obtain and maintain "[CGL] coverage in the amount of US $5 million; Product liability insurance in the amount of US $5 million per occurrence, US $10 million aggregate," and specified that "[s]uch policies shall name [JJCI] as an additional insured . . . ." *See id.* at Annex C. Thus, J&J can claim proceeds under policies that Debtor ITA was contractually required to obtain and maintain. *Id.*

## II.    J&J IS REMOVING THE STATE COURT TALC CLAIMS.

Contemporaneously with this filing, under 28 U.S.C. § 1452, J&J is filing notices of removal of the State Court Talc Claims. Federal subject matter jurisdiction exists over those claims under 28 U.S.C. § 1334(b) because each is related to the Debtors' bankruptcy. J&J's notices of removal inform the courts that J&J is filing this motion and requests deferral of consideration of any motions for remand pending this Court's ruling.

## ARGUMENT

## I.    THE TALC CLAIMS SHOULD BE TRANSFERRED TO THIS COURT UNDER 28 U.S.C. § 157(b)(5).[12]

28 U.S.C. § 157(b)(5) instructs this Court to "order that personal injury tort and wrongful death claims . . . be tried in the district court in which the bankruptcy case is pending, or in the

---

[12] 28 U.S.C. § 157(b)(5) grants this Court the power to fix venue for the Talc Claims, but the cases discussing this power use the terms "fix venue" and "transfer" interchangeably, and so will J&J.

district court in the district in which the claim arose . . . ." Courts have long recognized the

benefits of using this provision to aggregate nationwide claims—both federal and state, against

debtors and non-debtors alike—into one centralized forum.[13] For example, in *In re New England*

*Compounding Pharmacy, Inc. Prod. Liab. Litig.*, 496 B.R. 256 (D. Mass. 2013), the district court

in which a bankruptcy was pending accepted "(1) any case pending in federal court against [the

debtors or non-debtor affiliates], (2) any such case that is in the process of removal to federal

court, and (3) any case pending in any state court in which a party has made a claim against [the

debtors or non-debtor affiliates]," including certain cases not naming debtors as a defendant. *Id.*

at 264-65. Finding that it had "related to" jurisdiction over claims against the non-debtors on the

basis of automatic indemnification obligations, the court reasoned transfer was appropriate, in

part because:

> [W]ithout [aggregation in one forum, there was the risk] of
> inconsistent rulings or judgments on factual or scientific issues that
> may greatly complicate the resolution of these matters. And
> litigation in multiple courts also threatens to impose significant
> discovery burdens, as discovery from many of the same people and
> entities may be sought on multiple occasions.

*Id.* at 263-64; *see also id.* at 271-73 (aggregating the cases in one forum would be the "most

efficient use of the limited resources of the judicial system, and the fairest and most efficient

distribution of the assets of the estate").

    Similarly, in *A.H. Robins Co., Inc. v. Piccinin*, 788 F.2d 994 (4th Cir. 1986), the Fourth

Circuit affirmed a decision centralizing thousands of state and federal personal injury cases

against debtors and non-debtor co-defendants in the district court where a bankruptcy was

pending, concluding that it was "obviously in the interest of the class of claimants as a whole to

---

[13] This Court specifically has recognized, under § 157(b)(5), its "sole authority to determine the appropriate venue
for [actions alleging] personal injury tort and wrongful death claims against, among others, [non-debtors over which
the court has 'related to' jurisdiction]" where the related bankruptcy is pending in the United States Bankruptcy
Court for the District of Delaware. *Hopkins v. Plant Insulation Co.*, 342 B.R. 703, 708 (D. Del. 2006) (Farnan, J.).

obviate the tremendous expense of trying these cases [all involving one brand of intrauterine device] separately," and that centralization would ensure the "fair and non-preferential resolution of the . . . claims," as critical to "the development of a reasonable plan of reorganization for the debtor." *Id.* at 1011-14. *See also In re Montreal Maine & Atl. Ry., Ltd.*, No. 1:13-MC-00184-NT, 2014 WL 1155419, at *5, *9-10, *12 (D. Me. Mar. 21, 2014) (transferring product liability claims against non-debtors under § 157(b)(5), finding "related to" jurisdiction based on shared insurance with and "an unconditional right to indemnification from" debtor); *In re Nutraquest, Inc.*, No. 03-5869 (GEB), 2004 U.S. Dist. LEXIS 29143, at *42-43 (D.N.J. Mar. 5, 2004) (denying motion to remand and finding "related to" jurisdiction over transferred claims against non-debtors, citing the "strong legislative presumption in favor of transfer under §157(b)(5)") (quoting *In re Twin Labs.*, 300 B.R. 836, 841 (S.D.N.Y. 2003)).

