Case 19-01232-KCF    Doc 2-1    Filed 04/30/19    Entered 04/30/19 15:48:04    Desc
Exhibit C - Nolan Decl. Exhs. 4 to 12    Page 1 of 69

Case 1:19-mc-00103-UNA    Document 4-4    Filed 04/18/19    Page 1 of 6 PageID #: 453

# EXHIBIT 4

Case 19-01232-KCF    Doc 2-1    Filed 04/30/19    Entered 04/30/19 15:48:04    Desc
Exhibit C - Nolan Decl. Exhs. 4 to 12    Page 2 of 69

c-00103-UNA    Document 4-4    Filed 04/18/19    Page 2 of 6 PageID #: 454



## MATERIAL PURCHASE AGREEMENT
### COVER SHEET

Johnson & Johnson Consumer Companies, Inc., a New Jersey Corporation ("BUYER"), and Luzenac America, Inc., a Delaware corporation ("SELLER"), intending to be legally bound, hereby covenant and agree to purchase and sell, respectively, the Material, on the following terms and conditions:

MATERIAL:  The Material covered by this Agreement shall be the material (the "Material") set forth in Attachment A, attached hereto and incorporated herein by this reference.

QUANTITY:  During the Term of this Agreement, BUYER shall purchase from SELLER one hundred percent (100%) of BUYER's and BUYER's Affiliates' collective talc requirements by purchasing the Material with respect to each of the locations listed in Attachment C (the "Facilities"). The percentage of BUYER's and BUYER's Affiliates' total requirements of the Material purchased from SELLER during the Term may be confirmed by SELLER as set forth in Attachment A. An "Affiliate" of BUYER shall mean any direct or indirect subsidiary of BUYER and any other person or entity controlled by, controlling or under common control of BUYER.

SELLER is not obligated to supply Material to BUYER (i) in any quarter in excess of 1/4 x the maximum annual quantity shown for such Material in Attachment A or (ii) in any month in excess of 1/12 x the maximum annual quantity shown for such Material in Attachment A.

CONTRACT TERM:  January 1, 2010 through December 31, 2011, subject to earlier termination as provided herein (the "Term").

PRICE AND TERMS OF PAYMENT:  The prices for the Material covered by this Agreement shall be as set forth in Attachment B, attached hereto and incorporated herein by this reference.

DELIVERY TERMS:  The delivery terms for the Material shall be as set forth in Attachment C, attached hereto and incorporated herein by this reference.

BUYER'S LOCATION AND DELIVERY POINT:  The Material covered by this Agreement shall be delivered to the Facilities specified in Attachment C pursuant to the Shipment Schedule described therein.

GENERAL TERMS AND CONDITIONS OF SALE; AGREEMENT:  The General Terms and Conditions of Sale, attached hereto as Attachment D, are incorporated herein and made a part hereof by this reference. This Cover Sheet, the General Terms and Conditions of Sale, as modified or expanded by the terms of this Cover Sheet (including all Attachments hereto), are collectively referred to herein as the "Agreement". The Agreement shall constitute the agreed terms and conditions upon which BUYER is obligated to purchase and SELLER is obligated to sell the Material. In the event BUYER uses its own order acknowledgment form or any other form to accept this Agreement, such form shall be used for convenience only and any terms and conditions contained therein which are inconsistent with or in addition to those contained in this Agreement shall be and are rejected and shall be and are of no force and effect whatsoever between the parties unless expressly assented to in writing by the SELLER.

OTHER CONSIDERATIONS: BUYER will use commercially reasonable efforts to qualify SELLER's Australian ore as an alternate Material to be supplied under this Agreement by August 31, 2010.
IN THE EVENT BUYER SUCCESSFULLY QUALIFIES AUSTRALIAN ORE:
No later than August 31, 2010, BUYER and SELLER will discuss current costs and competitive pricing for such ore supply. Provided BUYER and SELLER can come to terms on acceptable pricing,

Case 19-01232-KCF    Doc 2-1    Filed 04/30/19    Entered 04/30/19 15:48:04    Desc
Exhibit C - Nolan Decl. Exhs. 4 to 12    Page 3 of 69

Case 1:19-mc-00103-UNA   Document 4-4   Filed 04/18/19   Page 3 of 6 PageID #: 455

SELLER will provide solely the Australian ore to BUYER through December 31, 2011 beginning on a date to be agreed to between the parties, which date shall represent a reasonable date to allow the parties to begin supplying and taking supply of the Australian ore. If Buyer and SELLER cannot come to terms on pricing for Australian ore supply by August 31, 2010, either party may terminate this Agreement on 30 days written notice.

**IN THE EVENT BUYER DOES NOT SUCCESSFULLY QUALIFY AUSTRALIAN ORE:**

If BUYER is unable to qualify SELLER's Australian ore by August 31, 2010 due to the ore not meeting BUYER's specifications as provided on Attachment A, BUYER or SELLER may terminate this Agreement at any time upon written 30 days written notice. SELLER may in its sole discretion continue to supply Chinese ore at the applicable prices stated on Attachment B through December 31, 2010, at which time this Agreement will automatically terminate.

IN WITNESS WHEREOF, the parties to this Agreement have executed the same as of the commencement date of the Term first above written.

SELLER
Luzenac America, Inc.

By _____
Name _____
Title _____

BUYER
Johnson & Johnson Consumer Companies, Inc.

By _David J. Radeke_
Name _David Radeke_
Title _V.P. GPO Global Supply Chain_

2

Case 19-01232-KCF    Doc 2-1    Filed 04/30/19    Entered 04/30/19 15:48:04    Desc
Exhibit C - Nolan Decl. Exhs. 4 to 12    Page 4 of 69

Case 1:19-mc-00103-UNA    Document 4-4    Filed 04/18/19    Page 4 of 6 PageID #: 456

**Attachment A**

MATERIAL SPECIFICATIONS

| Material | Grade | Maximum Purchase Quantity Metric Tons Per Year |
|---|---|---|
| *Grade 25* Talc* | As per J&J specification no. RM-008967 | 8,500 |

\* Manufactured from Guangxi Chinese Ore. Alternatively, the Material may be SELLER's Australian ore if the conditions in the "Other Considerations" Section of the Cover Sheet are met.

SELLER will consider filling orders in excess of the maximum purchase quantity on a case by case basis.

CONFIRMATION PROCEDURES

BUYER shall keep full and complete records and books of account with respect to all purchases of Material covered by the Agreement for a period of four (4) years after the close of the calendar year to which such records and books of account pertain. The SELLER may, at any time or times during or after the Term of the Agreement, request an independent audit of such records and books of account for the sole purpose of verifying that the total amount of each Material required to be purchased by BUYER from SELLER pursuant to the terms of the Agreement has been met. Any nationally recognized firm of independent certified public accountants designated by the SELLER and accepted by the BUYER shall, at any reasonable time or times and at the SELLER's expense, have the right to examine and audit such records and books of account maintained by the BUYER.

Case 19-01232-KCF    Doc 2-1    Filed 04/30/19    Entered 04/30/19 15:48:04    Desc
Exhibit C - Nolan Decl. Exhs. 4 to 12    Page 5 of 69

Case 1:19-mc-00103-UNA    Document 4-4    Filed 04/18/19    Page 5 of 6 PageID #: 457

**Attachment D**

GENERAL TERMS AND CONDITIONS OF SALE

    1.  Price; Taxes and Customs Duties; Conditions of Payment.  The price for the Material is as set forth on the face hereof. All prices are quoted, orders accepted, and billings rendered FCA Seller's facility and are exclusive of all federal, state and local excise, sales, use and similar taxes, and all import, export or customs duties, tariffs, or like charges, all of which shall be the responsibility of Buyer. Payment for Material shipped on approved credit is due net 30 days, or as stated on the face hereof, from date of invoice. Past due balances are subject to a late payment charge of 1.5% per month, or the maximum amount permitted by applicable law, whichever is less. Buyer shall pay all charges, costs and legal fees incurred in collecting amounts owed. Seller has the right to reschedule or cancel any order with Buyer if accounts are delinquent. If in the judgment of Seller the financial condition of Buyer at any time does not justify delivery upon the payment terms specified, Seller may require full or partial payment in advance.
    2.  Delivery and Risk of Loss.  All Material shall be delivered to Buyer as provided on the face hereof. Title shall pass to Buyer, and Buyer assumes all risk of loss, from the time the Material is loaded by Seller onto railcar or truck for shipment to Buyer at Seller's facility. In the absence of specific written instructions, Seller may exercise in its discretion the method of shipment. Unless otherwise agreed by the parties in writing, Seller shall have the exclusive right to arrange and book all freight for the transportation of the Material to Buyer. Delivery dates are the dates the Material is shipped from Seller's facility. Buyer shall be responsible for payment of all freight and transportation charges from Seller's point of loading to the delivery address specified on the face hereof. Delivery dates are approximate and are predicated on the prompt receipt by Seller of all necessary information and documentation from Buyer.
    3.  Quantity.  Actual weight of individual bags and other packaging may vary due to variations in the manufacturing process and packing equipment tolerances. Any claim for shortage must be made in writing to Seller within 30 days after Buyer's receipt of the Material. Seller is not obligated to deliver in any month more than a proportionate part of the maximum quantity specified, determined by dividing such maximum quantity by the total number of months included in the period of performance. When, in the opinion of Seller, there is a period of shortage of supply of said Material for any reason, Seller may allocate its available supply among any or all of its various customers upon such basis as it shall deem fair and practicable, with no liability on its part for failure to deliver the quantity or any portion therein specified.
    4.  Quality and Warranties.  Seller warrants that (1) the Material meets both Seller's general, published specifications and any additional specifications set forth on the face hereof; (2) Seller has good and sufficient title to the Material; and (3) the Material, as manufactured by Seller according to Seller's specifications, does not infringe any U.S. patent. Buyer has determined that Material with the quality characteristics conforming to such specifications will satisfy its contemplated use of the Material.  Upon Buyer's request, Seller shall prepare for Buyer for each shipment of Material a certificate of analysis describing the quality characteristics of such shipment pursuant to the sampling procedures specified in Section 5.  Buyer agrees that packaging material, which includes but is not limited to bags, supersacks, containers, shrink wrap, plastic wrap, dunnage bags and pallets ("Packaging Material"), shall only be used for shipment of Material from Seller to Buyer and that such Packaging Material shall be disposed of by Buyer in a manner that complies with all applicable laws.  Material on pallets in transport or in storage must be stored on a flat, load-bearing surface and bound to prevent shifting of the load.  Pallets are not suitable for and are not to be used for edge racking or stacking.  Buyer acknowledges that Material and Packaging Material must be protected from damage, moisture, excessive heat and ignition sources, and that personnel must be kept out of the path of any bags or pallets which may fall or shift during handling. Buyer assumes all risk of handling the Material at the point of delivery and Buyer agrees to indemnify Seller for claims by it or by third parties arising from such handling.
    **SELLER HEREBY EXPRESSLY DISCLAIMS (AND THEREFORE IS HEREBY EXCLUDED FROM THIS AGREEMENT) ANY OTHER WARRANTY, EXPRESS OR IMPLIED, AS TO THE MATERIAL AND PACKAGING MATERIAL, INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.  SELLER SHALL NOT BE LIABLE FOR ANY DAMAGE, LOSS, COST OR EXPENSE, OR BREACH OF WARRANTY, EXCEPT AS SET FORTH IN THIS SECTION 4. BUYER HEREBY WAIVES ALL CLAIMS FOR GENERAL, CONSEQUENTIAL, INCIDENTAL, OR SPECIAL DAMAGES AND AGREES THAT SELLER'S LIABILITY AND BUYER'S EXCLUSIVE REMEDY ARE EXPRESSLY LIMITED TO REPLACEMENT OF ANY MATERIAL AND PACKAGING MATERIAL WHICH DOES NOT MEET THE WARRANTY SET FORTH IN THIS SECTION 4, AND SUCH LIABILITY SHALL IN NO EVENT EXCEED THE PURCHASE PRICE FOR SUCH MATERIAL AND PACKAGING MATERIAL; PROVIDED THAT, NOTHING IN THIS PARAGRAPH SHALL BE DEEMED TO EXCLUDE OR LIMIT ANY LIABILITY UNDER ANY APPLICABLE LAW OR STATUTE WHICH, UNDER SUCH LAW OR STATUTE, CANNOT BE EXCLUDED OR LIMITED.**
    5.  Sampling and Analysis.  At the time the Material is loaded or packaged by Seller, whichever is earlier, Seller, at its expense, shall sample the Material in accordance with its normal sampling procedures. The results of sampling and analysis by Seller shall be final and conclusive for all purposes. Buyer's sole and exclusive remedy in the event delivered Material does not meet the quality standards set forth in Section 4 shall be to contact Seller and afford the Seller the opportunity to inspect and sample the Material.  If Seller agrees that the Material is nonconforming, Seller shall give instructions as to where to send the Material, at Seller's expense, and Buyer shall receive replacement Material in like quantities in lieu thereof. Rejection of such nonconforming Material shall be made not later than thirty (30) days after receipt by Buyer.
    6.  Defaults and Remedies.  If Seller defaults in any of its obligations hereunder, Buyer's sole remedy shall be refusal of delivery of Material or termination of this Agreement on the terms set forth below; if Buyer defaults in any of its obligations hereunder, Seller's remedies shall include suspension of performance together with all other rights and remedies at law or in equity which Seller may have as a result of Buyers default. If, despite any default by Buyer, Seller elects to continue to make deliveries, its action shall not constitute a waiver of any default by Buyer or in any way affect Seller's legal remedies for any such default. If Buyer defaults under this Agreement and the matter is placed in the hands of an attorney for collection, or suit is brought at law or in equity to enforce the provisions herein, Buyer agrees to pay attorneys' fees together with costs in addition to the amounts due hereunder. Seller shall indemnify, defend and hold harmless Buyer from any and all liability, claims, judgments or damages relating to any claims that the Material, as manufactured by Seller according to Seller's published specifications, violates any U.S. patent. Buyer agrees to indemnify, defend and hold harmless Seller from any and all liability, claims, judgments or damages relating to claims of patent infringement due to Buyer's alteration, use, reformulation or processing of the Material.
    7.  Force Majeure.  All obligations of either party hereunder (except the payment of money) shall be suspended while, but only so long as and to the extent that, such party is prevented from complying with such obligations in whole or in part by acts of God or of the public enemy, strikes, lockouts and other labor disputes, fire, flood, accidents, epidemics, quarantine restrictions, freight embargoes, earthquake, unusually severe weather, acts of war, terrorism, insurrection or mob violence, unforeseen shutdown or unavailability of major sources of supply, breakage of machinery or apparatus, laws, requirements, regulations or action of or the failure to act of any state, federal or local government, or

Case 19-01232-KCF    Doc 2-1    Filed 04/30/19    Entered 04/30/19 15:48:04    Desc
Exhibit C - Nolan Decl. Exhs. 4 to 12    Page 6 of 69

Case 1:19-mc-00103-UNA    Document 4-4    Filed 04/18/19    Page 6 of 6 PageID #: 458

any other matters beyond the reasonable control of said party which cannot be overcome by said party by means normally employed in the performance of this Agreement, whether similar to the matters herein specifically enumerated or otherwise. In the event of Seller's inability due to any of the above circumstances to supply all of the Material provided for hereunder, Seller reserves the right to allocate its available supply of Material among its purchasers, or any of them, as Seller, in its sole discretion, elects without liability to Buyer for any failure of performance which may result therefrom. The party affected by force majeure shall promptly and timely notify the other of the existence thereof, the expected delays, and the estimated effect upon its performance hereunder.