As in these cases, consolidation of the Talc Claims in this Court under § 157(b)(5) is appropriate and will "further the prompt, fair, and complete resolution of all claims 'related to' bankruptcy proceedings, and harmonize Section 1334(b)'s broad jurisdictional grant with the oft-stated goal of centralizing the administration of a bankruptcy estate." *In re Dow Corning Corp.* (*Dow I*), 86 F.3d 482, 497 (6th Cir. 1996).[14] This is because J&J and the Debtors each assert that they: (1) owe one another indemnification obligations irrespective of plaintiffs' ability to prove liability; and (2) share insurance. These considerations are sure to impact the size of the Debtors' estates and thus the timing and amount of distribution to creditors.

## II.     THIS COURT HAS JURISDICTION OVER THE TALC CLAIMS.

28 U.S.C. § 1334(b) grants original jurisdiction in federal district courts over, among other things, "all civil proceedings . . . related to cases under title 11." A "related to" case

---

[14] To further promote "prompt, fair, and complete resolution" of the Talc Claims by resolving common threshold issues of fact, law, and science efficiently, this Court may hold *Daubert* hearings on, for example, whether the talc supplied by the Debtors in J&J's talcum powder products is capable of causing mesothelioma.

represents "the broadest of the potential paths to bankruptcy jurisdiction." *In re Resorts Int'l, Inc.*, 372 F.3d 154, 163 (3d Cir. 2004). Such a case is one that "could *conceivably* have *any effect* on the estate being administered in bankruptcy." *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984), *overruled on other grounds by Things Remembered, Inc. v. Petrarca*, 516 U.S. 124, 129 (1995). "A key word in this test is 'conceivable.' Certainty, or even likelihood, is not a requirement." *In re Marcus Hook Dev. Park, Inc.*, 943 F.2d 261, 264 (3d Cir. 1991). As clarified by later cases, *Pacor*'s "conceivable effect" test asks "whether the allegedly related lawsuit would affect the bankruptcy without the intervention of yet another lawsuit." *In re W.R. Grace & Co.*, 591 F.3d 164, 172 (3d Cir. 2009) (quoting *Fed. Mogul Glob.*, 300 F.3d at 382). This test effectively asks: must underlying liability be resolved or must factual findings be made before the "effect" on the estate is felt? *See id.* Here, the answer is "no."

Critically, "related to" jurisdiction may extend to "suits *between third parties* that conceivably may have an effect on the bankruptcy estate." *W.R. Grace & Co.*, 591 F.3d at 171; *see also Nuveen Mun. Tr. ex rel. Nuveen High Yield Mun. Bond Fund v. WithumSmith Brown, P.C.*, 692 F.3d 283, 297-98 (3d Cir. 2012). And courts applying *Pacor* consistently recognize that suits against third parties implicating indemnification obligations owed by, or insurance policies shared with, the debtor may give rise to "related to" jurisdiction. *See, e.g.*, *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 230-31 (3d Cir. 2005); *In re Quigley Co., Inc.*, 676 F.3d 45, 53–57 (2d Cir. 2012). Such jurisdiction may be exercised even when the parties resist their obligations to indemnify or insure.[15] Other factors supporting a finding of "related to" jurisdiction include the underlying personal injury liability being "based on a single product,"

---

[15] *See In re W.R. Grace & Co.*, 386 B.R. 17, 28-29 & n.45 (Bankr. D. Del. 2008) (finding "related to" jurisdiction over claims against non-debtor on the basis of indemnification right and shared insurance although "[d]ebtors do not acknowledge liability to [non-debtors] under any of these circumstances"); *In re W.R. Grace & Co.*, 315 B.R. 353, 357-58 (Bankr. D. Del. 2004) (validity or ambiguity of contract setting forth indemnity is not relevant to determination of "related to" jurisdiction).

and a majority of plaintiffs asserting personal injury claims against both the debtor and non-debtor co-defendant, such that the parties share an identity of interest. *See Dow I*, 86 F.3d at 493; *W.R. Grace & Co.*, 386 B.R. at 30–33; *cf. Combustion Eng'g*, 391 F.3d at 230–31 (distinguishing "single product" in *Dow* from claims concerning different products, materials, and markets in *Combustion*).