8. Product Safety and Product Stewardship Program. Buyer understands and acknowledges that as part of Seller's product stewardship program, Seller from time to time will issue notices regarding the safe use of Seller's products, including appropriate and inappropriate end uses of Seller's products. Seller has the right to refuse to sell Material to unlawful or inappropriate end-uses as determined by Seller. Buyer agrees to comply with such safety policies and end use restrictions in its use and sale of Seller's products. Buyer further agrees upon written request from Seller to confirm in writing that Buyer is complying with Seller's safety policies and end use restrictions. In no event shall Seller be responsible for any damage, injury or loss occasioned by the misuse of Material or Buyer's negligence.

9. Buyer as End User; No Assignment. Unless Buyer is duly authorized to distribute the Material pursuant to a written distribution agreement with Seller, it is agreed and understood that the Material is being purchased by Buyer for its internal use and, without the express written authorization of Seller, Buyer may not repackage, resell, or otherwise distribute the Material to third parties. In addition, Buyer shall have no right to assign or transfer (whether by operation, by law or otherwise) all or any part of its rights or obligations under this Agreement except with the prior written consent of the Seller and no delegation of any obligation of Buyer shall be made without the prior written consent of Seller; provided, however, that Buyer shall be permitted to assign this Agreement in its entirety in connection with a merger, consolidation, sale of all or substantially all of Buyer's assets or equity interests or similar business combination or reorganization involving Buyer and another corporation or entity. Any attempted assignment or delegation of Buyer shall be void and ineffective for all purposes unless made in conformity with this paragraph. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective permitted successors and assigns.

10. Compliance with Laws; Export. Both parties shall comply with all applicable laws and regulations. Buyer shall not sell, ship or allow trans-shipment of any Material in any manner contrary to the export laws of the United States of America, including without limitation, to any prohibited individual, firm or entity appearing in Denied Party Lists published by the U.S. government, such as the list of Specially Designated Nationals published by the U.S. Department of Treasury OFAC, or to any country subject to economic or trade sanctions imposed by the U.S., except as otherwise authorized by U.S. law. Buyer shall also comply with all applicable laws and regulations of any destination country.

11. Notices. Any notices, payments, or other information herein contemplated to be given, made or delivered to Seller or Buyer hereunder shall be sufficient if personally delivered, mailed, or sent by electronic facsimile at the address of such party set forth on the face hereof or to such other address as such party may from time to time designate to the other in writing.

12. Incorporation By Reference. Terms appearing on the face hereof that in any way alter, condition or explain these General Terms and Conditions are incorporated herein by this reference. All terms so incorporated shall supersede any conflicting or contrary provision contained in these printed General Terms and Conditions.

13. Entire Agreement; Interpretation; Amendment. This Agreement contains the entire agreement between the parties, and there are no oral understandings, representations or agreements relative to this Agreement which are not fully expressed herein. Any terms appearing on any Order or other form used by Buyer which would modify or conflict with the terms and conditions set forth herein are expressly rejected. Except for the purpose of negating implied warranties, no course of prior dealings between the parties and no usage of the trade shall be relevant to supplement or explain any term used in this Agreement. If any provision of this Agreement, or the application thereof to any person, place, or circumstance, shall be held by a court of competent jurisdiction to be invalid, unenforceable, or void, the remainder of this Agreement and such provisions as applied to other persons, places, and circumstances shall remain in full force and effect. No amendment, modification, or waiver of any provision of this Agreement shall be effective unless in writing and signed by the parties hereto.

14. Governing Law. This Agreement shall be governed by the laws of the State of Colorado.
RTM US GTC of Sale 2007.doc

7

Case 19-01232-KCF    Doc 2-1    Filed 04/30/19    Entered 04/30/19 15:48:04    Desc
Exhibit C - Nolan Decl. Exhs. 4 to 12    Page 7 of 69

Case 1:19-mc-00103-UNA    Document 4-5    Filed 04/18/19    Page 1 of 6 PageID #: 459

# EXHIBIT 5

Case 19-01232-KCF   Doc 2-1   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 4 to 12   Page 8 of 69

Case 1:19-mc-00103-UNA   Document 4-5   Filed 04/18/19   Page 2 of 6 PageID #: 460

## MATERIAL PURCHASE AGREEMENT
### COVER SHEET

Johnson & Johnson Consumer Companies, Inc. a New Jersey Corporation ("BUYER"), and Luzenac America, Inc., a Delaware corporation ("SELLER"), intending to be legally bound, hereby covenant and agree to purchase and sell, respectively, the Material, on the following terms and conditions:

MATERIAL: The Material covered by this Agreement shall be the material (the "Material") set forth in Attachment A, attached hereto and incorporated herein by this reference.

QUANTITY: During the Term of this Agreement, BUYER shall purchase from SELLER one hundred percent (100%) of BUYER's talc requirements by purchasing the Material with respect to the location listed in Attachment C (the "Facility"). The percentage of BUYER's total requirements of the Material purchased from SELLER during the Term may be confirmed by SELLER as set forth in Attachment A. Notwithstanding the foregoing, SELLER acknowledges and agrees that during the Term BUYER may qualify alternate materials and shall be permitted to purchase qualification batches of material solely for the purposes of material qualification. SELLER is not obligated to supply Material to BUYER in any quarter in excess of 1/4 x the maximum annual quantity shown for such Material in Attachment A

CONTRACT TERM: January 1, 2011 through December 31, 2011, unless extended through December 31, 2012 pursuant to the "Other Considerations" Section below (the "Term").

PRICE AND TERMS OF PAYMENT: The prices for the Material covered by this Agreement shall be as set forth in Attachment B, attached hereto and incorporated herein by this reference.

DELIVERY TERMS: The delivery terms for the Material shall be as set forth in Attachment C, attached hereto and incorporated herein by this reference.

BUYER'S LOCATION AND DELIVERY POINT: The Material covered by this Agreement shall be delivered to the Facility specified in Attachment C pursuant to the Shipment Schedule described therein.

OTHER CONSIDERATIONS: BUYER will use commercially reasonable efforts to qualify SELLER's Australian ore as an alternate Material to be supplied under this Agreement by June 30, 2011. BUYER may shift such efforts to qualification of other ores (including third party sources) if BUYER reasonably determines after consultation with SELLER, that SELLER's Australian ore will not meet BUYER's specifications as provided on Attachment A.

**IN THE EVENT BUYER SUCCESSFULLY QUALIFIES AUSTRALIAN ORE:**
No later than June 30, 2011, BUYER and SELLER will discuss current costs and competitive pricing for such ore supply. Provided BUYER and SELLER can come to terms on acceptable pricing by June 30, 2011, SELLER will provide solely the Australian ore to BUYER through December 31, 2012 beginning on a date to be agreed to between the parties, which date shall represent a reasonable date to allow the parties to begin supplying and taking supply of the Australian ore. The supply of Australian ore shall be under the terms and conditions of this Agreement as a written amendment hereto that incorporates the pricing terms for the Australian ore as mutually agreed by the parties. If Buyer and SELLER cannot come to terms on pricing for Australian ore supply by June 30, 2011, SELLER agrees to supply Chinese ore through December 31, 2011, or until an alternate source is qualified, whichever is earlier, at which point the contract for supply will terminate unless otherwise agreed to in writing by the parties.

**IN THE EVENT BUYER DOES NOT SUCCESSFULLY QUALIFY AUSTRALIAN ORE:**
If BUYER is unable to qualify SELLER's Australian ore by June 30, 2011 due to the ore not meeting BUYER's specifications as provided on Attachment A, SELLER agrees to supply Chinese ore through December 31, 2011, or until an alternate source is qualified, whichever is earlier, at which point the contract for supply will terminate unless otherwise agreed to in writing by the parties.

GENERAL TERMS AND CONDITIONS OF SALE; AGREEMENT: The General Terms and Conditions of Sale, attached hereto as Attachment D, are incorporated herein and made a part hereof by this reference. This Cover Sheet, the General Terms and Conditions of Sale, as modified or expanded by the terms of this Cover Sheet (including all Attachments hereto), are collectively referred to herein as the "Agreement". The Agreement shall constitute the agreed terms and conditions upon which BUYER is obligated to purchase and SELLER is obligated to sell the Material. In the event BUYER uses its own

Case 19-01232-KCF    Doc 2-1    Filed 04/30/19    Entered 04/30/19 15:48:04    Desc
Exhibit C - Nolan Decl. Exhs. 4 to 12    Page 9 of 69

Case 1:19-mc-00103-UNA    Document 4-5    Filed 04/18/19    Page 3 of 6 PageID #: 461

order acknowledgment form or any other form to accept this Agreement, such form shall be used for convenience only and any terms and conditions contained therein which are inconsistent with or in addition to those contained in this Agreement shall be and are rejected and shall be and are of no force and effect whatsoever between the parties unless expressly assented to in writing by the SELLER. For clarity, the parties acknowledge and agree that the Material Purchase Agreement between them, which was effective January 1, 2010, was terminated as of December 31, 2010 and is no longer in force or effect.

IN WITNESS WHEREOF, the parties to this Agreement have executed the same as of the commencement date of the Term first above written.

**SELLER PRE APPROVAL**

Legal

Sales

Marketing

CCO

| | |
|---|---|
| **SELLER** | **BUYER** |
| Luzenac America, Inc. | Johnson & Johnson Consumer Companies, Inc. |
| By | By _WALTER CHARLES III_ |
| Name: Gary Goldberg | Name _Walter Charles III_ |
| Title    CEO | Title _Vice President Consumer Direct_ |

Case 19-01232-KCF    Doc 2-1    Filed 04/30/19    Entered 04/30/19 15:48:04    Desc
Exhibit C - Nolan Decl. Exhs. 4 to 12    Page 10 of 69

Case 1:19-mc-00103-UNA    Document 4-5    Filed 04/18/19    Page 4 of 6 PageID #: 462

### Attachment A

### MATERIAL SPECIFICATIONS

| Material | Grade | Maximum Purchase Quantity Metric Tons Per Year |
|---|---|---|
| *Grade 25* Talc* | As per J&J specification no. RM-008967, current revision | 5,500 |

\* Manufactured from Guangxi Chinese Ore. Alternatively, the Material may be SELLER's Australian ore if the conditions in the "Other Considerations" Section of the Cover Sheet are met.

SELLER will consider filling orders in excess of the maximum purchase quantity on a case by case basis.

### CONFIRMATION PROCEDURES

BUYER shall keep full and complete records and books of account with respect to all purchases of Material covered by the Agreement for a period of one (1) year after the close of the calendar year to which such records and books of account pertain. The SELLER may, at any time or times during or after the Term of the Agreement, request an independent audit of such records and books of account for the sole purpose of verifying that the total amount of each Material required to be purchased by BUYER from SELLER pursuant to the terms of the Agreement has been met. Any nationally recognized firm of independent certified public accountants designated by the SELLER and accepted by the BUYER shall, at any reasonable time or times and at the SELLER's expense, have the right to examine and audit such records and books of account maintained by the BUYER.

Protected Document – Subject to Protective Order

Case 19-01232-KCF    Doc 2-1    Filed 04/30/19    Entered 04/30/19 15:48:04    Desc
Exhibit C - Nolan Decl. Exhs. 4 to 12    Page 11 of 69

Case 1:19-mc-00103-UNA    Document 4-5    Filed 04/18/19    Page 5 of 6 PageID #: 463

**Attachment D**

General Terms And Conditions Of Sale (2009)

1. Price; Taxes and Customs Duties; Conditions of Payment. The price for the Material is as set forth on the face hereof and shall be paid in the currency as set forth on the face hereof. All prices are quoted, orders accepted and delivered, and billings rendered FCA Seller's facility (Incoterms 2000) and are exclusive of all federal, state and local excise, sales, use, value added, general services and similar taxes, and all import, export or customs duties, tariffs, or like charges, all of which shall be the responsibility of Buyer. Payment for Material shipped on approved credit is due net 30 days, or as stated on the face hereof, from date of invoice. Past due balances are subject to a late payment charge of 1.5% per month, or the maximum amount permitted by applicable law, whichever is less. Buyer shall pay all charges, costs and legal fees incurred in collecting amounts owed. Seller has the right to reschedule or cancel any order with Buyer if accounts are delinquent. If in the judgment of Seller the financial condition of Buyer at any time does not justify delivery upon the payment terms specified, Seller may amend such payment terms or require full or partial payment in advance. For export sales, Seller, in its sole discretion, may require Buyer, at its cost and expense, to obtain an irrevocable standby letter of credit in favor of Seller issued or confirmed by a U.S. bank acceptable to Seller, in a form acceptable to Seller, and in an amount acceptable to Seller; and Seller shall have the right to draw against all or any portion of the letter of credit amount on sight.

2. Delivery and Risk of Loss. Title shall pass to Buyer, and Buyer assumes all risk of loss, from the time the Material is loaded by Seller onto railcar or truck for shipment to Buyer at Seller's facility. In the absence of specific written instructions, Seller may exercise in its discretion the method of shipment. Unless otherwise agreed by the parties in writing, Seller shall have the exclusive right to arrange and book all freight for the transportation of the Material to Buyer. Delivery dates are the dates the Material is shipped from Seller's facility. Buyer shall be responsible for payment of all freight and transportation charges from Seller's point of loading to the delivery address specified by Buyer. Delivery dates are approximate and are predicated on the prompt receipt by Seller of all necessary information and documentation from Buyer.

3. Quantity. Actual weight of individual bags and other packaging may vary due to variations in the manufacturing process and packing equipment tolerances. Any claim for shortage must be made in writing to Seller within 30 days after Buyer's receipt of the Material. If specified on the face hereof, or on any Cover Sheet or contract into which these General Terms are incorporated, Seller is not obligated to deliver in any month more than a proportionate part of the maximum quantity specified, determined by dividing such maximum quantity by the total number of months included in the period of performance. When, in the opinion of Seller, there is a period of shortage of supply of said Material for any reason, Seller may allocate its available supply among any or all of its various customers upon such basis as it shall deem fair and practicable, with no liability on its part for failure to deliver the quantity or any portion therein specified.

4. Quality and Warranties. Seller warrants that (1) when shipped, the Material meets both Seller's general, published specifications and any additional specifications set forth on the face hereof or on any Cover Sheet or contract into which these General Terms are incorporated; (2) Seller has good and sufficient title to the Material; and (3) the Material, as manufactured by Seller according to Seller's specifications, does not infringe any U.S. patent. Buyer has determined that Material with the quality characteristics conforming to such specifications will satisfy its contemplated use of the Material. Upon Buyer's request, Seller shall prepare for Buyer for each shipment of Material a certificate of analysis describing the quality characteristics of such shipment pursuant to the sampling procedures specified in Section 5. Buyer agrees that packaging material, including pallets ("Packaging Material") shall only be used for shipment of Material from Seller to Buyer and that such Packaging Material shall be disposed of by Buyer in a manner that complies with all applicable laws. Material on pallets in transport or in storage must be stored on a flat, load-bearing surface and bound to prevent shifting of the load. Pallets are not suitable for and are not to be used for edge racking or stacking. Buyer acknowledges that Material and Packaging Material must be protected from damage, moisture, excessive heat and ignition sources, and that personnel must be kept out of the path of any bags or pallets which may fall or shift during handling. Buyer assumes all risk of handling the Material at the point of delivery and Buyer agrees to indemnify Seller for claims by it or by third parties arising from such handling.