### A. Under the Parties' Contractual Indemnification Rights and Obligations, the Talc Claims Immediately Impact the Debtors' Bankruptcy Estates.

While inchoate common law indemnity claims are not enough to confer "related to" jurisdiction under Third Circuit law, contractual indemnifications present "a more direct threat" to a debtor's estate and its reorganization. The key inquiry in this analysis is whether an indemnification right "has accrued upon the filing of a civil action," such that it is "not contingent on a factual finding." *In re Lower Bucks Hosp.*, 488 B.R. 303, 314 (E.D. Pa. 2013), *aff'd*, 571 F. App'x 139 (3d Cir. 2014) (citing *In re Federal-Mogul Global, Inc.*, 300 F.3d 368, 382 (3d Cir. 2002)). *See, e.g.*, *id.* (finding "related to" jurisdiction upon interpreting contracts to impose indemnification obligations triggered "at least in part . . . upon the filing of [a lawsuit]," and thus "not contingent upon a finding of liability"); *In re LTC Holdings, Inc.*, 587 B.R. 25, 38–39 (Bankr. D. Del. 2018) (finding "related to" jurisdiction on the basis of a contractual indemnification claim, reasoning that "[a]ny possible defenses by the Debtors against [non-debtor's] claim are not enough to derail jurisdiction over [action against non-debtor]. In other words, the Debtors' liability to [non-debtor] under the indemnification is not contingent on a finding of liability. . . . [The] indemnification claim has fully vested and can be acted upon at any point during the [action]"). And in keeping with *Pacor*, courts within the Third Circuit have found that contractual indemnity rights are fully vested, and unconditionally triggered, when their terms cover expenses or liabilities incurred in actions pre-judgment, regardless of the

indemnitee's fault—*e.g.*, when they create a duty to defend,[16] protect against any loss,[17] or obligate the indemnitor to attorney's fees and expenses.[18] *Pacor*'s test is also met where a creditor's recovery from a non-debtor could conceivably alter the amount of recovery by impacting the pool of assets available for distribution from a bankruptcy estate. *See Nuveen*, 692 F.3d at 297–98 & n.8.

Here, under express contractual language, rights and obligations of the Debtors vested immediately upon the filing of the Talc Claims—without regard to the claims' resolution in court—because certain contracts required the Debtors to defend J&J from and against *all* liabilities. Ex. 2 (1989 Agreement) § 10; Ex. 3 (2001 Agreement) § 7(a)(iv). These rights and obligations effectively decrease the pool of assets available to satisfy the Debtors' creditors. Citing other contractual provisions, the Debtors claim that J&J owes them a duty to defend. *See* Ex. 2 (1989 Agreement) § 11; Ex. 5 (2011 Agreement) ¶ 6; Ex. 12 (Demand Letter). Under others provisions still, the Debtors claim J&J must protect them against "any and all" losses, including attorneys' fees they incur; such an obligation potentially increases the size of the estates or reduces the Debtors' liabilities to the plaintiffs. *See* Ex. 7 (SPA) § 11.2(vi); *Nuveen*, 692 F.3d at 297–98 & n.8; *In re SemCrude, L.P.*, 428 B.R. 82, 99 (Bankr. D. Del. 2010) (exercising "related to" jurisdiction where, although not yet fixed, a co-defendant's obligation to a claimant would have discharged a liability of the debtors).

None of these cross-contractual obligations is contingent upon plaintiffs proving liability

---

[16] *See In re Millennium Lab Holdings II, LLC*, 591 B.R. 559, 583–84 (D. Del. 2018) ("contractual obligations to advance defense costs . . . before any final determination on the merits" supported "related to" jurisdiction); *Lower Bucks*, 488 B.R. at 316 (obligation to assume the defense was triggered upon the filing of the complaint).

[17] *See Royal Indem. Co. v. Admiral Ins. Co.*, No. 07-2048 (RBK), 2007 U.S. Dist. LEXIS 85991, at *13 (D.N.J. Nov. 19, 2007) (finding "related to" jurisdiction because claims under provision to indemnify and hold harmless against any loss were ripe).