SELLER HEREBY EXPRESSLY DISCLAIMS (AND THEREFORE IT IS HEREBY EXCLUDED FROM THIS AGREEMENT) ANY OTHER WARRANTY, EXPRESS OR IMPLIED, AS TO THE MATERIAL AND PACKAGING MATERIAL, INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. SELLER SHALL NOT BE LIABLE FOR ANY DAMAGE, LOSS, COST OR EXPENSE, OR BREACH OF WARRANTY, EXCEPT AS SET FORTH IN THIS SECTION 4. BUYER HEREBY WAIVES ALL CLAIMS FOR INDIRECT, CONSEQUENTIAL, INCIDENTAL, PUNITIVE, OR SPECIAL DAMAGES, INCLUDING, WITHOUT LIMITATION, LOSS OF PROFITS, DOWNTIME COSTS, OR COSTS OF SUBSTITUTE GOODS, AND AGREES THAT SELLER'S TOTAL LIABILITY, AND BUYER'S EXCLUSIVE REMEDY, ARE EXPRESSLY LIMITED TO REPLACEMENT OF ANY MATERIAL AND PACKAGING MATERIAL WHICH DOES NOT MEET THE WARRANTY SET FORTH IN THIS SECTION 4. IN NO EVENT SHALL SELLER'S AGGREGATE LIABILITY HEREUNDER, WHETHER FOR CLAIMS IN CONTRACT, TORT OR OTHERWISE, EXCEED THE PURCHASE PRICE PAID FOR THE MATERIAL AND PACKAGING MATERIAL; PROVIDED THAT, NOTHING IN THIS PARAGRAPH SHALL BE DEEMED TO EXCLUDE OR LIMIT ANY LIABILITY UNDER ANY APPLICABLE LAW OR STATUTE WHICH, UNDER SUCH LAW OR STATUTE, CANNOT BE EXCLUDED OR LIMITED.

5. Sampling and Analysis. At the time the Material is loaded or packaged by Seller, whichever is earlier, Seller, at its expense, shall sample the Material in accordance with its normal sampling procedures. The results of sampling and analysis by Seller shall be final and conclusive for all purposes. In the event delivered Material does not meet the quality standards set forth in Section 4, Buyer shall promptly contact Seller and afford the Seller the opportunity to inspect and sample the Material. If Seller agrees that the Material is nonconforming, Seller shall give instructions as to where to send the Material, at Seller's expense, and Buyer shall receive replacement Material in like quantities in lieu thereof. Rejection of such nonconforming Material shall be made not later than thirty (30) days after receipt by Buyer.

6. Defaults and Remedies. If Buyer defaults in any of its obligations hereunder, Seller's remedies shall include suspension of performance together with all other rights and remedies at law or in equity which Seller may have as a result of Buyers default. If, despite any default by Buyer,

Seller elects to continue to make deliveries, its action shall not constitute a waiver of any default by Buyer or in any way affect Seller's legal remedies for any such default. If Buyer defaults under this Agreement and the matter is placed in the hands of an attorney for collection, or suit is brought at law or in equity to enforce the provisions herein, Buyer agrees to pay reasonable attorneys' fees together with costs in addition to the amounts due hereunder. Buyer shall indemnify, defend and hold harmless Seller for any third party claims brought against Seller based on the use of Materials by Buyer.

7. Force Majeure. All obligations of either party hereunder (except the payment of money) shall be suspended while, but only so long as and to the extent that, such party is prevented from complying with such obligations in whole or in part by acts of God or of the public enemy, strikes, lockouts and other labor disputes, fire, flood, accidents, epidemics, quarantine restrictions, freight embargoes, earthquake, unusually severe weather, acts of war, terrorism, insurrection or mob violence, unforeseen shutdown or unavailability of major sources of supply, breakage of machinery or apparatus, laws, requirements, regulations or action of or the failure to act of any state, federal or local government, or any other matters beyond the reasonable control of said party which cannot be overcome by said party by means normally employed in the performance of this Agreement, whether similar to the matters herein specifically enumerated or otherwise. In the event of Seller's inability due to any of the above circumstances to supply all of the Material provided for hereunder, Seller reserves the right to allocate its available supply of Material among its purchasers, or any of them, as Seller, in its sole discretion, elects without liability to Buyer for any failure of performance which may result therefrom. The party affected by force majeure shall promptly and timely notify the other of the existence thereof, the expected delays, and the estimated effect upon its performance hereunder.

8. Product Safety and Product Stewardship Program. Buyer understands and acknowledges that as part of Seller's product stewardship program, Seller from time to time will issue notices regarding the safe use of Seller's products, including appropriate and inappropriate end uses of Seller's products. Seller has the right to refuse to sell Material to unlawful or inappropriate end-uses as determined by Seller. Buyer agrees to comply with such safety policies and end use restrictions in its use and sale of Seller's products. Buyer further agrees, upon written request from Seller to confirm in writing that Buyer is complying with Seller's safety policies and end use restrictions. In no event shall Seller be responsible for any damage, injury or loss occasioned by the misuse of Material or Buyer's negligence.

9. Buyer as End User; No Assignment. Unless Buyer is duly authorized to distribute the Material pursuant to a written distribution agreement with Seller, the Material is being purchased by Buyer for its internal use and, without the express written authorization of Seller, Buyer may not repackage, resell, or otherwise distribute the Material to third parties. In addition, Buyer shall have no right to assign or transfer (whether by operation, by law or otherwise) all or any part of its rights or obligations under this Agreement except with the prior written consent of the Seller, and no delegation of any obligation of Buyer shall be made without the prior written consent of Seller. Any attempted assignment or delegation of Buyer shall be void and ineffective for all purposes unless made in conformity with this paragraph. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective permitted successors and assigns.

10. Compliance with Laws; Export. Both parties shall comply with all applicable laws and regulations in connection with their performance hereunder. Buyer shall not sell, ship, import, export, re-export or allow trans-shipment of any Material in any manner contrary to any applicable export laws, including without limitation, to any prohibited individual, firm or entity appearing in Denied Party Lists published by the U.S. government, such as the list of Specially Designated Nationals published by the U.S. Department of Treasury OFAC, or to any country subject to economic or trade sanctions imposed by the U.S., except as otherwise authorized by U.S. law. Buyer shall also comply with all applicable laws and regulations of any destination country. Buyer shall indemnify, defend and hold harmless Seller from and against any breach by Buyer of its obligations under this paragraph.

11. Notices. Any notices, payments, or other information herein contemplated to be given, made or delivered to Seller or Buyer hereunder shall be sufficient if personally delivered, mailed, or sent by electronic facsimile at the address of such party set forth on the face hereof or to such other address as such party may from time to time designate to the other in writing.

12. Incorporation By Reference. Terms appearing on the face hereof, or on any cover sheet or contract into which these General Terms and Conditions are incorporated, that in any way alter, condition or explain these General Terms and Conditions are incorporated herein by this reference. All terms so incorporated shall supersede any conflicting or contrary provision contained in these printed General Terms and Conditions.

13. Entire Agreement; Interpretation; Amendment. Unless the parties have entered into a written contract that is intended to supersede these General Terms and Conditions, these General Terms and Conditions, together with any terms appearing on the face hereof or on any cover sheet or contract into which these General Terms and Conditions are incorporated, contain the entire agreement between the parties, and there are no oral understandings, representations or agreements relative to this Agreement which are not fully expressed herein. Any terms appearing on any Order or other form used by Buyer which would modify or conflict with the terms and conditions set forth herein are expressly rejected, and Buyer hereby specifically accepts any terms contained herein that are different or additional to those contained in any such Order. Except for the purpose of negating implied warranties, no course of prior dealings between the parties and no usage of the trade shall be relevant to supplement or explain any term used in this Agreement. If any provision of this Agreement, or the application thereof to any person, place, or circumstance, shall be held by a court of competent jurisdiction to be invalid, unenforceable, or void, the remainder of this Agreement and such provisions as applied to other persons, places, and circumstances shall remain in full force and effect. No amendment, modification, or waiver of any provision of this Agreement shall be effective unless in writing and signed by the parties hereto. English shall be the governing language hereof.

14. Governing Law and Dispute Resolution. This Agreement shall be governed by the laws of the State of Colorado, without regard to its conflicts of laws. The parties hereby exclude from any application to the purchase and sale of the Material the United Nations Convention on Contracts for the International Sale of Goods 1980 (Vienna Convention). Any disputes arising out of or in connection with this Agreement shall be finally settled by binding arbitration under the Commercial Arbitration Rules of the American Arbitration Association ("AAA") in effect on the date hereof (the "Rules"), except as such Rules are modified herein. Arbitration shall be conducted in Denver,

IMERYS 205622

Colorado and shall be in English. The arbitration shall be before a single arbitrator mutually agreed from a list provided by the AAA; *provided* if Seller and Buyer fail to agree on an arbitrator within 30 days after the claim for arbitration is made, then the arbitrator shall be selected by the AAA. Not less than 30 days prior to the arbitration, each party will submit to the other party the documents, in English, and a list of witnesses it intends to use in the arbitration. In any arbitration proceeding, each party will have the opportunity to examine its witnesses and to cross-examine the witnesses of the other party. The arbitrator shall issue a written opinion stating the findings of fact and the conclusions of law on which the decision is based. The decision of the arbitrator shall be final and binding, and may be enforced in any court of competent jurisdiction. Each party to the arbitration shall bear its respective costs in the preparation and presentation of the dispute, and shall bear equally in the administrative costs of the arbitration.

IMERYS 205623

Case 19-01232-KCF    Doc 2-1    Filed 04/30/19    Entered 04/30/19 15:48:04    Desc
Exhibit C - Nolan Decl. Exhs. 4 to 12    Page 13 of 69

Case 1:19-mc-00103-UNA    Document 4-6    Filed 04/18/19    Page 1 of 4 PageID #: 465

# EXHIBIT 6

Case 19-01232-KCF    Doc 2-1    Filed 04/30/19    Entered 04/30/19 15:48:04    Desc
Exhibit C - Nolan Decl. Exhs. 4 to 12    Page 14 of 69

Case 1:19-mc-00103-UNA   Document 4-6   Filed 04/18/19   Page 2 of 4 PageID #: 466
CONFIDENTIAL

## Amendment to Supply Agreement

This Amendment (the "Amendment") is made as of the 1st day of April 2004, to the Supply Agreement dated 15th April 2001 ("Supply Agreement"), by and between Johnson & Johnson Consumer Companies, Inc. and Luzenac America, Inc.

**WHEREAS**, Seller has notified Buyer of the intent to cease manufacturing operations of the Products in West Windsor, Vermont, and Buyer has agreed to qualify new product ("New Product") from Seller's manufacturing operations located in Houston, Texas

**NOW THEREFORE**, for good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto agree to amend the Supply Agreement as follows:

1. Except as specifically provided for in this Amendment, all other terms and conditions of the Agreement shall continue in full force and effect.  All defined terms not otherwise defined in this Amendment shall have the meaning set out in the Agreement.

2. New Product is to be substituted for "Products" in all cases throughout the Supply Agreement.

3. Annex A is amended and restated as set out on the attached Annex A to this Amendment.  In addition, the parties agree that all New Product shall be supplied by Seller solely from the facility specified on the attached Annex A.

4. Annex B, Section A, is hereby amended and restated as follows:

    i.  Olympic H Talc US$368 PER METRIC TON effective through December 31, 2006

    ii.  Price decreases to US$348 PER METRIC TON effective January 1, 2007 through December 31, 2007

    iii.  Price decreases to US$338 PER METRIC TON effective January 1, 2008 and beyond.

Case 19-01232-KCF    Doc 2-1    Filed 04/30/19    Entered 04/30/19 15:48:04    Desc
Exhibit C - Nolan Decl. Exhs. 4 to 12    Page 15 of 69

Case 1:19-mc-00103-UNA    Document 4-6    Filed 04/18/19    Page 3 of 4 PageID #: 467
CONFIDENTIAL

iv. All prices are FOB delivered to Buyer in Royston, Georgia via Bulk Rail

v. Pricing from Seller can only be altered should raw material increases or freight increases exceed 3% in any given year. Raw materials include talc, energy costs, packaging, and pallets. Transportation increases include freight from Houston, Texas to Royston, Georgia as well as freight from China to Houston. In the event any such increases exceed 3% in a particular year, the prices for the New Product shall be adjusted proportionately upward for the next calendar year to the extent necessary to reflect the amount of the increase which is in excess of 3%. All material or freight increase requests must be substantiated by documentation of increase from increasing party.

5. Annex B, Section B, is hereby deleted in its entirety.

6. Section 1( c) is hereby deleted in its entirety.

7. Section 1(d) is amended from F.O.B. Ludlow, Vermont (the "Shipping Point"), to F.O.B. Royston, Georgia (the "Delivery Point"). The risk of loss with respect to the New Product shall now pass to Buyer upon receipt and acceptance at the Delivery Point.

8. Section 3 (3) is amended from "…Seller shall maintain an adequate number of dedicated silos to ensure timely shipment", to read  "…Seller shall maintain an adequate number of dedicated silos and rail cars to ensure timely shipment".

9. Section 3 (d) is amended from "…Agreement, *provided, however,…*" to read "…Agreement. In such event Seller shall, at Buyer's request, make available such dedicated rail cars as may be sufficient to obtain New Product from such other source."

10. Section 4 (c) is amended to delete clause (iii) in its entirety.

11. Section 7 (a) (ii) is amended from "shall be limited to replacement…. Sections 4 (c) above" to "shall be limited to replacement of New Product".

12. Section 8 (a) is amended in its entirety to read "This Agreement shall expire and terminate effective December 31, 2006, unless sooner terminated pursuant to the other provisions of this Agreement."

Page 2 of 6

Case 19-01232-KCF    Doc 2-1    Filed 04/30/19    Entered 04/30/19 15:48:04    Desc
Exhibit C - Nolan Decl. Exhs. 4 to 12    Page 16 of 69

Case 1:19-mc-00103-UNA    Document 4-6    Filed 04/18/19    Page 4 of 4 PageID #: 468
CONFIDENTIAL

13. Section 22 (b) is amended to read "Contract Year shall mean, for any period of time after the date of this Amendment, the twelve-month period commencing on April 1st of any year during the term of this Agreement and concluding on March 31st of the next succeeding year

14. Section 23 (a) is amended to read "Seller will assume the leasehold interest of Buyer for the equipment specified on the attached Annex B (the "Equipment") pursuant to the Transfer Agreement in the form set out on the attached Annex C. Upon execution of the Transfer Agreement, Buyer shall have no further ownership or leasehold interest of any nature in the Equipment, and all right, title and interest in the Equipment shall transfer to Seller.

15. Section 23(b) is amended to remove clause (iii) thereof.

16. Section 23(c) is amended to remove clauses (ii) and (iv) thereof.

17. Section 23 (e) is amended to read "Buyer shall be responsible for training its employees to operate properly the Equipment and shall supervise all operations thereof. Buyer shall be responsible for all personal damages or injuries and for any damage to property or Equipment resulting from (i) Buyer's operation of the Equipment, or (ii) Buyer's use of the Equipment for any purpose other than as specifically contemplated by this Agreement.

18. Section 23(f) is hereby deleted in its entirety.

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the day and year first above written.