[18] *See LTC Holdings*, 587 B.R. at 38 (indemnification "clearly cover actions pre-judgment, regardless of fault by the [non-debtor indemnitee]" where it included, among other things, attorneys' expenses).

in talc actions or upon separate findings of fact, and thus cases in which courts have rejected "related to" jurisdiction on the basis of purported indemnification rights are distinguishable.[19] This Court need not net out the bilateral indemnities before exercising "related to" jurisdiction over the Talc Claims.[20] Rather, this Court should exercise "related to" jurisdiction because the contractual rights and obligations commenced *with* the Talc Claims. *See Lower Bucks*, 488 B.R. at 314. Moreover, these obligations will have a direct impact on what is available to distribute to the Debtors' creditors.

### B.    Shared Insurance Further Impacts the Debtors' Estates.

Courts have found that claims against non-debtor defendants who share insurance with the debtor also support "related to" jurisdiction. Jurisdiction may arise in this context because shared policies are considered property of the debtor's estate and prosecution of a claim against a co-insured non-debtor could deplete proceeds available to the debtor, reducing assets available to the bankruptcy estate. *See, e.g.*, *Quigley*, 676 F.3d at 53-54, 58 ("[W]here litigation of the [lawsuits against non-debtor] would almost certainly result in the drawing down of insurance policies that are part of the bankruptcy estate of [debtor], the exercise of bankruptcy jurisdiction to enjoin these suits was appropriate."); *Dow I*, 86 F.3d at 494–95 ("[T]he possible depletion of insurance policies depends on contingencies sufficiently immediate to support a finding of

---

[19] *Cf., e.g.*, *Combustion Eng'g, Inc.*, 391 F.3d at 231-32 (noting a lack of "express indemnification obligations"); *Fed. Mogul Glob., Inc.*, 300 F.3d at 382 (no jurisdiction where potential indemnification and contribution claims against debtor had not yet accrued and would require a subsequent lawsuit before they could affect the debtor's bankruptcy); *Steel Workers Pension Tr. v. Citigroup, Inc.*, 295 B.R. 747, 753 (E.D. Pa. 2003) (no "related to" jurisdiction where "[u]nder the contract, liability is not automatic [because Debtor] agrees to indemnify the . . . defendants *only if certain conditions are satisfied*. . . . Thus, before an indemnification claim arises, there must be a fact finding process which results in a determination favorable to the defendants").

[20] *See, e.g.*, *Dow I*, 86 F.3d at 494 ("The potential for [the debtor]'s being held liable to the nondebtors in claims for contribution and indemnification, *or vice versa*, suffices to establish a conceivable impact on the estate in bankruptcy."); *Montreal Maine*, 2014 WL 1155419, at *9 (D. Me. Mar. 21, 2014) ("The Claimants state product liability claims against [non-debtor] as the manufacturer and owner of [railroad cars] involved in the disaster. The Master Lease requires the [debtor] to indemnify [the non-debtor manufacturer] against these claims. . . . [T]he Court concludes that [non-debtor] has established an unconditional right to indemnification from the [debtor], and thus, that claims against it are related to the [debtor's] bankruptcy.").

'related to' jurisdiction."); *A.H. Robins*, 788 F.2d at 1008 (sustaining injunction and transfer of claims against non-debtors in part because such claims, if successful, would reduce insurance funds available to debtor's estate); *Montreal Maine*, 2014 WL 1155419, at *10 (finding jurisdiction and transferring non-debtors' cases based on shared insurance); *see also MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 92 (2d Cir. 1988) ("[A] debtor's insurance policies are property of the estate, subject to the bankruptcy court's jurisdiction.").

Here, insurance is available to J&J under the CGL Policies. Denton Decl. ¶¶ 6-7. The Debtors maintain that they are entitled to coverage under those policies. *See, e.g.*, *id.* ¶¶ 13-16; Ex. 1 (First Day Decl.) ¶¶ 38, 42. Likewise, the Proposed Future Claimants' Representative ("FCR") asserted in its Motion to Intervene in an adversary proceeding that *the Debtors have the right to seek up to approximately $2 billion in insurance proceeds from policies issued to J&J and its subsidiaries.* *See* Ex. 13 (FCR Mot.) ¶ 19. Additionally, Debtor ITA was to maintain policies naming J&J as an insured under its 2001 Supply Agreement obligations, thus entitling J&J to proceeds from such policies. *See* Ex. 3 (2001 Agreement) § 12, Annex C. To the extent a claim is prosecuted against J&J, it may look directly to these shared policies to satisfy any judgment. This fact alone has been decisive in establishing "related to" jurisdiction. *See Montreal Maine*, 2014 WL 1155419, at *10.