**LUZENAC AMERICA, INC.**

BY: _D. D. A._
Name: DANIEL D HARRIS
Title: PRESIDENT

**JOHNSON & JOHNSON CONSUMER COMPANIES, INC.**

BY: _D Michael Wittman_
Name: D. Michael Wittman
Title: VP of Operations

Page 3 of 6

Case 19-01232-KCF    Doc 2-1    Filed 04/30/19    Entered 04/30/19 15:48:04    Desc
Exhibit C - Nolan Decl. Exhs. 4 to 12    Page 17 of 69

Case 1:19-mc-00103-UNA    Document 4-7    Filed 04/18/19    Page 1 of 28 PageID #: 469

# EXHIBIT 7

Case 19-01232-KCF    Doc 2-1    Filed 04/30/19    Entered 04/30/19 15:48:04    Desc
Exhibit C - Nolan Decl. Exhs. 4 to 12    Page 18 of 69

Case 1:19-mc-00103-UNA    Document 4-7    Filed 04/18/19    Page 2 of 28 PageID #: 470

AGREEMENT

BETWEEN

CYPRUS MINES CORPORATION

AND

JOHNSON & JOHNSON

DATED

JANUARY 6, 1989

AG8805807

Case 19-01232-KCF   Doc 2-1   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 4 to 12   Page 19 of 69

Case 1:19-mc-00103-UNA   Document 4-7   Filed 04/18/19   Page 3 of 28 PageID #: 471

<u>TABLE OF CONTENTS</u>

| <u>Section</u> | | | <u>Page</u> |
|---|---|---|---|
| 1. | Sale of Stock | | 2 |
| 2. | Purchase Price and Payment | | 2 |
| | 2.1 | Base Purchase Price | 2 |
| | 2.2 | Adjustment of Base Purchase Price | 3 |
| 3. | Representations and Warranties of J & J, Windsor and Western | | 5 |
| | 3.1 | Organization and Existence | 5 |
| | 3.2 | Articles and Bylaws | 6 |
| | 3.3 | Minute Books and Stock Certificate Books and Records | 6 |
| | 3.4 | Capitalization | 7 |
| | 3.5 | Authority and No Violations | 8 |
| | 3.6 | Interest in Other Entities | 9 |
| | 3.7 | Financial Statements of Windsor and Western | 10 |
| | 3.8 | Undisclosed Liabilities | 11 |
| | 3.9 | Tangible Personal Property | 11 |
| | 3.10 | Real Property | 13 |
| | 3.11 | Transfers of Real and Personal Property | 14 |
| | 3.12 | Environmental Matters | 14 |
| | 3.13 | Permits and Compliance with Other Laws | 15 |
| | 3.14 | Litigation and Proceedings | 16 |
| | 3.15 | Contracts | 17 |
| | 3.16 | Customers | 17 |
| | 3.17 | Taxes | 18 |
| | 3.18 | Insurance and Bonds | 18 |
| | 3.19 | Banking and Personnel Matters | 19 |
| | 3.20 | Events Since Balance Sheet Date | 20 |
| | 3.21 | Brokers | 21 |
| | 3.22 | Disclosures | 22 |
| | 3.23 | Underground Storage Tanks; PCB's | 23 |
| | 3.24 | Pension and Benefit Matters | 23 |
| | 3.25 | Intellectual Property | 29 |
| 4. | Representations and Warranties of Cyprus | | 30 |
| | 4.1 | Organization and Existence | 30 |
| | 4.2 | Authority and No Violations | 30 |
| | 4.3 | Brokers | 31 |
| | 4.4 | Purchase for Investment | 31 |
| | 4.5 | Salaried Pension Plan | 31 |
| 5. | Covenants | | 32 |
| | 5.1 | Assumption of Obligations | 32 |
| | 5.2 | Windsor and Western Obligations | 32 |
| | 5.3 | Due and Uncollected Receivables; Petty Cash | 33 |
| | 5.4 | Change of Ownership | 33 |
| | 5.5 | Corporate Records | 33 |
| | 5.6 | Employee Matters | 33 |

AG8805B07

Case 19-01232-KCF   Doc 2-1   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 4 to 12   Page 20 of 69

Case 1:19-mc-00103-UNA   Document 4-7   Filed 04/18/19   Page 4 of 28 PageID #: 472

## TABLE OF CONTENTS (Continued)

| Section | | | Page |
|---|---|---|---|
| 5.7 | | Tax Matters Agreement | 41 |
| 5.8 | | Tax Liabilities and Refunds | 41 |
| 5.9 | | Insurance | 42 |
| 5.10 | | Articles and Bylaws | 43 |
| 5.11 | | Financial Statements of Windsor and Western | 43 |
| 5.12 | | Sale of Real Property and Personal Property | 44 |
| 5.13 | | Permits | 44 |
| 5.14 | | Banking and Personnel Matters | 44 |
| 5.15 | | Additional Permits | 45 |
| 5.16 | | Railroad Right-of-Way | 48 |
| 6. | Access to Records | | 50 |
| | 6.1 | Cyprus' Access | 50 |
| | 6.2 | J & J's Access | 51 |
| 7. | Closing | | 52 |
| 8. | Mutual Conditions Precedent to Closing | | 52 |
| | 8.1 | No Injunctions | 53 |
| | 8.2 | Approvals; Consents | 53 |
| | 8.3 | Board Approval | 53 |
| | 8.4 | Due Diligence | 54 |
| | 8.5 | Talc Supply Agreement | 54 |
| | 8.6 | Tax Matters Agreement | 55 |
| | 8.7 | Roger Miller Agreement | 55 |
| 9. | Conditions to Obligations of Cyprus | | 55 |
| | 9.1 | Representations and Warranties True | 55 |
| | 9.2 | No Adverse Change | 56 |
| | 9.3 | No Loss | 56 |
| | 9.4 | Certificates | 56 |
| | 9.5 | Opinion of Counsel | 56 |
| | 9.6 | Resignations | 57 |
| | 9.7 | Stock Certificates | 57 |
| | 9.8 | J & J Certificate of Good Standing | 58 |
| | 9.9 | Windsor Certificate of Good Standing | 58 |
| | 9.10 | Western Certificate of Good Standing | 58 |
| | 9.11 | Release of Escrowed Funds | 58 |
| 10. | Conditions to Obligations of J & J | | 58 |
| | 10.1 | Payment | 59 |
| | 10.2 | Representations and Warranties True | 59 |
| | 10.3 | Certificate | 59 |
| | 10.4 | Opinion of Counsel | 59 |
| 11. | Survival and Indemnification | | 60 |
| | 11.1 | Survival | 60 |
| | 11.2 | Indemnification by J & J | 61 |

AG8805B07

Case 19-01232-KCF   Doc 2-1   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 4 to 12   Page 21 of 69

Case 1:19-mc-00103-UNA   Document 4-7   Filed 04/18/19   Page 5 of 28 PageID #: 473

<u>TABLE OF CONTENTS</u> (Continued)

| Section | | | Page |
|---|---|---|---|
| | 11.3 | Indemnification by Cyprus | 62 |
| | 11.4 | Indemnification Procedure; Defense | 63 |
| | 11.5 | Exclusive Remedy | 64 |
| 12. | | Operation of Business | 64 |
| 13. | Miscellaneous | | 65 |
| | 13.1 | Parties in Interest; Assignment | 65 |
| | 13.2 | Expenses | 66 |
| | 13.3 | Confidentiality | 66 |
| | 13.4 | Notices | 67 |
| | 13.5 | Further Assurances | 68 |
| | 13.6 | Entire Agreement | 68 |
| | 13.7 | Modification | 68 |
| | 13.8 | Delay | 69 |
| | 13.9 | Governing Law | 69 |
| | 13.10 | Severability | 69 |
| | 13.11 | No Merger | 69 |
| | 13.12 | Obligations of Windsor and Western | 70 |
| | 13.13 | Headings | 70 |
| | 13.14 | Mutual Negotiation | 71 |

**<u>EXHIBITS</u>**

Exhibit A   1987 Balance Sheet
Exhibit B   Debt Instruments
Exhibit C   Undisclosed Liabilities
Exhibit D   Personal Property
Exhibit E   Real Property
Exhibit F   Transfers of Real Property and Personal Property
Exhibit G   Environmental Matters
Exhibit H   Permits
Exhibit I   Litigation
Exhibit J   Contracts
Exhibit K   Customers
Exhibit L   Insurance and Bonds
Exhibit M   Banking and Personnel Matters
Exhibit N   Encumbrances
Exhibit O   Transfers
Exhibit P   Underground Storage Tanks; PCB's
Exhibit Q   Employee Matters
Exhibit R   Patents, Trademarks, Trade Names and Licenses
Exhibit S   License Agreements
Exhibit T   Tax Matters Agreement
Exhibit U   Letter of Intent
Exhibit V   Talc Supply Agreement
Exhibit W   Release of Escrow Instructions
Exhibit X   Escrow Agreement
Exhibit Y   Confidentiality Agreement

AG8805B07

Case 19-01232-KCF   Doc 2-1   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 4 to 12   Page 22 of 69

Case 1:19-mc-00103-UNA   Document 4-7   Filed 04/18/19   Page 6 of 28 PageID #: 474

<u>AGREEMENT</u>

THIS AGREEMENT is made this sixth day of January, 1989 (the "Agreement") by and between Cyprus Mines Corporation, a Delaware corporation ("Cyprus"), and Johnson & Johnson, a New Jersey corporation ("J & J").

<u>W I T N E S S E T H</u>:

WHEREAS, J & J is the owner of all of the issued and outstanding shares of the capital stock of Windsor Minerals Inc., a Vermont corporation ("Windsor")(which capital stock shall hereinafter be referred to as the "Windsor Stock");

WHEREAS, Windsor is the owner of all of the issued and outstanding shares of the capital stock of Western Source Inc., a California corporation ("Western")(which capital stock shall hereinafter be referred to as the "Western Stock");

WHEREAS, J & J desires to sell and deliver all of the Windsor Stock to Cyprus, and Cyprus desires to purchase and receive all of said Windsor Stock from J & J, upon the terms and conditions provided herein; and

WHEREAS, J & J and Cyprus desire to enter into a Talc Supply Agreement (as such term is defined in Section 8.5 hereof), wherein Windsor agrees to sell and deliver, and J & J agrees to purchase and receive, talc pursuant to the terms and conditions set forth in the Talc Supply Agreement.

-1-

AG8805B07

a manner that would not adversely affect its qualified status.
Cyprus has no reason to believe that the Master Trust (the
"Cyprus Master Trust") maintained under the Agreement of Master
Trust between Cyprus Minerals Company and Boston Safe Deposit and
Trust Company dated August 1, 1988 is not exempt from tax
pursuant to Section 501(a) of the Code. The Cyprus Master Trust
has been determined by the IRS to be exempt from tax.


5.   Covenants.


5.1   **Assumption of Obligations**. On the Settlement
Date, Cyprus and J&J shall agree upon the Closing Balance
Sheet. All liabilities determined to remain with J & J hereunder
shall be the sole responsibility and liability of J & J, and J&J
shall promptly pay and discharge all such liabilities as they
become due. Except as otherwise set forth in this Agreement, all
other liabilities of Windsor and Western shall remain with
Windsor and Western from and after the Closing.


5.2   **Windsor and Western Obligations**. Prior to the
Closing Date, J & J shall cause Windsor and Western to perform
the obligations of Windsor and Western hereunder, and shall be
solely responsible and liable for each representation made, and
each warranty granted, by Windsor and Western, as if J & J had
made such representation or granted such warranty itself.


-32-

Case 19-01232-KCF   Doc 2-1   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 4 to 12   Page 24 of 69

Case 1:19-mc-00103-UNA   Document 4-7   Filed 04/18/19   Page 8 of 28 PageID #: 476

5.3   <u>Due and Uncollected Receivables; Petty Cash</u>.
Accounts and notes receivable of Windsor and Western which are
more than one hundred and eighty (180) days old as of the Closing
Date shall become the responsibility of J&J and shall be removed
from the Closing Balance Sheet.   Accounts and notes receivable
that are current on the Closing Date, but which become due and
uncollected after one hundred and eighty (180) days following the
Closing Date, shall be sold to J&J for cash at face value,
provided that such amounts exceed Five Thousand Dollars ($5,000)
in the aggregate.   Accounts receivable owed from affiliates of
J&J to Windsor shall be included in the Closing Balance Sheet.
Petty cash accounts existing at the operations of Windsor and
Western shall be included in the Closing Balance Sheet.

5.4   <u>Change of Ownership</u>.   Within thirty (30) days
following the Closing Date, Cyprus shall take all steps
reasonably necessary to notify the customers of Windsor and
Western of the change in ownership of Windsor and Western.

5.5   <u>Corporate Records</u>.   At Closing, J&J shall
provide Cyprus with all of the original corporate records of
Windsor and Western.

5.6   <u>Employee Matters</u>.   (a) Cyprus agrees that
Windsor and Western will accept on the Closing all salaried
employees employed by Windsor or Western respectively upon the
Closing, in the positions held immediately prior to the Closing,
on terms and conditions of employment, including benefit plans,

-33-

AG8805B07

Case 19-01232-KCF    Doc 2-1    Filed 04/30/19    Entered 04/30/19 15:48:04    Desc
Exhibit C - Nolan Decl. Exhs. 4 to 12    Page 25 of 69
Case 1:19-mc-00103-UNA    Document 4-7    Filed 04/18/19    Page 9 of 28 PageID #: 477

which will be consistent with the terms and conditions of employment of Cyprus salaried employees, which the parties understand to be such terms and conditions as Cyprus deems appropriate. Cyprus agrees that Windsor will accept on the Closing all hourly employees employed by Windsor on the Closing in the positions held immediately prior to Closing, on the then current terms and conditions of employment and the obligations attendant thereto. Cyprus agrees that Windsor will assume or retain the existing Collective Bargaining Agreement of Windsor with the Cement, Lime, Gypsum and Allied Workers Division of the Brotherhood of Boilermakers International, AFL-CIO Local and Lodge D449, which expires May 11, 1990 (the "Collective Bargaining Agreement");

(b) Cyprus agrees that Windsor and Western will retain or assume all liabilities and obligations relating to all hourly and salaried employees of Windsor and Western respectively (whether active, inactive, former or retired), their dependents and beneficiaries, including those relating to the Collective Bargaining Agreement, Employee Plans and Benefit Arrangements; provided, however, that, not withstanding the foregoing, after the Closing, J&J, and not Cyprus, Windsor or Western shall be solely liable for and shall pay or provide: (i) pension benefits under the Retirement Plan of Johnson & Johnson and Affiliated Companies (the "J&J Salaried Plan") for all salaried employees of Windsor and Western (whether active, inactive, former or retired) their dependents and beneficiaries; (ii) benefits under the J&J Savings Plan for all active, inactive, former or retired salaried

-34-

AG8805B07

Case 19-01232-KCF   Doc 2-1   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 4 to 12   Page 26 of 69

Case 1:19-mc-00103-UNA   Document 4-7   Filed 04/18/19   Page 10 of 28 PageID #: 478

employees of Windsor and Western, their dependents and beneficiaries; (iii) pension benefits, life insurance, medical benefits, supplemental pension benefits, short- and long-term disability benefits and all other benefits for those individuals listed on Exhibit Q hereto; (iv) any and all health care continuation coverage to which any current or former Windsor or Western salaried employee (or a dependent of such) is or becomes entitled in connection with a "qualifying event" (as defined in Code Section 162(k)(3)) occurring on or before the Closing Date; and (v) any and all stock options, stock appreciation, incentive compensation or other such benefits for Windsor and Western employees for periods prior to the Closing. Nothing stated in this Section 5.6(b) shall modify or alter the obligations of Cyprus and J&J to each other contained elsewhere in this Agreement.

In respect of all life insurance, medical, supplemental pension and other benefits (except benefits under the J&J Salaried Plan) for all salaried employees of Windsor and Western who have retired on or before the Closing Date, J&J shall pay or provide such benefits and Cyprus shall fully and promptly reimburse J&J the actual out of pocket identified cost of such benefits on a quarterly basis, in each case following receipt of a statement from J&J specifying such actual cost in reasonable detail. In respect of life insurance, Cyprus shall reimburse J&J for only the amount of any premiums paid by J&J in respect of such salaried retiree. In respect of medical benefits, Cyprus shall reimburse J&J for ASO fees and medical expenses covered under the

-35-

AG8805807

Case 19-01232-KCF   Doc 2-1   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 4 to 12   Page 27 of 69
Case 1:19-mc-00103-UNA   Document 4-7   Filed 04/18/19   Page 11 of 28 PageID #: 479

Johnson & Johnson Salaried Health Care Plan.   In respect of supplemental pension benefits, Cyprus shall reimburse J&J for benefits paid pursuant to the J & J Supplemental Pension Plan. In respect of all of the above, Cyprus also shall reimburse J&J for the actual cost to J&J of performing the services described above.   Cyprus shall have the right to review, during normal office hours and upon reasonable notice, such records of J&J as may be necessary to verify any charges imposed upon Cyprus under this Section.   Upon 30 days notice to J&J, Cyprus shall have the right to assume the obligations of any or all of such benefits directly, and to provide or cause an affiliate to provide any or all of such benefits, at which time J&J shall be relieved of its obligations hereunder in respect of such benefit.