### C. The Parties Share an Identity of Interest Because a Claim Against J&J is, in Essence, a Claim against Imerys.

The Debtors have historically been the sole supplier of talc to J&J. Under similar circumstances, courts—including the Bankruptcy Court for the District of Delaware—have exercised "related to" jurisdiction where the debtor shared an identity of interest with its non-debtor co-defendants. In *A.H. Robins*, the Fourth Circuit described the hallmark "unusual circumstances" establishing this basis: where "there is such identity between the debtor and the

third-party [non-debtor] defendant that the debtor may be said to be the real party defendant."

788 F.2d at 999. Drawing on *A.H. Robins*, in *Dow I*, the Sixth Circuit concluded that "related to"

jurisdiction existed over thousands of claims against non-debtor manufacturers of silicone breast

implants, where the debtor supplied the silicone materials to those non-debtors. *See Dow I*, 86

F.3d at 482, 493-94 & n.11. The nature of the claims asserted in the so-called "Supplier Actions"

and others against non-debtors established that the debtor and non-debtor defendants were

"closely related" with regard to their roles in the breast implant litigation. *See id.* at 493.

Recently, in *In re TK Holdings, Inc.*, Judge Shannon of this District's Bankruptcy Court

exercised "related to" jurisdiction over hundreds of personal injury, wrongful death, and so-

called Lemon Law claims pending against non-debtor car manufacturers, or OEMs, alleging

injury arising from their use of Takata airbags. *See* Ex. 14 (TKH Hr'g Tr.). Addressing the

identity of interest between the debtors and non-debtors (and distinguishing *Federal-Mogul*),

Judge Shannon reasoned:

> This case before me today is not analogous to an asbestos case
> where there are often dozens of potentially responsible parties,
> each one effectively to the exclusion of the others and a persistent
> and legitimate question of whether a plaintiff has any actual
> relationship to a particular defendant. Here, every single claimant
> knows the vehicle they purchased and can establish the fact that it
> contains a Takata airbag system.

Ex. 14 (TKH Hr'g Tr.) at 16:17–25. In other words, as here, there was no question that every

claim against the non-debtor OEMs related directly to the debtors' alleged conduct.[21] Nor are the

facts here analogous to a traditional asbestos case. Each Talc Claim plaintiff can draw a direct

line between the bottles of J&J's talcum powder products allegedly used and the Debtors' talc.

Thus, each claim against J&J by its terms directly implicates the Debtors.

---

[21] Similarly, the bankruptcy court in *W.R. Grace & Co.* recognized an identity of interest where the debtor's mining operations and conduct were "at the core of the issues raised" in actions against a non-debtor railroad—arguably "a proximate cause" of the plaintiffs' injuries. 386 B.R. at 30-31.

Case 1:19-cv-01230-RGA Document 94-1 Filed 04/18/19 Page 21 of 27 PageID #: 825
Case 19-01230-LSS Doc 104 Filed 04/26/19 Entered 04/26/19 17:07:42 Desc
Exhibit C - Part 2 of 5 Memo of Law    Page 21 of 27

## III.    THIS COURT SHOULD HEAR THE STATE COURT TALC CLAIMS.

Although 28 U.S.C. § 1334(c) provides this Court two ways to abstain from hearing the State Court Talc Claims[22]—mandatory and permissive—courts have advised that "[t]ransfer should be the rule, abstention the exception" under § 157(b)(5). *In re Pan Am. Corp.*, 950 F.2d 839, 845 (2d Cir. 1991). Here, abstention would run counter to the efficient and equitable administration of the Debtors' estates.

### A.    A Mandatory Abstention Analysis Does Not Apply Here.

Mandatory abstention is inapplicable in this case. 28 U.S.C. §§ 157(b)(4) and (b)(2)(B) together provide that § 1334(c)(2) does not apply to the liquidation of personal injury or wrongful death claims against a debtor's estate. And courts have found that § 157(b)(2)(B) "encompass[es] not only personal injury and wrongful death claims, but also claims for contribution or indemnity that *derive from* personal injury or wrongful death claims." *New England Compounding*, 496 B.R. at 270-72. That is because "indemnity claims are simply procedural vehicles for asserting liability against the estate for some underlying harm," and "[a] narrower reading would create a potentially gaping loophole in the carefully crafted system for the orderly administration of bankruptcy estates." *Id.*[23]