J&J shall assist Cyprus by continuing to be responsible for pension payments under and administration of the Windsor Hourly Plan until such time as the related assets and liabilities are transferred to the Cyprus Master Trust.

J&J will keep confidential, and will not disclose to any other person, all confidential information given to J&J by Cyprus, Windsor or Western, or their employees, in order to allow J&J to provide the services contemplated under this Agreement.   J&J shall use or disclose such confidential information only as may be necessary in order to provide services hereunder, as otherwise provided by law or required by any government agency, or with the written consent of Cyprus.

-36-

AG8805807

Case 19-01232-KCF   Doc 2-1   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 4 to 12   Page 28 of 69

Case 1:19-mc-00103-UNA   Document 4-7   Filed 04/18/19   Page 12 of 28 PageID #: 480

All liabilities of Windsor and Western for medical, dental and
life insurance benefiits incurred prior to the Closing Date and
presented to J&J or the appropriate agent of J&J for payment on
or before the Settlement Date shall be paid by J&J.   Such
liabilities not presented to J&J for payment on or before the
Settlement Date shall remain the obligations of Windsor and
Western;

(c) Effective as of the Closing, Cyprus will amend or cause
to be amended the Cyprus Salaried Plan to include as eligible
employees all salaried employees of Windsor and Western who
continue as employees of Windsor and Western after the Closing.
For each such salaried employee, the accrued benefits
attributable to the period of service of such employee with J&J
or a subsidiary of J&J on and prior to the Closing Date shall be
determined under the terms of the J&J Salaried Plan as in effect
on the Closing Date, on the basis of the compensation of such
employee on and before the Closing Date and service of such
employee through the last day of the calendar month in which the
Closing Date occurs, and without regard to any compensation of
such employee after the Closing Date and service of such employee
after the last day of the calendar month in which the Closing
Date occurs.   For each such salaried employee, the accrued
benefits attributable to the period of service of such employee
with Cyprus or a subsidiary of Cyprus following the Closing shall
be determined under the terms of the Cyprus Salaried Plan or a

-37-

successor plan, if any, on the basis of the compensation of such employee after the Closing Date and service after the last day of the calendar month in which the Closing Date occurs and without regard to any compensation and service of such employee on or before the Closing Date; provided, however that each such employee shall receive credit under the Cyprus Salaried Plan or a successor plan, if any, for purposes of vesting and determination of eligibility to participate and to receive benefits, but not for purposes of benefit accrual, for all service of such employee on or before the Closing in the employment of J&J or any affiliated company of J&J that was credited for such purposes under the J&J Salaried Plan;

(d) effective as of the Closing Date, Cyprus agrees to amend the Cyprus Minerals Company Savings Plan and Trust (the "Cyprus Savings Plan") to include as eligible employees all active salaried employees of Windsor and Western on the Closing Date and to credit, only for purposes of vesting and determination of eligibility to participate in the Cyprus Savings Plan, all service of such employees before the Closing Date in the employment of J&J and any affiliated company of J&J that was credited for such purposes under the J&J Savings Plan.

J&J shall cause the account balances in the J&J Savings Plan of all active salaried employees of Windsor and Western on the Closing Date to be distributed in accordance with the terms of that Plan, the provisions of applicable law and the election of

-38-

AG8805B07

Case 19-01232-KCF   Doc 2-1   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 4 to 12   Page 30 of 69

Case 1:19-mc-00103-UNA   Document 4-7   Filed 04/18/19   Page 14 of 28 PageID #: 482

the participant or beneficiary. J&J shall provide such individuals with the required 402(f) notice;

(e) Cyprus agrees that Windsor will assume or retain the assets, liabilities and sponsorship of the Windsor Hourly Plan as of the Closing Date. J&J agrees that within 60 days of the Closing Date, J&J will transfer in cash from the J & J Master Trust to the Cyprus Master Trust all assets of the Windsor Hourly Plan, determined in accordance with the usual procedures used under the Johnson & Johnson Master Trust for the determination of the separate shares of a single plan thereunder. Until the date of any segregation of the assets of the Windsor Hourly Plan pursuant to the transfer, such assets shall share pro rata in the investment experience, including expenses, of the J&J Master Trust. Upon segregation, such assets shall be liquidated to cash, and from the date of such liquidation to the date of transfer of possession of the assets will be invested in the Bankers Trust Commingled Short-Term Investment Fund, a qualified fund for qualified plans for which Bankers Trust Company acts as Trustee.

J&J shall cause Windsor and Western to make on or before the Closing Date all required contributions under the Windsor Hourly Plan for all completed fiscal years, including contributions that may not by law have otherwise been required to be made until the due date for filing the tax return for any completed fiscal year. All contributions and payments accrued under the Windsor

-39-

AG8805B07

Case 19-01232-KCF   Doc 2-1   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 4 to 12   Page 31 of 69
Case 1:19-mc-00103-UNA   Document 4-7   Filed 04/18/19   Page 15 of 28 PageID #: 483

Hourly Plan, determined in accordance with prior funding and accrual practices, as adjusted to the extent required to include proportional accruals for service for periods prior to the Closing Date, will be discharged and paid by Windsor to the Plan on or prior to the Closing Date.

In addition, J&J, and not Windsor or Western, shall pay to the Windsor Hourly Plan, on or before the date of the actual transfer of the assets, any amount necessary so that, as of the date of the actual transfer of the assets, the fair market value of the assets of the Windsor Hourly Plan (including for these purposes any accrued but unpaid contributions) equalled or exceeded the present value of all "benefit liabilities" (as defined in ERISA Section 4001(a)(16)) under the Windsor Hourly Plan determined on a termination basis using the assumptions used for reporting purposes in Note 13 to the 1987 corporate financial statements of Windsor and J&J, including without limitation an assumed interest rate of 8.75 percent.

        (f)  J&J shall be solely liable and responsible for all claims made by employees of Windsor and Western pursuant to applicable workmen's compensation laws, if such claims arise out of any act, event or occurrence occurring prior to the Closing Date and such claims are filed prior to the Settlement Date. J&J's liability pursuant to the foregoing sentence shall include, without limitation, all costs, damages, expenses and settlements payable after the Closing.  Windsor and Western shall retain all

-40-

AG8805807

Case 19-01232-KCF   Doc 2-1   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 4 to 12   Page 32 of 69

Case 1:19-mc-00103-UNA   Document 4-7   Filed 04/18/19   Page 16 of 28 PageID #: 484

liability and responsibility for all claims made by their respective employees pursuant to applicable workman's compensation laws if such claims: (i) arise out of any act, event or occurrence occurring on or after the Closing Date; or (ii) arise out of any act, event or occurrence occurring prior to the Closing Date, but were not properly filed on or prior to the Settlement Date.

5.7   **Tax Matters Agreement.**   On or before the Closing Date, Cyprus and J&J shall enter into a Tax Matters Agreement substantially in the form of Exhibit "T", attached hereto and by this reference incorporated herein (the "Tax Matters Agreement"). Cyprus and J&J each acknowledge and confirm the content of the Tax Matters Agreement, and agree to perform all obligations required thereunder.

5.8   **Tax Liabilities and Refunds.**   Any tax liability determined to be due and owing on behalf of Windsor and/or Western, or any tax refund determined to be due and owing Windsor and/or Western, for periods prior to the Closing Date as a result of an audit performed by any taxing authority after the Closing Date, shall be the sole responsibility and liability of, or shall be paid over to, J & J, as the case may be. All Land Gains Tax determined to be due to the Vermont Tax Department as a result of the transaction contemplated herein shall be the sole liability and responsibility of J & J. Prior to the Closing Date, Cyprus and J & J shall negotiate in good faith to determine J & J's

-41-

AG8805B07

Case 19-01232-KCF    Doc 2-1    Filed 04/30/19    Entered 04/30/19 15:48:04    Desc
Exhibit C - Nolan Decl. Exhs. 4 to 12    Page 33 of 69

Case 1:19-mc-00103-UNA    Document 4-7    Filed 04/18/19    Page 17 of 28 PageID #: 485

basis in such Real Property, and the amount of the Base Purchase Price allocable to each parcel of Real Property. Cyprus shall be responsible for performing an appraisal of the Real Property prior to any negotiations between Cyprus and J & J concerning the foregoing.

5.9    Insurance.    Windsor and Western have been included, since the acquisition or incorporation thereof by J&J, as additional insureds on all general liability, employee liability, workers' compensation, and other insurance policies held by J&J. On and after the Closing Date, J&J agrees to use its best efforts to make such coverages and policies (including excess coverage policies) available to Cyprus, Windsor and Western, and their affiliates, up to the limits specified in such policies, and to cooperate with Cyprus and its affiliates in making claims against such policies. In the event of a claim, Windsor and Western shall be responsible for the balance of any applicable deductibles and retentions, and for the amount of any claim or claims made against Windsor or Western in excess of applicable coverage limits, and for the costs of defending any claim or claims made against Windsor or Western to the extent to which such insurance coverages do not cover such costs or do not apply. For the purposes of this Section 5.9, the term "deductibles" shall include the amount of any captive insurance underwritten or reinsured in whole or in part by J&J or its affiliates. To the extent that the amount of any proposed insurance settlement given serious consideration by Cyprus or its

-42-

AG8805B07

affiliates, or to the extent that a potential trial judgment,
would exhaust the coverage available to J&J, Cyprus and its
affiliates agree to permit J&J to participate in such settlement
negotiations, or in the defense of such litigation, as the case
may be.  Cyprus shall have the final authority in the event of
any dispute between J&J and Cyprus concerning the foregoing
matters; provided, however, that Cyprus and J&J shall cooperate
in the event of litigation against J&J's insurance carriers to
establish coverage.  J&J shall be solely liable for its cost in
any such litigation to establish coverage.

5.10  **Articles and Bylaws.**  From the date hereof
through the Closing Date, Windsor shall not amend its Articles of
Association or Bylaws, and Western shall not amend its Articles
of Incorporation or Bylaws without the prior written consent of
Cyprus.

5.11  **Financial Statements of Windsor and Western.**  On
the Settlement Date, the Closing Balance Sheet shall fairly
present the combined financial position of Windsor and Western as
of the Closing Date, and shall be prepared in conformity with
generally accepted accounting principles consistently applied,
subject to the adjustments described in Section 2.2 hereof.
Between the date hereof and the Closing Date, neither J & J, nor
Windsor nor Western shall do or perform any act, or shall omit to
act, which act or omission will result in a material adverse
change in the financial condition, assets, or liabilities of

-43-

Case 19-01232-KCF   Doc 2-1   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 4 to 12   Page 35 of 69
Case 1:19-mc-00103-UNA   Document 4-7   Filed 04/18/19   Page 19 of 28 PageID #: 487

the Tax Records for more than three (3) years, Cyprus shall deliver the Tax Records to J & J. After the Closing, Cyprus shall provide J&J with access to the assets and operations of Windsor and Western and to persons knowledgeable therewith, and shall give J&J access to those Records retained by Cyprus, and permit J&J to make copies thereof at all reasonable times and upon reasonable prior notice to Cyprus, in order to permit J&J to prepare its tax returns and financial statements, to investigate or defend any indemnity claim under Section 11 hereof and for any other reasonable purpose.

7. **Closing**. The closing of the transaction contemplated in this Agreement (the "Closing") shall take place at 9:00 a.m. on January 6, 1989 (the "Closing Date"), at the offices of Cyprus in Englewood, Colorado; provided, however, that the parties may, by mutual prior written agreement, accelerate or extend the Closing Date beyond January 6, 1989, in order to obtain such governmental approvals or third party consents as may be reasonably required to consummate the transaction contemplated herein, or for such other good cause as the parties may mutually determine (such date shall also be a "Closing Date").

8. **Mutual Conditions Precedent to Closing**. The obligations of Cyprus and of J&J pursuant to this Agreement are subject to the satisfaction, at or before the Closing, of all the conditions set forth in this Section 8; provided, however, that

AG8805B07

Cyprus or J&J may waive any or all of such conditions, in whole
or in part, at such party's sole discretion.


    8.1   **No Injunctions**.  On the Closing Date, no action
or proceeding shall have been instituted or threatened to set
aside the transactions provided for herein, and there shall be no
effective injunction, writ or temporary restraining order or any
order of any nature issued by a court or governmental agency of
competent jurisdiction, directing the transaction provided for
herein not be consummated as herein provided.


    8.2   **Approvals; Consents**.  Any and all approvals and
authorizations of, filings and registrations with, and
notifications to any governmental or regulatory authority, and
any and all approvals or consents by any third party, required
for the execution, delivery and performance of this Agreement by
both parties, and the consummation of the transactions
contemplated herein, shall have been duly obtained or made and
shall be in full force and effect.


    8.3   **Board Approval**.  This Agreement and the
transaction contemplated herein shall have been approved by the
Board of Directors of Cyprus Mines Corporation and by the
Executive Committee of J&J, which Board and which Committee may
decline such approval at the sole and exclusive discretion of
such Board or Committee, as the case may be, for any reason
whatsoever.


-53-

AG8805807

Case 19-01232-KCF    Doc 2-1    Filed 04/30/19    Entered 04/30/19 15:48:04    Desc
Exhibit C - Nolan Decl. Exhs. 4 to 12    Page 37 of 69

Case 1:19-mc-00103-UNA    Document 4-7    Filed 04/18/19    Page 21 of 28 PageID #: 489

8.4    **Due Diligence.**    Cyprus shall have completed its due diligence investigation prior to the Closing Date, and shall have verified to its satisfaction:  (i) the quantity, quality and recoverability of the talc reserves owned and operated by Windsor and Western;  (ii) the satisfactory physical and operating condition of the Personal Property; (iii) the satisfactory state of title to Personal Property and Real Property; (iv) the risk associated with any actual or threatened litigation to which J&J or any of its affiliates may be a party concerning exposure to talc is, in Cyprus' sole opinion, an acceptable risk; and (v) the talc inventories of Windsor and Western are, in Cyprus' sole opinion, saleable and recoverable and shall be stated on the Closing Balance Sheet at the lower of cost or market.

8.5    **Talc Supply Agreement.**    Cyprus shall not acquire or purchase the Windsor Stock pursuant to this Agreement, and the transaction contemplated herein shall not close, unless, on or before Closing, Cyprus and J&J, or affiliates of Cyprus and J&J, shall have executed a mutually satisfactory Talc Supply Agreement, wherein Cyprus agrees or affiliates of Cyprus agree to supply, and J&J or affiliates of J&J agree to purchase, cosmetic grade talc pursuant to the terms and conditions set forth therein (the "Talc Supply Agreement").    The Talc Supply Agreement shall be in substantially the form attached as Exhibit "V" hereto and by this reference incorporated herein.