Even if a mandatory abstention analysis *could* apply, § 1334(c)(2) requires a district court

---

[22] Although 28 U.S.C. § 157(b)(5) contains mandatory language ("shall order"), some courts have construed the provision to give the district courts discretion to leave cases in state court. *See, e.g.*, *Pan Am.*, 950 F.2d at 844. "A motion under section 157(b)(5), therefore, requires an abstention analysis." *Id.* Here, because J&J moves under § 157(b)(5) to fix venue in this forum, it is this Court—rather than the removal district courts—that would engage in abstention analyses. *Cf.*, *e.g.*, *Hopkins*, 342 B.R. at 710; *New England Compounding*, 496 B.R. at 270.

[23] *See also Hopkins*, 342 B.R. at 709-10 (mandatory abstention does not apply, per § 157(b)(4), "to the liquidation of personal injury tort or wrongful death cases," including those not "against the debtor or the debtor's property"); *Nutraquest, Inc.*, 2004 U.S. Dist. LEXIS 29143, at *44 (concluding mandatory abstention does not apply to cases, including against non-debtors, transferred pursuant to § 157(b)(5)); *Abbatiello v. Monsanto Co.*, No. 06 CIV. 266 (KMW), 2007 WL 747804, at *3 (S.D.N.Y. Mar. 8, 2007) ("[T]he exception to mandatory abstention also applies to litigation against [non-debtor defendants], because [debtor] is obligated to indemnify [non-debtor defendants] for any judgment awarded against them."); *Berry v. Pharmacia Corp.*, 316 B.R. 883, 889 (S.D. Miss. 2004) ("[T]he rationale for exempting personal injury and wrongful death claims against the debtor's estate from the mandatory abstention provision applies fully to the claims against [non-debtor defendant].").

to remand a claim only where: (1) although related to a Title 11 case, the claim does not arise under Title 11 or arise in a Title 11 case; (2) the claim could not have been commenced in federal court but-for the jurisdictional basis afforded by Section 1334; *and* (3) the state court can timely adjudicate the claim. The State Court Talc Claims do not satisfy these requirements.

Indeed, the state courts from which the claims are removed, despite their best efforts, cannot adjudicate them in a "timely" fashion relative to a single federal court, which has the ability to consolidate the cases in regard to key common threshold issues and streamline pretrial proceedings, in concert with and consideration of the Debtors' bankruptcy proceedings. The administrative options available to this Court would benefit not only the Debtors, but their creditors, whom the Bankruptcy Code was also enacted to protect by promoting uniformity and the expeditious resolution of claims. This is far preferable to duplicative proceedings across the country that threaten to decrease the size of the Debtors' estates in light of indemnification claims and the depletion of available insurance assets. Additionally, district courts would have original diversity jurisdiction over the majority of the removed State Court Talc Claims (*i.e.*, those with complete diversity between J&J, a New Jersey citizen, and plaintiffs). *See Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 419 (3d Cir. 2010)).[24] Accordingly, mandatory abstention is neither appropriately applied nor triggered.

### B.    This Court Should Decline To Permissively Abstain.

Permissive abstention is also unwarranted. Although a district court may abstain "in the interest of justice, or in the interest of comity with State courts or respect for State law," 28 U.S.C. § 1334(c)(1), courts have questioned whether permissive abstention is proper in

---

[24] To the extent the Court finds it necessary (it is not), it may abstain only as to claims brought by New Jersey resident plaintiffs and/or transfer their ovarian cancer-related claims directly to the MDL.

connection with a § 157(b)(5) transfer.[25] Indeed, because of the statutory purpose behind Section

157(b)(5), permissive abstention should be "rarely invoked" in circumstances like these. *Beck*,

277 B.R. at 181. It is against this backdrop that courts should consider the twelve permissive

abstention factors. *See In re Twin Labs.*, 300 B.R. at 841.[26] Application of these factors—in

keeping with Congressional intent and the presumption in favor of transfer—favors transfer of

the State Court Talc Claims to this District.