AG8805B07

Case 19-01232-KCF   Doc 2-1   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 4 to 12   Page 38 of 69

Case 1:19-mc-00103-UNA   Document 4-7   Filed 04/18/19   Page 22 of 28 PageID #: 490

11.    Survival and Indemnification

         11.1  Survival.    To the extent that the representations and warranties set forth in Section 3.24 hereof relate to ERISA, such representations and warranties shall survive the Closing for a period of two (2) years following the Closing Date.    The representations and warranties set forth in Section 3.24(h) shall survive the Closing for a period of two (2) years following the Closing Date. The representations and warranties set forth in Section 3.9 hereof relating to the "Shear Disc" shall survive until the termination or expiration of the Talc Supply Agreement.    All other representations and warranties contained in Sections 3 and 4 hereof shall survive the Closing for a period of one year following the Closing Date.    With respect to the obligations, covenants and agreements contained in Sections 2.2, 3.24(j), 5.2, 5.3, 5.4, 5.6, 5.7, 5.8, and 5.11, such obligations, covenants or agreements shall survive until the same shall have been duly performed.    With respect to the obligations, covenants and agreements contained in Sections 5.15 and 5.16, such obligations, covenants and agreements, as between Windsor and J&J, shall survive the Closing for the periods set forth therein.    With respect to the obligations, covenants and agreements contained in Sections 5.1, 5.9, 11.2(v) and 11.2(vi) hereof, such obligations, covenants and agreements, as between Cyprus and J&J, shall survive the Closing forever.    Any representation, warranty, covenant or obligation contained in this Agreement relating to taxes shall survive the Closing for

-60-

AG8805B07

Case 19-01232-KCF   Doc 2-1   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 4 to 12   Page 39 of 69

Case 1:19-mc-00103-UNA   Document 4-7   Filed 04/18/19   Page 23 of 28 PageID #: 491

the period of the applicable Statute of Limitations, including all extensions thereof.

11.2  **Indemnification by J&J.**  Consistent with the provisions of Section 11.1 hereof, J&J hereby agrees to indemnify and hold harmless Cyprus from and against any and all claims, demands, penalties, suits, proceedings, judgments, losses, liabilities, damages, costs and expenses of every kind and nature (including, but not limited to, reasonable attorneys' fees and any and all related litigation costs and expenses arising after Closing from or as a consequence of any such proceeding described in this Section 11.2, including such attorneys' fees and costs incurred in connection with pursuing claims under this Section 11.2) (collectively referred to in this Section 11.2 as "Costs") imposed upon or incurred by Cyprus or its affiliates as a result of or in connection with or arising out of:  (i) any and all inaccurate representations or material breaches of covenants, warranties, stipulations, agreements and certifications made by or on behalf of J&J, Windsor or Western in this Agreement or in any document delivered hereunder; (ii) any material breach of or material default in the performance by J&J of any covenant, agreement or obligation contained in this Agreement; (iii) any tax liability or obligation determined in accordance with Sections 3.17 and 5.8 hereof to be due and owing on behalf of Windsor and/or Western for periods prior to the Closing Date; (iv) any liabilities related to the J & J Salaried Plan; (v) any debt, liability or other financial obligation not consistent with

-61-

Case 19-01232-KCF   Doc 2-1   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 4 to 12   Page 40 of 69

Case 1:19-mc-00103-UNA   Document 4-7   Filed 04/18/19   Page 24 of 28 PageID #: 492

the business of Windsor or Western which:   (A) is the legal
obligation of Windsor or Western; (B) was undertaken on behalf of
or at the request or direction of J&J; and (C) creates or gives
rise to any liability which Cyprus would not assume but for the
consummation of the transaction contemplated herein; and (vi) any
product liability-based claim, suit, demand or cause of action
directed against Cyprus, Windsor or Western or any of their
affiliates arising out of the sale of talc or talc-containing
products manufactured by Windsor, Western, J&J or the affiliates
of Windsor, Western or J&J, prior to Closing. J&J's obligation of
indemnification pursuant to Sections 11.2(v) and 11.2(vi) shall
survive the Closing forever.

        11.3   Indemnification by Cyprus.   Cyprus hereby agrees
to indemnify and hold J&J harmless from and against any and all
claims,   demands,   penalties,   suits,   proceedings,   judgments,
losses, liabilities, damages, costs and expenses of every kind
and nature (including, but not limited to, reasonable attorneys'
fees and all related litigation costs and expenses arising after
Closing from or as a consequence of any such proceeding described
in this Section 11.3, including such attorneys' fees and costs
incurred in connection with pursuing claims under this Section
11.3) (collectively referred to in this Section 11.3 as "Costs")
imposed upon or incurred by J&J or its affiliates as a result of
or in connection with or arising from:   (i) any and all
inaccurate representations or material breaches of covenants,
warranties, stipulations, agreements and certifications made by

-62-

AG8805B07

Case 19-01232-KCF    Doc 2-1    Filed 04/30/19    Entered 04/30/19 15:48:04    Desc
Exhibit C - Nolan Decl. Exhs. 4 to 12    Page 41 of 69

Case 1:19-mc-00103-UNA    Document 4-7    Filed 04/18/19    Page 25 of 28 PageID #: 493

or on behalf of Cyprus in this Agreement or in any document
delivered hereunder; (ii) any material breach of or material
default in the performance by Cyprus of any covenant, agreement
or obligation contained in this Agreement; and (iii) any tax
refund obligation determined in accordance with Section 5.8
hereof to be due and owing J&J for periods prior to the Closing
Date.


      11.4  <u>Indemnification Procedure; Defense</u>.  In the
event that any indemnified party determines that it is entitled
to indemnification under this Agreement, it shall promptly
thereafter so notify the indemnifying party in writing, which
writing shall set forth in detail the amount of and the basis for
such claim.  Promptly after receipt by the indemnified party of
notice of the commencement of any action involving the subject
matter of the foregoing indemnity provisions, such indemnified
party shall, if any claim in respect thereof is to be made
against the indemnifying party under Section 11.2 or 11.3, notify
the indemnifying party in writing of the commencement thereof. In
case any such action is brought against any indemnified party,
and it notifies the indemnifying party of the commencement
thereof, the indemnifying party shall have the right to
participate therein, and to the extent that it may elect by
written notice delivered to the indemnified party promptly after
receiving the aforesaid notice from such indemnified party, to
assume the defense thereof, with counsel reasonably satisfactory
to such indemnified party; provided, however, that if the

-63-

AG8805B07

Case 19-01232-KCF   Doc 2-1   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 4 to 12   Page 42 of 69
Case 1:19-mc-00103-UNA   Document 4-7   Filed 04/18/19   Page 26 of 28 PageID #: 494

defendants in any such action include both the indemnified party and the indemnifying party and the indemnified party shall have reasonably concluded that there may be legal defenses available to it and other indemnified parties which are different or are in addition to those available to the indemnifying party, the indemnified party or parties shall have the right to select separate counsel to assert, at the cost and expense of the indemnified party or parties, such legal defenses and to otherwise participate in the defense of such action on behalf of such indemnified party or parties, subject to reimbursement of such costs and expenses to the indemnified party or parties upon a final determination that such defense is within the indemnification obligations set forth in this Section 11. In the event that the indemnifying party shall assume the defense of a lawsuit as provided herein, the indemnifying party, after consultation with the indemnified party, shall have reasonable control over the decision to try, settle, compromise or otherwise terminate such lawsuit.

11.5  **Exclusive Remedy**.  J&J and Cyprus acknowledge and agree that the indemnity provisions of this Section 11 shall be the exclusive remedy for either party for any matter for which either party may be indemnified.

12.  **Operation of Business**.  Between the date hereof and the Closing Date, J&J shall cause Windsor and Western to operate their businesses in the ordinary course.  Neither Windsor nor

-64-

AG8805807

Case 19-01232-KCF   Doc 2-1   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 4 to 12   Page 43 of 69

Case 1:19-mc-00103-UNA   Document 4-7   Filed 04/18/19   Page 27 of 28 PageID #: 495

Western shall enter into or amend any material contract, or otherwise adversely affect in any material respect the financial conditions, ownership or operations of Windsor and Western without the prior written consent of Cyprus, which consent shall not be unreasonably withheld. With respect to capital investments and expenditures, and the ongoing operation of Windsor and Western facilities, J&J shall cause Windsor and Western to operate the business and facilities in the ordinary course, and shall make such capital investments and expenditures as may be required therefor; provided, however, that no capital investment or expenditure in excess of One Hundred Thousand Dollars ($100,000) shall be made or approved without the prior written consent of Cyprus, which consent or approval shall not be unreasonably withheld. After the Closing, Windsor shall have the right to manage its business and all aspects of it, and J & J shall have no right, except as set forth in the Talc Supply Agreement, to manage Windsor's business or any aspect of it.

13.   **Miscellaneous.**

13.1   **Parties in Interest; Assignment.**   This Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors and permitted assigns. This Agreement is not made for the benefit of any person, firm, corporation or other entity not a party hereto, and nothing in this Agreement shall be construed to give any person,

AG8805807

Case 19-01232-KCF   Doc 2-1   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 4 to 12   Page 44 of 69

Case 1:19-mc-00103-UNA   Document 4-7   Filed 04/18/19   Page 28 of 28 PageID #: 496

affect the interpretation of any of the provisions of this Agreement.

13.13 **Mutual Negotiation**. This Agreement and the language contained herein have been arrived at by the mutual negotiation of the parties. Accordingly, no provision hereof shall be construed against one party or in favor of another party merely by **reason of** draftsmanship.

IN WITNESS, WHEREOF, the parties have caused this Agreement to be executed effective as of the day and year first set forth above.

CYPRUS MINES CORPORATION,
a Delaware corporation,

By: _____

Title: Vice President _____

JOHNSON & JOHNSON,
a New Jersey corporation

By: _____

Title: _____

Case 19-01232-KCF    Doc 2-1    Filed 04/30/19    Entered 04/30/19 15:48:04    Desc
Exhibit C - Nolan Decl. Exhs. 4 to 12    Page 45 of 69

Case 1:19-mc-00103-UNA    Document 4-8    Filed 04/18/19    Page 1 of 13 PageID #: 497

# EXHIBIT 8

Case 19-01232-KCF    Doc 2-1    Filed 04/30/19    Entered 04/30/19 15:48:04    Desc
Exhibit C - Nolan Decl. Exhs. 4 to 12    Page 46 of 69
Case 1:19-mc-00103-UNA   Document 4-8   Filed 04/18/19   Page 2 of 13 PageID #: 498

John C. Garde (014171986)
**McCARTER & ENGLISH LLP**
100 Mulberry Street, Four Gateway Center
Newark, New Jersey 07102
Tel. 973-622-4444
Attorneys for Defendants
*Johnson & Johnson and*
*Johnson & Johnson Consumer Inc.*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| **RICARDO RIMONDI** and **PILAR RIMONDI**, | SUPERIOR COURT OF NEW JERSEY LAW DIVISION: MIDDLESEX COUNTY DOCKET NO: MID-L-02912-17 AS |
| Plaintiffs, : | |
| | ASBESTOS LITIGATION |
| v, : | CIVIL ACTION |
| BASF CATALYSTS LLC, *et al.*, : | **DEFENDANTS JOHNSON & JOHNSON CONSUMER INC. AND JOHNSON & JOHNSON'S JANUARY 2019 AMENDED SUPPLEMENTAL RESPONSES TO PLAINTIFFS' SUPPLEMENTAL INTERROGATORIES AND INITIAL REQUESTS FOR PRODUCTION OF DOCUMENTS** |
| Defendants. | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Defendants Johnson & Johnson Consumer Inc. ("JJCI") and Johnson & Johnson (collectively, "Defendants"), by and through their attorneys, hereby provide their January 2019 Amended Supplemental Responses ("Responses")[1] to Plaintiffs' Supplemental Interrogatories ("Interrogatories") and Initial Requests for Production of Documents ("Requests") stating as follows:

---

[1] These Responses supersede prior responses to these Interrogatories and Requests.

1

Case 19-01232-KCF    Doc 2-1    Filed 04/30/19    Entered 04/30/19 15:48:04    Desc
Exhibit C - Nolan Decl. Exhs. 4 to 12    Page 47 of 69
Case 1:19-mc-00103-UNA   Document 4-8   Filed 04/18/19   Page 3 of 13 PageID #: 499

## <u>INTRODUCTORY STATEMENT TO RESPONSES TO INTERROGATORIES AND REQUESTS</u>

Plaintiffs' action concerns alleged exposure to Johnson's® Baby Powder cosmetic talc products sold in the United States ("JBP").[2] JBP have been manufactured and sold at various periods of time by one or more of the Defendants and/or their predecessors, subsidiaries and affiliates (the "J&J Companies").  JJCI is currently the entity primarily responsible for the formulation, manufacture, testing, marketing and sale of Johnson's® Baby Powder.  Johnson & Johnson is a holding company that does not design, manufacture, market or sell Johnson's® Baby Powder (or any other product).[3]  Accordingly, the overwhelming majority of documents and information regarding JBP are in the possession of JJCI.

Johnson's® Baby Powder has been sold for over a century and continues to be sold today.  Over the many decades that JBP has been sold, different entities, departments, and employees – as well as third parties – have had responsibilities for various activities pertaining to these products, including, but not limited to activities relating to formulation, manufacture, testing, marketing and sale.  Many of Plaintiffs' claims relate to such activities which took place in the mid to late 1900s and therefore many of the individuals who were involved in or had first-hand knowledge of such activities have died or are no longer employed by any of the J&J Companies.

---

[2]    Defendants' Document Production (as defined herein) also includes documents regarding Shower to Shower® cosmetic talc products sold in the United States.  One or more of the J&J Companies (as defined herein) manufactured, marketed, and sold Shower to Shower® during the period from approximately 1960 to 2012.  In 2012, Shower to Shower® was sold to Valeant Pharmaceuticals International, Inc. ("Valeant"), which currently manufactures, markets and sells the product.

[3]    For this reason, Defendants object to Plaintiffs' collective allegations against JJCI and Johnson & Johnson on the grounds that they are factually and legally incorrect and improper.  By making this response, Defendants do not concede that Johnson & Johnson is a proper defendant in this action.

2

Case 19-01232-KCF    Doc 2-1    Filed 04/30/19    Entered 04/30/19 15:48:04    Desc
Exhibit C - Nolan Decl. Exhs. 4 to 12    Page 48 of 69
Case 1:19-mc-00103-UNA   Document 4-8   Filed 04/18/19   Page 4 of 13 PageID #: 500

In connection with personal injury actions against Defendants alleging exposure to JBP (including actions alleging that such exposure caused ovarian cancer, mesothelioma, or other diseases), Defendants have conducted reasonable searches at various times over the course of many years to identify, collect and produce documents that relate in a reasonably direct manner to Plaintiffs' allegations concerning JBP.  Although Defendants' searches generally have been broad in scope, over the last several years, Defendants have expanded their searches to take into account, among other factors, the development of the claims and defenses in talc personal injury actions, discovery requests propounded on Defendants, and the overall increase in number and scope of talc personal injury actions against Defendants.  In addition, in late 2017, Defendants re-visited sources from which documents were previously collected and made additional efforts to identify documents that may not have been identified in connection with earlier searches.[4] Responsive documents identified in connection with all of the foregoing search efforts are being produced in this action, subject to the entry of a Protective Order in this action (the "Document Production").

Included within the scope of Defendants' Document Production are documents concerning the talc and talcum powder used in JBP (talc mining and the fabrication and processing of talc powder, including sampling, testing and other quality control measures) as well as documents concerning the following activities and/or subject matters: research, formulation, specification, manufacture, quality control, labeling, sales, regulatory, adverse event reports, health and safety-related testing, and other consideration of health and safety issues

---

[4]    Because many of the documents collected in connection with the late 2017 search efforts were historic paper documents, reasonable methods of de-duplicating such documents against those previously produced are not available and, as a result, Defendants expect that many documents added to the production in connection with the late 2017 search efforts are duplicative of documents previously produced.