1.    *The Effect on the Efficient Administration of the Estate Favors Transfer.*

The flood of personal injury and wrongful death claims arising out of alleged exposure to

the Debtors' talc caused the filing of the Debtors' bankruptcy. As described above, these claims'

resolution will impact the bankruptcy estates. Therefore, they will also impact the overall theory,

timing, and implementation of any chapter 11 plan. Accordingly, the aggregation of the Talc

Claims in this Court will further judicial efficiency and the "prompt, fair, and complete

resolution" of all claims. *See, e.g.*, *In re Dow Corning Corp.* (*Dow II*), 113 F.3d 565, 571 (6th

Cir. 1997) (issuing writ of mandamus following district court's abstention, citing need to avoid

diminishment of assets and efficient and fair administration of estate); *Nutraquest, Inc.*, 2004

U.S. Dist. LEXIS 29143, at *45 (finding abstention improper on this factor because "[t]he

centralization of all personal injury and wrongful death claims [including those against non-

---

[25] *See Pan Am.*, 950 F.2d at 845 (permissive abstention would "contraven[e] the legislative history"); *Beck v. Victor Equip. Co., Inc.*, 277 B.R. 179, 181 (S.D.N.Y. 2002) (discretionary abstention would "undercut the statutory purpose of § 157(b)(4)"); *see also Nutraquest, Inc.*, 2004 U.S. Dist. LEXIS 29143, at *43 (recognizing the "strong legislative presumption in favor of transfer under § 157(b)(5) . . . [where] federal courts have a virtually unflagging obligation . . . to exercise" their jurisdiction).

[26] These factors include: (1) the effect or lack thereof on the efficient administration of the estate, (2) the extent to which state law issues predominate over bankruptcy issues, (3) the difficulty or unsettled nature of the applicable state law, (4) the presence of a related proceeding commenced in state court or other nonbankruptcy court, (5) the jurisdictional basis, if any, other than 28 U.S.C. § 1334, (6) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case, (7) the substance rather than form of an asserted "core" proceeding, (8) the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court, (9) the burden [on] the court's docket, (10) the likelihood that the commencement of the proceeding in bankruptcy court involves forum shopping by one of the parties, (11) the existence of a right to a jury trial, and (12) the presence in the proceeding of non-debtors. *Id.*

debtors] will assist in 'developing a reasonable plan of reorganization' or orderly plan of liquidation 'and at the same time assure fair and non-preferential resolution of outstanding claims.'") (quoting *Dow I*, 86 F.3d at 496). Abstention, conversely, would only create undue delay. *See, e.g.*, *New England Compounding*, 496 B.R. at 273 (finding abstention would be "counterproductive" to judicial efficiency and the fair and efficient distribution of the estate).

### 2. The Talc Claims are Integrally Related To the Debtors' Reorganization.

The Talc Claims are integrally related to the Debtor's bankruptcy case for the same reasons this Court has "related to" jurisdiction: J&J and the Debtors possess shared insurance and bilateral contractual indemnification obligations. The impact these have on the Debtors' estates and creditors, in turn, depend on expenses and determinations of liability and damages in the Talc Claims. *See Dow II*, 113 F.3d at 571 (noting that non-debtor co-defendants share joint insurance coverage with the debtors in determining whether district court's permissive abstention was appropriate); *New England Compounding*, 496 B.R. at 271–73 ("[T]he primary focus of the plan will likely be satisfying, to the maximum extent possible, the unsecured claims of injured plaintiffs for damages and possibly of third parties for contribution or indemnity. Thus, decisions on factual and legal issues as to liability and damages in all of the state-court cases will likely have tremendous import on the bankruptcy proceedings and the reorganization plan."). Thus, resolution of the Talc Claims—the very impetus for the Debtors' petitions—will be determinative of the Debtors' reorganization efforts, and weighs against abstention.

### 3. Risk of Inconsistent Results, Waste, and Delay Favors Transfer.

The thousands of State Court Talc Claims all allege personal injuries or wrongful death caused by alleged exposure to the Debtors' talc. All present the same overlapping sets of key threshold issues relating to the alleged contamination of the Debtors' talc, whether it can cause cancer, and the state of industry knowledge regarding the safety of talc. Therefore, transfer and

coordination of these claims will allow this Court to resolve certain threshold issues, significantly reducing the waste of judicial resources. *See Pan Am.,* 950 F.2d at 845 (describing the "manifest purpose of [§] 157(b)(5)" as "consistent with Congress' desire to eliminate the confusion, delay and inefficiencies associated with the Bankruptcy Act's limited jurisdictional scheme."). Further, the State Court Talc Claims have been filed in multiple courts before multiple judges. Their transfer to this single Court will prevent disparate outcomes. Thus, this factor favors transfer.