Case 19-01232-KCF    Doc 2-1    Filed 04/30/19    Entered 04/30/19 15:48:04    Desc
Exhibit C - Nolan Decl. Exhs. 4 to 12    Page 49 of 69
Case 1:19-mc-00103-UNA    Document 4-8    Filed 04/18/19    Page 5 of 13 PageID #: 501

reasonably related to JBP.  Also included in the Document Production are documents that may

pertain to Johnson's® Baby Powder sold outside the United States to the extent that they

reasonably relate to testing regarding asbestos or ovarian cancer.  Reasonable efforts also have

been made to include in Defendants' Document Production documents produced by Defendants

(including documents obtained from certain third parties) in all personal injury actions against

Defendants involving JBP.[5]

In addition, Plaintiffs have served a number of sets of discovery (including these

Requests and Interrogatories) that relate to the alleged sale of Johnson's® Baby Powder in the

Peru ("Foreign-Related Discovery").  Notwithstanding the breadth and scope of the foregoing

searches, Defendants have undertaken additional investigation in connection with the Foreign-

Related Discovery.  Defendants conducted additional reasonable searches specifically focused on

the types of information and documents sought in connection with the Foreign-Related

Discovery pertaining to Plaintiffs' alleged exposure periods of 1960 to 1992 in Peru.  Defendants

have identified additional responsive documents which have been added to the Document

Production, as described in the April 26, 2018 letter to Mr. Cotilletta.

By referring Plaintiffs in certain of their Responses to the materials described above,

Defendants are not stating, with respect to each and every Interrogatory or Request that they

have or have had responsive information or documents, that they agree with the characterizations

contained in the Interrogatories or Requests, or that all documents that may contain information

responsive to each and every Interrogatory and Request are included in the materials described

above.  Rather, by such reference, including descriptions of what documents Defendants have a

---

[5]   Defendants are making such documents available without waiver of their right to object to the authenticity
and/or admissibility of such documents on any ground, including but not limited to, hearsay, lack of relevance
and undue prejudice.  To the extent that Defendants identify additional responsive documents in connection
with this or other personal injury actions against Defendants involving exposure to JBP, they will supplement
their Document Production and make them available in this case.

Case 19-01232-KCF    Doc 2-1    Filed 04/30/19    Entered 04/30/19 15:48:04    Desc
Exhibit C - Nolan Decl. Exhs. 4 to 12    Page 50 of 69
Case 1:19-mc-00103-UNA    Document 4-8    Filed 04/18/19    Page 6 of 13 PageID #: 502

reasonable and good faith belief would be included in the Document Production, Defendants are stating that, if they have documents with responsive information, they have taken reasonable steps to identify those documents and include them in the Document Production.

Defendants' Document Production is in a reasonably usable, fully searchable form and Plaintiffs can identify specific documents that may be responsive to particular Interrogatories or Requests based on their own interpretation of such Interrogatories or Requests. Nevertheless, in response to certain Interrogatories and Requests that are reasonably narrow in scope and specific, Defendants have identified in their Responses by way of example Bates numbers of documents that they have a reasonable and good faith belief are responsive to such Interrogatories and Requests, based on their interpretation of those Interrogatories and Requests. Such references are not intended to be a comprehensive listing of each and every document that may be responsive to an Interrogatory or Request.

In addition, Defendants have made additional reasonable and good-faith efforts to identify documents in their Document Production that relate in a reasonably direct manner to certain topics ("Topics"). In developing the Topics, Defendants have taken into account the claims and defenses in talc personal injury litigation, as well as specific discovery requests Defendants have received. The Topics are identified below and the documents relating to such Topics will be identified in a spreadsheet that accompanies the Document Production. By providing such information to Plaintiff, Defendants are not stating that every document in the Document Production that may relate in some way to a Topic has been identified on the spreadsheet, but rather that Defendants have taken reasonable steps to identify such documents. The Topics are as follows:

1. Talc Sources (Mines/Mills/Suppliers)

Case 19-01232-KCF    Doc 2-1    Filed 04/30/19    Entered 04/30/19 15:48:04    Desc
Exhibit C - Nolan Decl. Exhs. 4 to 12    Page 51 of 69
Case 1:19-mc-00103-UNA    Document 4-8    Filed 04/18/19    Page 7 of 13 PageID #: 503

2. Manufacturing

3. Testing

4. Formulas/Product Specifications

5. Packaging Specifications/Labelling

6. Advertisements

7. Marketing

8. Sales/Distribution

9. Studies/Medical Literature

10. Adverse Events/Complaints/Workers' Comp Files

11. Warnings

12. Discussion of Health and/or Safety

13. Regulatory and Government Communications

14. Trade Associations

15. Cornstarch and Non-Talc Powder Formulations

16. Corporate History/Structure (Annual Reports, 10-Ks, Histories, Corporate Structure

Documents).

Pursuant to New Jersey Rule of Court 4:10-2(e)(2), any production of documents or

disclosure of information protected by any privilege, immunity, or doctrine, and/or any

production of a confidential document or confidential information, is not intended as, and shall

not be construed as, a waiver.

These Responses are made in a good faith effort to supply factual information and specify

legal contentions that are presently known.  Defendants reserve the right to supplement and/or

amend their Responses based on information or documents discovered in connection with

Case 19-01232-KCF    Doc 2-1    Filed 04/30/19    Entered 04/30/19 15:48:04    Desc
Exhibit C - Nolan Decl. Exhs. 4 to 12    Page 52 of 69
Case 1:19-mc-00103-UNA    Document 4-8    Filed 04/18/19    Page 8 of 13 PageID #: 504

ongoing investigation, discovery and/or trial preparation in accordance with the New Jersey
Rules of Court.

## GENERAL OBJECTIONS TO INTERROGATORIES AND REQUESTS

Defendants generally object to Plaintiffs' Interrogatories and Requests, including but not
limited to the Instructions and Definitions, to the extent that they seek to impose obligations
beyond those set forth in the New Jersey Rules of Court, this Court's Local Rules, Case
Management Orders or other orders entered by this Court in connection with this case, or any
other applicable law or rules.  Defendants object to the definitions of the terms "defendant",
"you", "your", and "your company" on the grounds that they are compound, vague, ambiguous,
and overbroad insofar as these terms as defined would refer to entities acting without any
authority from Defendants.  Defendants object to the definitions of the terms "asbestos",
"asbestos product" and "asbestos-containing product" on the grounds that they are compound,
vague, ambiguous, and overbroad insofar as they purport to include products beyond those at
issue in this litigation.  Furthermore, they are as vague and ambiguous to the extent it fails to
distinguish between raw asbestos, asbestos contained in different types of products or product
components, and/or different types of asbestos fibers.  Defendants never mined raw asbestos or
manufactured any asbestos-containing products.  Defendants object to the definitions of the term
"Talc" on the grounds that it is vague, ambiguous, and overbroad insofar as it purports to include
both industrial and cosmetic talc.  JBP only contained cosmetic talc.  Defendants object to the
definitions of the terms "talc product" and "talc-containing product" on the grounds that they are
compound, vague, ambiguous, and overbroad insofar as they purport to include products beyond
those at issue in this litigation.  Further, Defendants generally object to the extent that Plaintiffs'
Interrogatories and Request seek information and/or documents unrelated to JBP.  In addition,

Case 19-01232-KCF   Doc 2-1   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 4 to 12   Page 53 of 69
Case 1:19-mc-00103-UNA   Document 4-8   Filed 04/18/19   Page 9 of 13 PageID #: 505

Defendants generally object to Plaintiffs' Interrogatories and Requests to the extent that they

seek "all" information or "all documents" regarding a particular subject matter (or similarly

broad language) on the grounds that such Interrogatories and Requests (a) are vague and

ambiguous, (b) are overly broad, (c) seek information and/or documents that are not relevant

under Rule 4:10-2(a), (d) are unduly burdensome, and (e) seek information and/or documents

protected from disclosure by the attorney-client privilege, the attorney work product doctrine, or

both, as well as any other privilege or protection recognized by law.

### SPECIFIC OBJECTIONS THAT APPLY TO MULTIPLE INTERROGATORIES AND REQUESTS

Several of Defendants' objections apply to more than one Interrogatory or Request.  To

avoid repetition of objections that may apply to several of the Interrogatories and Requests, those

objections are set forth in the form of numbered paragraphs below.  Where applicable, these

objections are specifically incorporated by reference to paragraph number—e.g., "Specific

Objection No. 2"—in Defendants' Responses to particular Interrogatories and Requests below.

1.      Privilege:  Defendants object to Plaintiffs' Interrogatories and Requests to the

extent that they seek information and/or documents protected from disclosure by the attorney-

client privilege, the work product doctrine, the joint defense privilege, the common interest

doctrine, the self-critical analysis privilege, and/or any other privilege recognized by law.

2.      Confidential, commercially sensitive and proprietary information:  Defendants

object to Plaintiffs' Interrogatories and Requests to the extent they seek information and/or

documents that are confidential, commercially sensitive and proprietary, including but not

limited to information and/or documents relating to their products' design, testing, and

manufacturing.  Defendants state that they are not withholding documents based on this

objection, but rather are producing such documents subject to the protective order entered in this

Case 19-01232-KCF    Doc 2-1    Filed 04/30/19    Entered 04/30/19 15:48:04    Desc
Exhibit C - Nolan Decl. Exhs. 4 to 12    Page 54 of 69
Case 1:19-mc-00103-UNA    Document 4-8    Filed 04/18/19    Page 10 of 13 PageID #: 506

action.  In addition, Defendants may redact certain of the information described above from such documents and produce them in a redacted form.

3.    <u>Personal Information</u>:  Defendants object to Plaintiffs' Interrogatories and Requests to the extent they seek personal or private information and/or documents containing personal or private information about individuals other than Plaintiffs, including, but not limited to, home addresses and phone numbers of Defendants' current and former employees and identifying information (including but not limited to medical information) regarding other consumers of Defendants' products.  This information is not relevant, privileged, private, and/or confidential, and Defendants are required by law to protect some or all of it from disclosure.  Defendants state that they are not withholding documents containing personal information based on this objection, but rather are redacting personal information from documents and producing them in a redacted form.

4.    <u>Unreasonable Scope</u>:  Defendants object to Plaintiffs' Interrogatories and Requests to the extent that they are unreasonable, overly broad, unduly burdensome, and not proportional to the needs of the case (including but not limited to insofar as they are completely unlimited as to time period or are not limited to a reasonable time period) on the grounds that such Interrogatories and Requests violate Rule 4:10-2 of the New Jersey Rules of Court.

5.    <u>Foreign Entities</u>:  Defendants object to Plaintiffs' Interrogatories and Requests as unduly burdensome and not proportional to the needs of the case because they seek to require Defendants to obtain detailed information and documents from independent foreign entities that may have manufactured, distributed, or sold Johnson's® Baby Powder in the Peru.

6.    <u>Discovery Regarding Relationship Among Corporate Entities</u>:  Plaintiffs object to those  Interrogatories  and  Requests  that  seek  information  regarding  the  relationship  among

Case 19-01232-KCF    Doc 2-1    Filed 04/30/19    Entered 04/30/19 15:48:04    Desc
Exhibit C - Nolan Decl. Exhs. 4 to 12    Page 55 of 69
Case 1:19-mc-00103-UNA   Document 4-8   Filed 04/18/19   Page 11 of 13 PageID #: 507

different Johnson & Johnson entities on the grounds that such requests are unduly burdensome and oppressive and the information sought is neither relevant to the subject matter of this action, nor reasonably calculated to lead to the discovery of admissible evidence.  While the Johnson & Johnson (J&J) Defendants deny any liability in this action, to the extent any J&J entity is found liable, Johnson & Johnson Consumer Inc. (JJCI) is the entity that will accept such liability, regardless of whether it was the J&J entity that manufactured, marketed or sold the product(s) at issue for the entirety of Plaintiff's exposure to those products, and without waiver of its position that each J&J subsidiary and affiliate is a separate and distinct entity.

Subject to the qualifications set forth in the Introductory Statement and without waiver of the objections stated above, Defendants respond to the individual Interrogatories and Requests as follows.

## **ANSWERS TO SUPPLEMENTAL INTERROGATORIES**

INTERROGATORY NO. 1:

State the full name, address, telephone number and position of all corporate officers or other persons representing, providing information or otherwise assisting you in answering these interrogatories.

ANSWER TO INTERROGATORY NO. 1:

These responses are served on behalf of Defendants JJCI and Johnson & Johnson. Defendants' attorneys prepared these responses after consultation with Defendants, review of documents, and consideration of information that has been developed in the litigation.  These responses are verified by authorized agent(s) of Defendants as required by the applicable rules. The verification form will identify the individual making the verification.

To the extent that this Interrogatory seeks additional or different information, Defendants object on the grounds stated in Specific Objection No. 1 and 4.

Case 19-01232-KCF    Doc 2-1    Filed 04/30/19    Entered 04/30/19 15:48:04    Desc
Exhibit C - Nolan Decl. Exhs. 4 to 12    Page 56 of 69
Case 1:19-mc-00103-UNA    Document 4-8    Filed 04/18/19    Page 12 of 13 PageID #: 508

To the extent that this Interrogatory seeks additional or different information, Defendants

object on the grounds stated in Specific Objection No. 4.

INTERROGATORY NO. 15:

Do you maintain a database, compilation, summary and/or records of your sales

of cosmetic or personal hygiene products? If yes, please provide a detailed description of same

and the addresses where these are maintained and the name and address of their custodian(s).

ANSWER TO INTERROGATORY NO. 15:

By agreement of the parties at an April 26, 2018 meet-and-confer between Plaintiffs'

counsel and Defendants' counsel, Defendants are providing an amended response to this

Interrogatory with respect to JBP only.  Defendants state that they have a reasonable and good

faith belief that the materials described in the Introductory Statement include documents

containing available information regarding sales of JBP in the United States, including but not

limited to the following: JNJTALC000849720 to JNJTALC000849726 and

JNJTALC000849728 to JNJTALC000849770.

To the extent that this Interrogatory seeks additional or different information, Defendants

object on the grounds stated in Specific Objection No. 4.

INTERROGATORY NO. 16:

Identify where your cosmetic or personal hygiene products, including, but not

limited to, those identified by Plaintiffs or any other fact witness in this case, were manufactured,

assembled and distributed and by whom (name and address).

ANSWER TO INTERROGATORY NO. 16:

By agreement of the parties at an April 26, 2018 meet-and-confer between Plaintiffs'

counsel and Defendants' counsel, Defendants are providing an amended response to this

34

Case 19-01232-KCF   Doc 2-1   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 4 to 12   Page 57 of 69
Case 1:19-mc-00103-UNA   Document 4-8   Filed 04/18/19   Page 13 of 13 PageID #: 509

Interrogatory with respect to JBP only.  Defendants state that they have a reasonable and good faith belief that the following entities were responsible for the manufacture and distribution of JBP during approximately the following periods:

- 1894-1972  Johnson & Johnson

- 1972-1979  Johnson & Johnson Baby Products Company, a Division of Johnson & Johnson (*See* JNJTALC000471083-JNJTALC000471089).

- 1979-1981    Johnson & Johnson Baby Products Company (*See* JNJTALC000471090-JNJTALC000471103).

- 1981-1988  Johnson & Johnson Baby Products Company (a distinct entity from the above)    (*See*    JNJTALC000533370-JNJTALC000533377; JNJTALC000533378-JNJTALC000533380).

- 1988-1997    Johnson & Johnson Consumer Products, Inc.   (*See* JNJTALC000533381-JNJTALC000533385;    JNJTALC000533386-JNJTALC000533387).

- 1997-2015  Johnson & Johnson Consumer Companies, Inc.

- 2015-present Johnson & Johnson Consumer Inc. (*See* JNJTALC000471104-JNJTALC000471107; JNJTALC000471108-JNJTALC000471109).

To the extent that this Interrogatory seeks additional or different information, Defendants object on the grounds stated in Specific Objection No. 4.