>        4.      *Settled State Tort Law and Jury-Trial Rights Do Not Require Abstention.*

The State Law Talc Claims are based primarily on state tort laws which give a right to a jury trial. Nevertheless, these state law factors need not be afforded any weight. By enacting 28 U.S.C. § 157, Congress specifically "singled out" personal injury claims, which are "almost always governed by state law," "as the very ones it wanted transferred." *In re Twin Labs.*, 300 B.R. at 841. Similarly, the right to a jury trial should not impact this Court's analysis because the plaintiffs have not lost that right; the very provision under which J&J is moving fixes venue for where "claims shall be tried." 28 U.S.C. § 157(b)(5). Moreover, abstention based on the predominance of state law is only warranted where "a particularly unusual question" or "unsettled questions" of state law exists. *Pan Am.*, 950 F.2d at 846. Indeed, § 1334(c)(1) was enacted in response to a case that required the interpretation of unsettled law. *See id.* Here, the State Court Talc Claims consist of well settled, statutory and/or common law product defect claims. None of the law is "difficult, unsettled, or unfamiliar to a federal court." *See In re Twin Labs.*, 300 B.R. at 841. Abstention gets no weight here.

>        5.      *Debtors, Not J&J, Chose This Forum.*

As has already been partly achieved through the aggregation of over 80% of like cases in the MDL, J&J now seeks to centralize the claims against it in the fewer than 20% of remaining

talc actions to avoid inefficiencies, inconsistencies, and delays—the very policies Congress sought to further in enacting § 157(b)(5). The Debtors, not J&J, selected this forum for their bankruptcy petition, and J&J is not seeking to thwart the Debtors' choice. *Cf. Hopkins*, 342 B.R. at 717 (concluding that "[*plaintiff*-debtor's] opposition to the transfer, coupled with the lack of precedent for applying Section 157(b)(5) *to frustrate the debtor/plaintiff's choice of forum* are additional factors" weighing in favor of abstention). J&J is seeking to fix a consolidated venue for claims that directly impact the Debtors' estates in the Debtors' chosen forum. There is no mechanism to aggregate all of the claims in a single state court forum. Thus, this factor does not favor abstention.

## IV.    UNDER SECTION 157(b)(5), THIS COURT MAY FIX VENUE FOR CLAIMS OR CAUSES OF ACTION, EVEN IF THEY HAVE ALREADY BEEN REMANDED.

To the extent any of the district courts have remanded the State Court Talc Claims at the time of this Court's decision, such remand does not diminish this Court's power to fix venue under § 157(b). In *Hopkins*, Judge Farnan of this Court expressly recognized that "the Court may consider the transfer of this case under Section 157(b) regardless of the decisions reached by the California court on the transfer and remand issues." Ex. 15 (*Hopkins*, 06-cv-298-JJF (D. Del. May 22, 2006), Mem. Order) at 3.[27]

### CONCLUSION

For the foregoing reasons, this Court should grant J&J's motion and fix venue in this Court for the Talc Claims, thus enabling an efficient, consolidated adjudication of common threshold issues.

---

[27] *See also A.H. Robins*, 788 F.2d at 998 (affirming district judge's order transferring claims, *wherever pending*, to a single forum); *Dow I*, 86 F.3d at 493 (citing with approval the order entered in *A.H. Robins*).

As noted, through its removal filings, J&J is alerting the district courts to this motion and seeking a stay of consideration of any motions for remand pending this Court's ruling.

Dated:   April 18, 2019
         Wilmington, Delaware

Respectfully submitted,

**DRINKER BIDDLE & REATH LLP**
*/s/ Steven K. Kortanek*
Steven K. Kortanek (Del. Bar No. 3106)
Patrick A. Jackson (Del Bar No. 4976)
Joseph N. Argentina, Jr. (Del. Bar No. 5453)
222 Delaware Ave., Suite 1410
Wilmington, DE 19801-1621
Telephone: (302) 467-4200
Facsimile: (302) 467-4201
Steven.Kortanek@dbr.com
Patrick.Jackson@dbr.com
Joseph.Argentina@dbr.com

-and-

WEIL, GOTSHAL & MANGES LLP
Diane P. Sullivan
Marcia L. Goldstein
Ronit J. Berkovich
Rachel A. Farnsworth
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Johnson & Johnson and*
*Johnson & Johnson Consumer Inc.*