<u>INTERROGATORY NO. 17</u>:

Identify each person, business or other entity in the chain of distribution of your cosmetic or personal hygiene products, including, but not limited to, those identified by Plaintiffs

Case 19-01232-KCF    Doc 2-1    Filed 04/30/19    Entered 04/30/19 15:48:04    Desc
Exhibit C - Nolan Decl. Exhs. 4 to 12    Page 58 of 69

Case 1:19-mc-00103-UNA    Document 4-9    Filed 04/18/19    Page 1 of 2 PageID #: 510

# EXHIBIT 9

Case 19-01232-KCF    Doc 2-1    Filed 04/30/19    Entered 04/30/19 15:48:04    Desc
Exhibit C - Nolan Decl. Exhs. 4 to 12    Page 59 of 69

Case 1:19-mc-00103-UNA    Document 4-9    Filed 04/18/19    Page 2 of 2 PageID #: 511

### CONSENT, ASSIGNMENT, AND ASSUMPTION

Reference is made to the Talc Supply Agreement between Cyprus Windsor Minerals Corporation, a Vermont corporation ("Assignor"), and Johnson & Johnson Baby Products Company, dated January 6, 1989 (the "Agreement"). Assignor hereby assigns its rights and delegates the performance of its duties under the Agreement to RTZ America, Inc., a Delaware corporation ("Assignee"). Johnson & Johnson Consumer Products, Inc., a New Jersey corporation ("CPI"), as successor in interest to Johnson & Johnson Baby Products Company, hereby consents to the assignment of rights and the delegation of performance of duties under the Agreement by Assignor to Assignee.

The consent of CPI granted hereby shall not release Assignor from any liability or responsibility under the Agreement and does not constitute a waiver or an estoppel with respect to any rights that CPI may have by reason of Assignor's past performance or failure to perform. The consent of CPI granted hereby is granted subject to the condition that Assignee has agreed, and hereby agrees, to assume and perform all of the obligations, covenants and agreements of Assignor in the Agreement and to comply with all the terms and conditions of the Agreement.

No provision of this consent, assignment, and assumption shall be deemed to alter or modify any term or condition of the Agreement.

In witness whereof, the parties have caused this consent, assignment, and assumption to be executed effective as of the ___29___ th day of June, 1992.

JOHNSON & JOHNSON
PRODUCTS, INC.

By: _Brian T. McGrath_
    Name: Brian T. McGrath
    Title: Director of Purchasing &
           Package Engineering

RTZ AMERICA, INC.

By: _Arthur P Bliss_
    Name: Arthur L Bliss
    Title: President

CYPRUS WINDSOR MINERALS CORPORATION

By: _____
    Name: Philip C. Wolf
    Title: President

Produce

0623.DEH

Case 19-01232-KCF   Doc 2-1   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 4 to 12   Page 60 of 69

Case 1:19-mc-00103-UNA   Document 4-10   Filed 04/18/19   Page 1 of 4 PageID #: 512

# EXHIBIT 10

Case 19-01232-KCF    Doc 2-1    Filed 04/30/19    Entered 04/30/19 15:48:04    Desc
Exhibit C - Nolan Decl. Exhs. 4 to 12    Page 61 of 69

Case 1:19-mc-00103-UNA    Document 4-10    Filed 04/18/19    Page 2 of 4 PageID #: 513

AMENDMENT AGREEMENT

AMENDMENT, dated as of December _31_, 1996, to Talc Supply Agreement dated January 6, 1989, as heretofore amended and assigned (the "Agreement"), between Johnson & Johnson Consumer Products, Inc. (as successor to Johnson & Johnson Baby Products Company) (the "Buyer"), and RTZ America, Inc. (as successor in interest to Windsor Minerals Inc.) (the "Seller").

For good and valuable consideration, the receipt of which is hereby acknowledged, Buyer and Seller hereby agree to and hereby amend the Agreement as follows:

1.    All capitalized terms used and not defined in this Amendment shall have the respective meanings set forth in the Agreement.

2.    Section 2(a) is amended by replacing the date "December 31, 1998" with the date "December 31, 1996".

3.    Section 2(b) is hereby deleted in its entirety and replaced with the following:

> "The term of this Agreement shall be extended from January 1, 1997 through the close of business on December 31, 1999 (the "Additional Term"),  and shall be automatically extended for up to two additional one-year terms, unless Seller notifies Buyer in writing no later than July 1, 1999 (or July 1, 2000 in the event the term hereof is extended for the calendar year 2000) of its decision to terminate the term of this Agreement as of the end of the then-current calendar year.  Prior to March 31, 2001, if this Agreement is still in effect, Buyer shall (i) if requested in writing by Seller, engage in good faith negotiations as to extending the term of this Agreement beyond calendar year 2001, upon terms and conditions mutually acceptable to the parties, and (ii) not enter into any talc supply agreement with any third party for greater than 10% of the Talc requirements of Buyer and Johnson & Johnson (Canada), Inc. ("J&J Canada") in the United States and Canada."

4.    The first sentence of Section 3(a) is hereby deleted in its entirety and replaced with the following:

> "Subject to the provisions of Section 3(c) hereof, Buyer shall purchase from Seller and shall cause J&J Canada to purchase from Seller (i)

Case 19-01232-KCF   Doc 2-1   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 4 to 12   Page 62 of 69

Case 1:19-mc-00103-UNA   Document 4-10   Filed 04/18/19   Page 3 of 4 PageID #: 514

2

> not less than 98% of the Talc requirements of Buyer and J&J Canada
> in the years 1997 and 1998 for products sold by Buyer and J&J
> Canada in the United States and Canada and (ii) not less than 90% of
> the Talc requirements of Buyer and J&J Canada in the years 1999,
> 2000 and 2001 (unless this Agreement is earlier terminated in
> accordance with the terms hereof) for products sold by Buyer and J&J
> Canada in the United States and Canada."

5.    Section 3(c)(ii) is hereby deleted in its entirely and replaced with the following:

> "During the term of this Agreement from January 1, 1999 through and
> until December 31, 2001 (or the earlier termination of this Agreement
> in accordance with the terms hereof) , Buyer shall have the right to
> purchase up to 10% of Buyer's United States and Canada cosmetic
> talc requirements from a supplier other than Seller, which supplier
> has qualified its ore source with Buyer in accordance with the
> provisions of Section 6 (a) hereof."

6.    Section 4 is deleted in its entirety and replaced with the following:

> "The price which Buyer shall pay to Seller for the Talc purchased by
> Buyer during the Additional Term shall be as follows:

| Date of Shipment of Talc | Price Per Metric Ton |
|---|---|
| Calendar Year 1997 | US$390. |
| Calendar Year 1998 | US$335. |
| Calendar Year 1999 | US$260. |
| Calendar Years 2000 & 2001 | US$260 |

7.    In the event of any conflict or inconsistency between the provisions of this
Amendment and the provisions of the Agreement with respect to the matters set
forth herein, the terms of this Amendment shall control. All references to the
Agreement in any other agreement or document shall hereafter be deemed to refer
to the Agreement as hereby amended. Except as expressly set forth herein, the
terms and conditions of the Agreement are hereby ratified and confirmed in all
respects and shall remain in full force and effect in accordance with the terms
thereof.

Case 19-01232-KCF    Doc 2-1    Filed 04/30/19    Entered 04/30/19 15:48:04    Desc
Exhibit C - Nolan Decl. Exhs. 4 to 12    Page 63 of 69

Case 1:19-mc-00103-UNA   Document 4-10   Filed 04/18/19   Page 4 of 4 PageID #: 515

3

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed and delivered as of the date first above written.

RTZ AMERICA, INC.

JOHNSON & JOHNSON
CONSUMER PRODUCTS, INC.

By: _____
President

By: _____
Chief Purchasing Officer

talcam1.doc 12/03/96

Case 19-01232-KCF    Doc 2-1    Filed 04/30/19    Entered 04/30/19 15:48:04    Desc
Exhibit C - Nolan Decl. Exhs. 4 to 12    Page 64 of 69

Case 1:19-mc-00103-UNA    Document 4-11    Filed 04/18/19    Page 1 of 3 PageID #: 516

# EXHIBIT 11

Case 19-01232-KCF   Doc 2-1   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 4 to 12   Page 65 of 69

Case 1:19-mc-00103-UNA   Document 4-11   Filed 04/18/19   Page 2 of 3 PageID #: 517

June 15, 2000

Ms. Karen A. Pfirrman                                    *Sent by Fax*
Purchasing Manager                                       *& by Courier*
Johnson & Johnson
Consumer Products Company
P.O. Box 587
545 Old Elbert Road
Royston, Georgia 30662

(Phone:  706-245-2042)

Dear Karen:

Reference is made to the Amendment Agreement dated as of December 31,
1996 to the Talc Supply Agreement dated as of January 6, 1989 between
Johnson & Johnson Consumer Products, Inc. and RTZ America, Inc.

Pursuant to Section 3 of that Amendment Agreement, this letter is to advise you
that, we, the Seller have decided to terminate the term of this Amendment
Agreement as of the end of calendar year 2000.

As we discussed by phone, thereafter, for calendar year 2001, Luzenac America
would be pleased to continue to supply to Johnson & Johnson talc of the type
and specification set out in the Talc Supply Agreement at a price of US $285 per
metric ton, or US$25 per metric ton higher than the currently prevailing price.

We regret having to take this position.  We appreciate the opportunity to work
with you in a continued spirit of cooperation to seek a long term arrangement
which will be satisfactory to both of our companies.

Sincerely,



Richard J. Meli
President

CC:  *Director of Procurement*, J &J Baby Products Company, c/o Johnson & Johnson Consumer
        Products, Inc., 501 George Street, New Brunswick, NJ  08903, sent by Registered Mail
        *General Counsel*, Johnson & Johnson, One Johnson & Johnson Plaza, New Brunswick, NJ
        08933, sent by Registered Mail
        *André Talmon* – Luzenac Group
        *Jack Buettner* – Luzenac America
        *Steve Mauney* – Luzenac America

Case 19-01232-KCF    Doc 2-1    Filed 04/30/19    Entered 04/30/19 15:48:04    Desc
Exhibit C - Nolan Decl. Exhs. 4 to 12    Page 66 of 69

Case 1:19-mc-00103-UNA    Document 4-11    Filed 04/18/19    Page 3 of 3 PageID #: 518

J &J Baby Products Company
c/o Johnson & Johnson Consumer Products, Inc.
501 George Street, New Brunswick, NJ  08903

Attn:  Director of Procurement,


Johnson & Johnson
One Johnson & Johnson Plaza
New Brunswick, NJ  08933

Attn:  General Counsel

Case 19-01232-KCF    Doc 2-1    Filed 04/30/19    Entered 04/30/19 15:48:04    Desc
Exhibit C - Nolan Decl. Exhs. 4 to 12    Page 67 of 69

Case 1:19-mc-00103-UNA   Document 4-12   Filed 04/18/19   Page 1 of 3 PageID #: 519

# EXHIBIT 12

Case 19-01232-KCF   Doc 2-1   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 4 to 12   Page 68 of 69

Case 1:19-mc-00103-UNA   Document 4-12   Filed 04/18/19   Page 2 of 3 PageID #: 520


June 23, 2015



**VIA FEDERAL EXPRESS**

J&J Baby Products Company
c/o Johnson & Johnson Consumer Products,
Inc.
501 George Street
New Brunswick, New Jersey 08903
Attn:  Director of Procurement

J&J Baby Products Company
c/o Johnson & Johnson Consumer Products,
Inc.
501 George Street
New Brunswick, New Jersey 08903
Attn: Vice President – Finance

**Re:    Indemnification Demand Notice for Ovarian Cancer Lawsuits**

Dear Sir/Madam:

I write to notify Johnson & Johnson; Johnson & Johnson Baby Products Company, a division of Johnson & Johnson Consumer Products, Inc.; and Johnson & Johnson Consumer Companies, Inc. (collectively "J&J") of Imerys Talc America, Inc.'s f/k/a Luzenac America, Inc. ("Imerys") demand for indemnification pursuant to various talc supply and material purchase agreements with J&J (the "Agreements"), as well as by operation of law.

Specifically, the 1989 Talc Supply Agreement between J&J and Windsor Minerals, Inc. provides that J&J "shall indemnify, defend and hold harmless [Windsor Minerals], and its affiliates, and each of their respective directors, officers, employees, and agents from and against all liabilities arising out of any product liability-based claim, suit, demand or cause of action directed against [Windsor Minerals] or any of [Windsor Minerals'] affiliates: (i) arising out of the sale of cosmetic talc products to consumer markets, which products were manufactured by [Windsor Minerals] prior to [January 6, 1989]; or (ii) for which [J&J] is directly or indirectly responsible as a result of [J&J's] possession, use or processing of Talc delivered to [J&J] pursuant to this Agreement, or as a result of [J&J's] manufacture, shipment and sale of Talc-containing product (including without limitation, baby powder and adult powder) derived from Talc delivered to [J&J] pursuant to this Agreement … The provisions of this Section 11 survive termination or expiration of this Agreement." (1989 Talc Supply Agreement, §11.)

Also in 1989, J&J sold the stock of Windsor Minerals, Inc. to Cyprus Mines Corporation ("Cyprus") pursuant to a Stock Purchase Agreement (the "SPA"). The 1989 SPA requires J&J to indemnify Cyprus against any "product liability-based claim, suit, demand or cause of action directed against Cyprus, Windsor or Western or any of their affiliates arising out of the sale of talc or talc-containing products manufactured by Windsor, Western, J&J or the affiliates of Windsor, Western or J&J, prior to Closing … J&J's obligation of indemnification … shall survive the Closing forever." (1989 SPA, §11.2.) In or around 1992, Cyprus sold its U.S. talc operations to RTZ America, Inc., a subsidiary of the Rio Tinto Group, which subsequently changed the name of its U.S. talc operations from Cyprus to Luzenac America, Inc. ("Luzenac").

100 Mansell Court East, Suite 300, Roswell, GA 30076
Tel: 770-645-3300 - Fax: 770-645-3475 - www.imerys.com

Case 19-01232-KCF   Doc 2-1   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
                Exhibit C - Nolan Decl. Exhs. 4 to 12    Page 69 of 69

Case 1:19-mc-00103-UNA   Document 4-12   Filed 04/18/19   Page 3 of 3 PageID #: 521

In addition, the 2011 Material Purchase Agreement between J&J and Luzenac provides that J&J "shall indemnify, defend and hold harmless [Luzenac] for any third party claims brought against [Luzenac] based on the use of Materials by [J&J]." (2011 Material Purchase Agreement, ¶ 6.) On August 1, 2011, Rio Tinto America, Inc. sold the stock of the talc operations of the Rio Tinto Group to Mircal SA, which later changed the name from Luzenac to Imerys Talc America, Inc.

As you know, since 2009, numerous lawsuits have been filed against Imerys Talc America, Inc. f/k/a Luzenac America, Inc. in various jurisdictions alleging bodily injury as a result of long-term use of certain talc-based body powders manufactured by J&J with talc delivered by Imerys/Luzenac in accordance with the Agreements with J&J (the "Talc Lawsuits").

In light of the allegations contained in the Talc Lawsuits, this letter is to notify you that J&J is obligated under the Agreements and/or principles of implied contract and/or implied indemnity to indemnify, defend, and hold harmless Imerys with respect to the liabilities resulting from the Talc Lawsuits including, but not limited to, legal defense costs and reasonable attorney fees incurred in defending the Talc Lawsuits.

Please confirm in writing no later than ten (10) business days that J&J will comply with its indemnification obligations. Once I receive such confirmation, I will forward invoices for legal fees incurred to date for reimbursement and will continue to forward invoices for legal fees incurred by Imerys' counsel in defending ongoing or subsequent Talc Lawsuits.

Sincerely,

Ryan J. Van Meter
Vice President & General Counsel, North America
Imerys Talc America, Inc.

cc: Johnson & Johnson
    One Johnson & Johnson Plaza
    New Brunswick, New Jersey 08933
    Attn: General Counsel

21188106.3