Case 19-01232-KCF   Doc 2-2   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18   Page 1 of 94

Case 1:19-mc-00103-UNA   Document 4-13   Filed 04/18/19   Page 1 of 22 PageID #: 522

# EXHIBIT 13

Case 19-01232-KCF   Doc 2-2   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18   Page 2 of 94
Case 1:19-mc-00103-RGA-SRF   Document 4-23   Filed 04/29/19   Page 2 of 226 PageID #: 523

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| IMERYS TALC AMERICA, INC., *et al.*,[1] | Case No. 19-10289 (LSS) |
| Debtors. | (Jointly Administered) |
| IMERYS TALC AMERICA, INC. IMERYS TALC VERMONT, INC. and IMERYS TALC CANADA, INC., | |
| Plaintiffs, | Adv. Pro. No. 19-50115 (LSS) |
| v. | |
| CYPRUS AMAX MINERALS COMPANY and CYPRUS MINES CORPORATION, | |
| Defendants. | |

## THE PROPOSED FUTURE CLAIMANTS'
## REPRESENTATIVE'S MOTION TO INTERVENE

Pursuant to Rule 24(a) or, alternatively, Rule 24(b)(1)(B) of the Federal Rules of Civil

Procedure, James L. Patton, Jr., the proposed legal representative (the "Proposed FCR")[2] for

unknown individuals who do not currently hold talc-related claims against the Debtors but are

expected to assert claims or "Future Claims" against the Debtors in the future (the "Future

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Imerys Talc America, Inc. (6358), Imerys Talc Vermont, Inc. (9050), and Imerys Talc Canada Inc. (6748). The Debtors' address is 100 Mansell Court East, Suite 300, Roswell, Georgia 30076.

[2] The Debtors and the U.S. Trustee are in discussions regarding the scheduling of the substantive hearing on the Debtors' motion for an order appointing the Proposed FCR.

Case 19-01232-KCF   Doc 2-2   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18   Page 3 of 94
Case 1:19-mc-00103-MN-SS   Document 4-23   Filed 04/29/19   Page 32 of 226 PageID #: 524

Claimants"), hereby submits this motion (the "Motion"), in his own right or on behalf of such other person as the Court may ultimately appoint as the representative for Future Claimants in these chapter 11 cases (as appointed, the "FCR"), for entry of an order permitting the FCR to intervene as a plaintiff in the above-captioned adversary proceeding (the "Action") commenced by Imerys Talc America, Inc. ("ITA") and its affiliated chapter 11 debtors (collectively, the "Debtors") against Cyprus Amax Minerals Company ("CAMC") and Cyprus Mines Corporation ("Cyprus Mines" and, together with CAMC, the "Defendants").

## INTRODUCTION

1.      As in any bankruptcy case, numerous creditors and parties in interest will play a role in this reorganization. This case, however, has an additional element. It involves asbestos-related claims and liabilities, and future claims or demands.

2.      The Debtors initiated these cases to resolve for themselves, and likely certain non-debtor affiliates, pending and future claims by plaintiffs alleging personal injuries caused by exposure to talc mined, processed, or distributed by one or more of the Debtors (the "Talc Claims"). The Debtors' talc-related liability is owed primarily to two groups: those victims with manifest injuries ("Current Claimants") and those victims who are not yet aware of their injuries but who will assert claims ("Future Claims") for compensation in the future—the Future Claimants. Given their likely number and value, the disposition of Future Claims is arguably the single most important aspect of this bankruptcy. Thousands of persons injured by the Debtors' talc will assert claims for compensation in the future. But since their injuries have yet to manifest themselves, the Future Claimants are unable to appear in this proceeding. It is the duty of the FCR to represent these Future Claimants and to assure that their rights and interests are fully protected.

01:24335170.1

2

Case 19-01232-KCF   Doc 2-2   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18   Page 4 of 94
Case 1:19-mc-00189-RA-SN   Document 4-25   Filed 03/29/19   Page 3 of 26 PageID #: 525

3.      The FCR's duties include assuring that sufficient assets will be available to fairly compensate Future Claimants. The Debtors' insurance assets will likely provide a significant portion of the compensation available to Future Claimants, and thus, those insurance assets will be among the singular interests of any FCR appointed in these cases.

4.      As the statutory fiduciary representative of all Future Claimants under 11 U.S.C. §§ 105(a) and 524(g) and a party in interest under 11 U.S.C. § 1109(b), the FCR has an absolute right under Rule 24(a) of the Federal Rules of Civil Procedure to intervene in the Action on behalf of Future Claimants. In the alternative, the Court should permit the FCR to intervene under Rule 24(b)(1)(B) of the Federal Rules of Civil Procedure. Intervention by the FCR in the Action is critical because it will enable the FCR to exercise his fiduciary duties to assert and protect Future Claimants' interests, which interests would not otherwise be adequately protected by the existing parties to this Action, including the Debtors and the Committee,[3] who owe no duty to Future Claimants and who cannot provide the "vigorous and faithful vicarious representation" required by due process.[4] The FCR will be judicious in exercising his or her rights of participation in motion practice, discovery, settlement discussions, and proceedings before the Court, but the FCR's intervention is necessary to ensure that Future Claimants' rights and interests are fully protected.

---

[3] The Official Committee of Tort Claimants (the "Committee") has moved to intervene in the Action. *See* Adv. Docket No. 16.

[4] *See Ivy v. Diamond Shamrock Chems. Co. (In re Agent Orange Prod. Liab. Litig.)*, 996 F.2d 1425, 1435 (2d Cir. 1993).

01:24335170.1

Case 19-01232-KCF    Doc 2-2    Filed 04/30/19    Entered 04/30/19 15:48:04    Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18    Page 5 of 94
Case 1:19-mc-00103-SLR    Document 4-25    Filed 04/29/19    Page 54 of 226 PageID #: 526

## JURISDICTION AND VENUE

5.      The Court has jurisdiction to consider this matter pursuant to 28 U.S.C.

§§ 1334(b) and 157(b)(1). Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and

1409(a).

## FACTUAL BACKGROUND

**A.  The Debtors' Stated Goal for These Cases Is to Establish a Trust That Will Fairly Compensate the Holders of Current and Future Talc Claims.**

6.      The Debtors commenced these chapter 11 cases on February 13, 2019 (the

"Petition Date") with the "primary goal" of confirming a "consensual plan of reorganization

pursuant to sections 105(a), 524(g), and 1129 of the Bankruptcy Code that channels all of the

present and future Talc Claims to a trust vested with substantial assets and provides for a

channeling injunction prohibiting claimants from asserting" Talc Claims against the Debtors or

their affiliates.[5]

7.      Section 524(g) is a unique provision of the Bankruptcy Code that serves the dual

purposes of (i) enabling a debtor with significant asbestos liability to restructure and emerge as a

viable business entity and (ii) providing suitable funding to pay equitably the claims of current

and future victims of asbestos-related diseases.[6] Section 524(g) conditions issuance of a

channeling injunction on multiple requirements, including certain findings about the debtor's

---

[5] Declaration of Alexandra Picard, Chief Financial Officer of the Debtors in Support of Chapter 11 Petitions and First Day Pleadings ¶ 11(the "First Day Declaration").

[6] *See In re Federal-Mogul Global Inc.*, 684 F.3d 355, 359 (3d Cir. 2012); *see also* 11 U.S.C. § 524(g)(2)(B)(ii)(V) (providing that there must be "a reasonable assurance that the trust will value, and be in a financial position to pay, present claims and future demands that involve similar claims in substantially the same manner."); § 524(g)(4)(B)(ii) (a plan cannot be confirmed unless it is deemed to be "fair and equitable with respect to the persons that might subsequently assert [future] demands"); 140 Cong. Rec. H10,765 (Oct. 4, 1994) (stating that the "new subsection (g) to section 524 of the Code" was set up to establish equitable mechanisms to resolve "future personal injury claims against the debtor based on exposure to asbestos-containing products" and that "the interests of future claimants are ill-served if Johns-Manville and other asbestos companies are forced into liquidation and lose their ability to generate stock value and profits that can be used to satisfy claims").

01:24335170.1

Case 19-01232-KCF   Doc 2-2   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18   Page 6 of 94
Case 1:19-mc-00103-SHS   Document 4-25   Filed 03/29/19   Page 5 of 22 PageID #: 527

liability and adequate protections for claimants, such as a supermajority vote by current claimants and appointment of a future claimants' representative to represent the currently unidentifiable victims who may seek compensation for their injuries after a plan of reorganization is confirmed.[7]

8.       Indeed, due process, fundamental fairness, and the limits of subject-matter jurisdiction mark the outer boundaries of what may be considered a "claim" subject to discharge in bankruptcy. Because there is no effective way to notify unknown and not-yet-symptomatic victims of their right to participate in bankruptcy proceedings, the claims of these individuals cannot be asserted before confirmation of a chapter 11 plan and likely would not be discharged through any such plan.[8] Thus, without "vigorous and faithful vicarious representation" by the FCR,[9] a bankruptcy discharge alone will not operate to free the Debtors from their Future Claims, nor will it preclude Future Claimants from asserting direct actions against the Debtors after the chapter 11 cases have concluded.[10]

9.       Accordingly, under § 524(g), to the extent a debtor is seeking confirmation of a plan pursuant to which the court will issue an injunction channeling future claims and demands to a trust, a legal representative must be appointed for the purpose of protecting the rights of the individuals holding those future claims and demands.[11]

---

[7] *Id.*; *see also* 11 U.S.C. § 524(g)(4)(B)(i) (an injunction affecting future claimants may be issued only if "the court appoints a legal representative for the purpose of *protecting the rights of persons* that might subsequently assert demands" (emphasis added)).

[8] *See Wright v. Owens Corning*, 679 F.3d 101, 107 (3d Cir. 2012) ("Inadequate notice accordingly 'precludes discharge of a claim in bankruptcy.'" (quoting *Chemetron Corp. v. Jones*, 72 F.3d 341, 346 (3d Cir. 1995))).

[9] *Diamond Shamrock Chems.*, 996 F.2d at 1435.

[10] *See* 11 U.S.C. § 1141(d); 11 U.S.C. § 524(e); *see also Hall v. Nat'l Gypsum Co.*, 105 F.3d 225, 229 (5th Cir. 1997); *Houston v. Edgeworth (In re Edgeworth)*, 993 F.2d 51, 53 (5th Cir. 1993).

[11] *See* 11 U.S.C. § 524(g)(4)(B)(i).

Case 19-01232-KCF    Doc 2-2    Filed 04/30/19    Entered 04/30/19 15:48:04    Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18    Page 7 of 94
Case 1:19-mc-00103-MN    Document 4-23    Filed 04/29/19    Page 7 of 22 PageID #: 528

**B. The FCR's Duties Include Assuring That Trust Funding Will Be Sufficient to Fairly Compensate Future Claimants.**

10.     On February 27, 2019, the Debtors filed a motion seeking entry of an order appointing the Proposed FCR as "the legal representative for future talc personal injury claimants of the Debtors."[12]

11.     The benefits of appointing an FCR experienced in asbestos bankruptcies are many. The technical details regarding the structure and timing of trust contributions, the scope of the channeling injunction, the technicalities of § 524(g), and the trust distribution procedures and trust agreement that will govern the trust created pursuant to § 524(g) are largely unique to asbestos bankruptcies and thus beyond the ken of even an experienced bankruptcy practitioner.[13] Appointment of an experienced FCR also minimizes the potential for missteps that could prolong the reorganization process, delay payments to current claimants, and result in substantially increased professional fees and other bankruptcy-related expenses. Finally, appointment of an experienced and well-regarded FCR helps establish and preserve an appropriate factual record, which helps ensure that the validity of the channeling injunction will not be subject to collateral attack.

12.     The FCR will be charged with protecting and representing the rights of persons that might subsequently assert Future Claims against the Debtors.[14] This requires the FCR to

---

[12] Debtors' Motion for Order Appointing James L. Patton, Jr., as Legal Representative for Future Talc Personal Injury Claimants, *Nunc Pro Tunc* to the Petition Date at 1 [Docket No. 100] (the "FCR Appointment Motion").

[13] *See, e.g.*, S. Elizabeth Gibson, Fed. Judicial Ctr., *Judicial Management of Mass Tort Bankruptcy Cases* 67 (2005) ("In deciding whom to appoint, judges should look for persons with the training and experience needed to deal competently with the tort, bankruptcy, corporate, financial, and constitutional issues that will be involved in representing the interests of future claimants.").

[14] *See, e.g.*, FCR Appointment Motion ¶ 21 ("To protect the interests of such Future Claimants it is necessary and appropriate for the Court to appoint a legal representative to act as their fiduciary."); *id.* ¶ 22 ("The appointment of a future claimants' representative is necessary to represent the interests of Future Claimants and ensure that the relief sought through a plan of reorganization in this case comports with due process and fairness.").

Case 19-01232-KCF   Doc 2-2   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18   Page 8 of 94
Case 1:19-mc-00103-RGA-LPS   Document 2-25   Filed 04/29/19   Page 7 of 226 PageID #: 529

play a central role in the development and approval of a plan of reorganization, including first-hand participation in negotiating the plan and the right to be heard with reference to any motion filed.[15]

13.      The FCR's most important duties are to assure that the protections of the Debtors' proposed channeling injunction are afforded only where consistent with the interests of Future Claimants and to assure that any claims-resolution trust ultimately proposed in this case is adequately funded and appropriately structured to assure that Future Claimants will be treated and paid in a manner substantially similar to Current Claimants. The estimated number and value of Future Claims in this case makes the holders of such Future Claims one of the most important constituencies in this bankruptcy. It is likely that tens of thousands of Future Claimants will assert claims for compensation.

14.      Accordingly, one of the questions central to these chapter 11 cases is: at what level must a trust be funded to compensate Future Claimants appropriately? One of the FCR's primary objectives will be to provide the Court with the information necessary to answer this question.

**C.  The Debtors' Insurance Assets Will Provide Significant Funding for the Trust.**

15.      On March 7, 2019, the Debtors commenced the above-captioned adversary proceeding by filing the *Debtors' Complaint for Injunctive and Declaratory Relief* [Adv. Docket

---

[15] *See, e.g.*, *Manville Corp. v. Equity Sec. Holders Comm. (In re Johns-Manville Corp.)*, 66 B.R. 517, 526–27 (Bankr. S.D.N.Y. 1986); *In re UNR Indus., Inc.*, 71 B.R. 467, 479 (Bankr. N.D. Ill. 1987) ("[T]he Legal Representative is not in fact a committee.  Instead, he has been granted the powers and responsibilities of a committee."); *In re Keene Corp.*, 188 B.R. 903, 905 (Bankr. S.D.N.Y. 1995) (denying a co-defendant of the debtor leave to file a late claim for contribution or indemnity in the face of opposition by the future claimants' representative); *Official Comm. of Injury Claimants v. Official Comm. of Unsecured Creditors (In re Eagle Picher Indus., Inc.)*, 169 B.R. 135, 138 (Bankr. S.D. Ohio 1994) (staying discovery sought by the Official Committee of Unsecured Creditors in reference to more than 100 proofs of claim filed by asbestos claimants in the face of opposition from the futures representative).

01:24335170.1

Case 19-01232-KCF   Doc 2-2   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18   Page 9 of 94
Case 1:19-mc-00103-MN   Document 4-25   Filed 04/29/19   Page 9 of 226 PageID #: 530

No. 1] (the "<u>Complaint</u>").[16] The Complaint seeks to stop Defendants' attempts to access and

deplete the proceeds of the Insurance Policies, which would have the effect of reducing the

amounts otherwise available to the Debtors' creditors, through a trust, to cover talc-related

claims.

16.     The Action is the first of many insurance- and indemnity-related disputes that

may arise in these Chapter 11 Cases. As the First Day Declaration makes plain, the Debtors have

significant insurance assets through varied primary and excess insurers, subject to potential

competing claims from various current and former affiliates.[17]

17.     As explained in more detail in the First Day Declaration, the Debtors have the

right to seek insurance coverage under (i) four primary liability policies that Zurich American

Insurance Company ("Zurich") issued to Luzenac America (a prior owner of the Debtors) from

May 1997 to May 2001 with total aggregate limits of liability of $20 million and (ii) ten primary

liability policies that Zurich issued to entities affiliated with Rio Tinto (another prior owner of

the Debtors) from May 2001 to May 2011 with total aggregate limits of $480 million

(collectively, the "Zurich Policies").

18.     The Debtors also have the right to seek insurance coverage under four primary

general liability policies and four umbrella polices issued by XL Insurance America, Inc. ("XL")

to Imerys USA and its subsidiaries for the period of January 2011 to January 2015 (collectively,

the "XL Policies"). The four primary XL Policies had total aggregate limits of $4 million, and

the four umbrella XL Policies had total aggregate limits of $34 million. It is the Proposed FCR's

---

[16] Capitalized terms not otherwise defined herein have the meanings given to them in the Complaint.

[17] First Day Declaration ¶¶ 38–45.

understanding that, as of the Petition Date, the XL Policies have total remaining limits of approximately $37 million.[18]

19.     Based on his prepetition diligence, the Proposed FCR understands that the Debtors also have the right to seek the proceeds from various insurance policies issued to (i) Standard Oil (Indiana) and (ii) J&J and its subsidiaries. The Standard Oil (Indiana) policies and J&J policies had total aggregate limits of approximately $1.2 billion and approximately $2 billion, respectively, although the remaining and available limits on these policies were unknown as of the Petition Date.[19]

20.     Finally, and most significantly here, the Debtors have rights to the proceeds of the Insurance Policies that provide coverage for liabilities arising out of the talc business of Cyprus. More specifically, the Debtors have the right to seek insurance coverage under (i) four primary liability policies issued by The American Insurance Company from May 1961 to October 1964 and (ii) umbrella and excess policies issued by various insurers from April 1962 to July 1986 with total aggregate limits of approximately $180 million.[20]

21.     Given the FCR's fiduciary duty to protect the interests of Future Claimants and to assure that trust funding will be sufficient to compensate Future Claimants fairly, it is critical that the FCR be permitted to intervene to protect against the potential dissipation of estate assets that could otherwise be used to compensate Future Claimants.

---

[18] *See id.* ¶ 40.

[19] *See id.* ¶ 41.

[20] *See id.*

Case 19-01232-KCF    Doc 2-2    Filed 04/30/19    Entered 04/30/19 15:48:04    Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18    Page 11 of 94
Case 1:19-mc-00039-DNH-DLS Document 4-23    Filed 04/29/19    Page 11 of 26 PageID #: 532

## RELIEF REQUESTED[21]

22.     The Proposed FCR respectfully requests that the Court enter an order permitting the FCR to intervene as of right in the Action as a plaintiff pursuant to Rule 24(a) of the Federal Rules of Civil Procedure (the "Rules"). Alternatively, the Proposed FCR respectfully requests that the Court exercise its discretion and enter an order permitting the FCR to intervene in the Action pursuant to Rule 24(b)(1)(B). For the convenience of the current parties to the Action, and in the interest of being judicious about his participation in the Action, the Proposed FCR hereby adopts and incorporates the Debtors' Complaint by reference with respect to the relief it seeks against the Defendants, while reserving all of the FCR's rights as to any other or further relief. As such, the Proposed FCR will not file a pleading stating a claim or defense as would otherwise be required under Rule 24(c), unless the Court orders otherwise. In addition, the Proposed FCR does not intend to serve duplicative discovery or take other duplicative actions, and will coordinate with the other parties to the Action to work within the current schedule.

## BASIS FOR THE RELIEF REQUESTED

### I.     The FCR Has an Absolute Right to Intervene in the Action Under Rule 24(a).

Under Rule 24(a) of the Federal Rules of Civil Procedure, the FCR has an absolute right to intervene in the Action if (i) a federal statue gives him or her an unconditional right to intervene or (ii) disposing of the Action would impair or impede the FCR's ability to protect Future Claimants' interest in the Debtors' insurance assets and existing parties to the Action

---

[21] Prior to filing this Motion, the undersigned counsel to the Proposed FCR contacted counsel to the Debtors, the Committee, and the Defendants to obtain their consent with respect to the FCR's request to intervene in the Action. The Debtors and Committee have provided their consent, and the Defendants have informed the Proposed FCR that they will decide whether to consent to the FCR's intervention after reviewing this Motion.

Case 19-01232-KCF   Doc 2-2   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18   Page 12 of 94
Case 1:19-mc-00103-BLS-SmSoDoc 4-23   Filed 09/29/19   Page 12 of 26 PageID #: 533

would not adequately represent that interest.[22] Permitting the FCR's intervention is mandatory if either prong is met. Here, the FCR easily meets both.

### A. The FCR Has the Right to Intervene in the Action Under Rule 24(a)(1).

23.     Rule 24(a)(1) requires that any person must be allowed to intervene if there is a federal statute that provides an "unconditional right" for that person to intervene. Here, the FCR has an unconditional right to intervene under §§ 105, 524(g), and 1109(b) of the Bankruptcy Code.

24.     To the extent a debtor is seeking confirmation of a plan pursuant to which the court will issue an injunction channeling future claims to a trust, § 524(g) requires a legal representative be appointed for the purpose of protecting the rights of future claimants.[23] As noted above, the Debtors' "primary goal in filing these Chapter 11 Cases" is to confirm a plan of reorganization that relies, in part, on §§ 105 and 524(g) of the Bankruptcy Code to channel Talc Claims to a trust.[24] Accordingly, the FCR has an unconditional statutory right to intervene on behalf of Future Claimants under § 524(g) of the Bankruptcy Code.[25]

25.     The FCR also has an unconditional right to intervene under § 1109(b) of the Bankruptcy Code. Section 1109(b) provides, in pertinent part, that a party in interest "may raise and may appear and may be heard on any issue in a case under this chapter . . . ." The FCR is

---

[22] See Fed. R. Civ. P. 24(a).

[23] See 11 U.S.C. § 524(g)(4)(B)(i).

[24] First Day Declaration ¶ 11.

[25] Cf. In re Celotex Corp., 377 B.R. 345, 351 (Bankr. M.D. Fla. 2006) ("[T]he Legal Representative and the TAC are charged with the duty of protecting the interests of the present and future Asbestos Personal Injury Claimants. If they are not permitted to intervene, therefore, their ability to protect their constituencies' interests may be impaired or impeded, since the disposition of this action will ultimately affect . . . the amount of the funds that are available to pay Personal Injury Claims.").

01:24335170.1

Case 19-01232-KCF    Doc 2-2    Filed 04/30/19    Entered 04/30/19 15:48:04    Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18    Page 13 of 94
Case 1:19-mc-00139-SB    Document 4-23    Filed 04/29/19    Page 132 of 226 PageID #: 534

indisputably a party in interest under § 1109(b).[26] The Third Circuit has also made clear that a party's unconditional right to appear and be heard under § 1109(b) extends to adversary proceedings such as the Action.[27] Indeed, the proposed order appointing the Proposed FCR is explicit that the FCR will have "standing under section 1109(b) of the Bankruptcy Code to be heard as a party-in-interest *in all matters related to the Chapter 11 Cases* and shall have such powers and duties of a committee, as set forth in section 1103 of the Bankruptcy Code, as are appropriate for a Future Claimants' Representative."[28]

26.    Accordingly, §§ 524(g) and 1109(b) of the Bankruptcy Code give the FCR an "unconditional right" to intervene in the Action under Rule 24(a)(1). This alone is sufficient for the Court to grant the Motion.

**B.  The FCR Has the Right to Intervene in the Action Under Rule 24(a)(2).**

27.    Rule 24(a)(2) also entitles the FCR to intervene in the Action as of right. According to Third Circuit law, a party seeking to intervene under Rule 24(a)(2) need only show: "1) a timely application for leave to intervene, 2) a sufficient interest in the underlying litigation, 3) a threat that the interest will be impaired or affected by the disposition of the underlying action, and 4) that the existing parties to the action do not adequately represent the prospective intervenor's interests."[29] These four factors are easily established here.

---

[26] *See, e.g., In re Amatex Corp.*, 755 F.2d 1034, 1042 (3d Cir. 1985) ("Future claimants are undeniably parties in interest to these reorganization proceedings pursuant to the broad, flexible definition of that term . . . ." (quoting *In re Johns-Manville Corp.*, 36 B.R. 743, 749 (Bankr. S.D.N.Y. 1984), *aff'd, In re Johns-Manville Corp.*, 40 B.R. 219 (S.D.N.Y. 1984))).

[27] *See In re Marin Motor Oil, Inc.*, 689 F.2d 445, 451 (3d Cir. 1982) (holding that § 1109(b) gave the creditors' committee the unconditional right to participate in an adversary proceeding because "the exact language of section 1109(b) . . . grants a right to appear and be heard not in 'a case' but 'on any issue in a case'"); *see also Phar-Mor, Inc. v. Coopers & Lybrand*, 22 F.3d 1228, 1240 (3d Cir. 1994) ("[W]e hold that § 1109(b) as interpreted by *Marin* allows creditors' committees to intervene in non-core, 'related to' proceedings pending in a federal district court.").

[28] FCR Appointment Motion at Ex. A (emphasis added).

[29] *Liberty Mut. Ins. Co. v. Treesdale, Inc.*, 419 F.3d 216, 220 (3d Cir. 2005).

Case 19-01232-KCF    Doc 2-2    Filed 04/30/19    Entered 04/30/19 15:48:04    Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18    Page 14 of 94
Case 1:19-mc-00103-RGA-SRF    Document 4-23    Filed 04/29/19    Page 14 of 226 PageID #: 535

28.     First, the Motion is timely because "proceedings of substance on the merits" have not yet occurred and because current parties to the Action would not be prejudiced by the FCR's intervention.[30] The FCR is adopting and incorporating the Debtors' Complaint by reference with respect to the relief it seeks against the Defendants, while reserving the FCR's rights as to any other or further relief, and will coordinate with the other parties to the Action to work within the current schedule. Thus, intervention by the FCR will not delay or impede the Action. Moreover, this Motion is being filed before an order has even been entered appointing the FCR who will protect the rights of Future Claimants in connection with the Action. Accordingly, the Motion is plainly timely.

29.     Second, Future Claimants have a substantial interest in the Action.[31] The Debtors' stated goal in seeking declaratory and injunctive relief is to stop Defendants' attempts to access and deplete the proceeds of the Insurance Policies.[32] Depletion of the Debtors' insurance proceeds would have a material impact on the amounts otherwise available to Future Claimants, through a trust, to cover talc-related claims.[33] As the statutory fiduciary representative of all Future Claimants, the FCR has a direct interest in asserting and protecting the rights of Future Claimants.

---

[30] *Cf. Mountain Top Condo. Ass'n v. Dave Stabbert Master Builder, Inc.*, 72 F.3d 361, 369–70 (3d Cir. 1995) (holding that intervention was timely when "proceedings of substance on the merits" had not yet occurred and current parties would not be prejudiced by intervention); *Consol. SWINC Estate v. ACE USA, Inc. (In re Stone & Webster, Inc.)*, 380 B.R. 366, 370 (Bankr. D. Del. 2008) (same).

[31] *See Liberty Mut. Ins. Co.*, 419 F.3d at 220 (holding that "[t]o establish a sufficient interest for intervention," an intervenor must show "'an interest relating to the property or transaction which is the subject of the action'" (quoting *Mountain Top Condo.*, 72 F.3d at 366)).

[32] *See* Complaint ¶ 2.

[33] *See, e.g.,* Complaint ¶ 37 ("[F]ailure to grant the requested injunction would irreparably harm the Debtors' reorganization efforts by allowing a third party to utilize property of the Debtors' estates that would otherwise be available to fund a trust in furtherance of the Debtors' efforts to effectuate a restructuring plan that will provide for the fair and equitable treatment of all Talc Claims.").

01:24335170.1

Case 19-01232-KCF   Doc 2-2   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18   Page 15 of 94
Case 1:19-mc-00103-UNA   Document 4-23   Filed 04/29/19   Page 154 of 226 PageID #: 536

30.     Third, the Future Claimants' interests may be impaired or otherwise affected by the disposition of the Action.[34] As noted above, the Court is being called upon to, among other things, stop Defendants' attempts to access and deplete the proceeds of the Insurance Policies.[35] As such, the outcome of the Action will have a material impact on the amounts otherwise available to Future Claimants, through a trust, to cover Talc Claims.[36] Again, the FCR, as the statutory fiduciary representative of all Future Claimants, has a strong interest in presenting arguments on the issues raised in the Complaint to protect Future Claimants against a potential reduction in the available compensation.

31.     Lastly, no existing party adequately represents Future Claimants' interests in this Action. To prevail on this factor, the FCR need only show that the representation of Future Claimants' interests "may be inadequate."[37] Accordingly, the FCR "'has a minimal burden of showing that the existing parties cannot adequately represent its interest.'"[38] In *Celotex*, for example, the Bankruptcy Court held that the future claimants' representative and the trust advisory committee comprised of current claimants each met the "minimal burden" to intervene in an adversary proceeding that could affect trust assets. As the *Celotex* court explained, the future claimants' representative and the trust advisory committee "have singular constituencies with clear economic interests."

---

[34] *See Dev. Fin. Corp. v. Alpha Housing & Health Care*, 54 F.3d 156, 162 (3d Cir. 1995) (holding that a party seeking intervention must demonstrate that the underlying lawsuit represents a tangible threat to its legally protectable interest); *see also* Rule 24, Advisory Committee Notes, 1966 Amendments ("If an absentee would be substantially affected in a practical sense by the determination made in an action, he should . . . be entitled to intervene.").

[35] *See* Complaint ¶ 2.

[36] *See, e.g.*, Complaint ¶ 37.

[37] *Mountain Top*, 72 F.3d at 368–69 (internal quotation omitted).

[38] *Celotex*, 377 B.R. at 351 (quoting *Georgia v. U.S. Army Corps of Eng'rs*, 302 F.3d 1242, 1245 (11th Cir. 2002)).

Case 19-01232-KCF   Doc 2-2   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18   Page 16 of 94
Case 1:19-mc-00103-RGA   Document 4-23   Filed 04/29/19   Page 165 of 226 PageID #: 537

32.     The Third Circuit has similarly explained that, "future claimants require their own
spokesperson" because the debtor and the creditors' committee do not "have interests similar to
those of future claimants . . . ."[39] Indeed, neither the Debtors nor the Committee owe a fiduciary
duty to Future Claimants. It is only the FCR who can provide the "vigorous and faithful
vicarious representation" that ameliorates the due-process concerns associated with the unknown
and asymptomatic individuals whose rights to compensation will be affected by the outcome of
the Action.[40] Without independent representation, Future Claimants risk receiving less favorable
treatment than Current Claimants in any potential resolution of the Action.[41] Indeed, it is the
unknown Future Claimants who bear the greatest risks in chapter 11 cases such as the Debtors'.
Once a debtor has redirected its liability to a claims-resolution trust, it is the latecomers who will
be left with nowhere to turn if trust funding is inadequate.

33.     Accordingly, the FCR easily meets the standard for intervention as of right under
Rule 24(a)(2), and the Motion should therefore be granted.

## II.     Permissive Intervention Is Warranted Under Rule 24(b).

34.     Alternatively, the FCR seeks permission to intervene under Rule 24(b)(1)(B),
which states that "[o]n timely motion, the court may permit anyone to intervene who . . . has a
claim or defense that shares with the main action a common question of law or fact."[42]
Permissive intervention is warranted, given that the Motion is timely and there is a substantial
overlap of questions of law and fact between the FCR's arguments and the Debtors' likely

---

[39] *Amatex*, 755 F.2d at 1042-43.

[40] *Diamond Shamrock Chems.*, 996 F.2d at 1435.

[41] *See In re Combustion Eng'g, Inc.*, 391 F.3d 190, 242 (3d Cir. 2004) (recounting how future claimants received
"demonstrably unequal" treatment under deal struck before appointment of future claimants' representative).

[42] Fed. R. Civ. P. 24(b)(1)(B).

Case 19-01232-KCF    Doc 2-2    Filed 04/30/19    Entered 04/30/19 15:48:04    Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18    Page 17 of 94
Case 1:19-mc-00103-RGA-SRF  Document 4-23    Filed 04/29/19    Page 17 of 226 PageID #: 538

arguments in this Action. Moreover, as noted above, permitting the FCR to intervene will not

unduly delay or prejudice the adjudication of the existing parties' rights.[43]

## **CONCLUSION**

For the reasons set forth above, the Proposed FCR respectfully requests that the Court

grant the Motion and enter the proposed order, annexed hereto as **Exhibit A**, approving the

intervention of the FCR as a plaintiff in the Action pursuant to Rule 24(a) or, alternatively, Rule

24(b)(1)(B).

Dated: March 29, 2019                    YOUNG CONAWAY STARGATT & TAYLOR, LLP

                                         */s/ Sharon M. Zieg*
                                         Robert S. Brady (No. 2847)
                                         Edwin J. Harron (No. 3396)
                                         Sharon M. Zieg (No. 4196)
                                         Rodney Square
                                         1000 North King Street
                                         Wilmington, Delaware 19801
                                         Telephone: (302) 571-6600
                                         Facsimile: (302) 571-1253
                                         Email: rbrady@ycst.com
                                              eharron@ycst.com
                                              szieg@ycst.com

                                         *Proposed Counsel to the Proposed FCR*

---

[43] *See* Rule 24(b)(3) ("In exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights.").

01:24335170.1

Case 19-01232-KCF   Doc 2-2   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18   Page 18 of 94
Case 1:19-mc-00439-LPS Document 25-1 Filed 04/08/19 Page 16 of 23 PageID #: 539

**Exhibit A**

**Proposed Order**

Case 19-01232-KCF   Doc 2-2   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18   Page 19 of 94
Case 1:19-mc-00019-UNA   Document 25-1   Filed 04/18/19   Page 19 of 23   PageID #: 540

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| IMERYS TALC AMERICA, INC., *et al.*,[1] | Case No. 19-10289 (LSS) |
| Debtors. | (Jointly Administered) |
| IMERYS TALC AMERICA, INC. IMERYS TALC VERMONT, INC. and IMERYS TALC CANADA, INC., | |
| Plaintiffs, | Adv. Pro. No. 19-50115 (LSS) |
| v. | |
| CYPRUS AMAX MINERALS COMPANY and CYPRUS MINES CORPORATION, | |
| Defendants. | |

## ORDER GRANTING THE PROPOSED FUTURE CLAIMANTS'
## REPRESENTATIVE'S MOTION TO INTERVENE

Upon consideration of the motion (the "Motion") of James L. Patton, Jr., the proposed

legal representative (the "Proposed FCR") for future talc personal-injury claimants against the

Debtors ("Future Claimants"), in his own right or on behalf of such other person as the Court

may ultimately appoint as the representative for Future Claimants in these chapter 11 cases (as

appointed, the "FCR"), to intervene as a plaintiff in the above-captioned action (the "Action");

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Imerys Talc America, Inc. (6358), Imerys Talc Vermont, Inc. (9050), and Imerys Talc Canada Inc. (6748). The Debtors' address is 100 Mansell Court East, Suite 300, Roswell, Georgia 30076.

Case 19-01232-KCF    Doc 2-2    Filed 04/30/19    Entered 04/30/19 15:48:04    Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18    Page 20 of 94
Case 1:19-mc-00103-UNA   Document 25-1   Filed 04/18/19   Page 20 of 23 PageID #: 541

and appropriate notice having been provided to all parties in interest; and for good cause

appearing therefor;

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is granted.

2.      The FCR is permitted to intervene as a plaintiff in the Action.

3.      This Court shall retain jurisdiction to hear and determine all matters arising from

or related to the implementation of this order.

Dated: _____, 2019          _____
Wilmington, Delaware                        LAURIE SELBER SILVERSTEIN
                                            UNITED STATES BANKRUPTCY JUDGE

01:24335170.1

Case 19-01232-KCF   Doc 2-2   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18   Page 21 of 94
Case 1:19-mc-00039-RGA   Document 23-2   Filed 04/08/19   Page 21 of 22 PageID #: 542

## CERTIFICATE OF SERVICE

      The undersigned hereby certifies that on March 29, 2019, the foregoing **The Proposed Future Claimants' Representative's Motion to Intervene** was served upon the following in the manner indicated below:

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins, Esq.
Michael J. Merchant, Esq.
Marcos A. Ramos, Esq.
Amanda R. Steele, Esq.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
collins@rlf.com
merchant@rlf.com
ramos@rlf.com
steele@rlf.com
*Electronic Mail and Hand Delivery*

**LATHAM & WATKINS LLP**
Richard A. Levy, Esq.
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
richard.levy@lw.com
*Electronic Mail and First Class Mail*

**NEAL, GERBER & EISENBERG LLP**
Angela R. Elbert, Esq.
Jason A. Frye, Esq.
Two North LaSalle Street, Suite 1700
Chicago, Illinois 60602-3801
aelbert@nge.com
jfrye@nge.com
*Electronic Mail and First Class Mail*

**LATHAM & WATKINS LLP**
Jeffrey E. Bjork, Esq.
Kimberly A. Posin, Esq.
Helena G. Tseregounis, Esq.
Amy C. Quartarolo, Esq.
355 South Grand Avenue, Suite 100
Los Angeles, California 90071-1560
jeff.bjork@lw.com
kim.posin@lw.com
helena.tseregounis@lw.com
amy.quartarolo@lw.com
*Electronic Mail and First Class Mail*

**LATHAM & WATKINS LLP**
George A. Davis, Esq.
Keith A. Simon, Esq.
885 Third Avenue
New York, New York 10022
george.davis@lw.com
keith.simon@lw.com
*Electronic Mail and First Class Mail*

**MORRIS NICHOLS ARSHT & TUNNELL LLP**
Robert J. Dehney, Esq.
Gregory Werkheiser, Esq.
Matthew O. Talmo, Esq.
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19899-1347
rdehney@MNAT.com
gwerkheiser@MNAT.com
mtalmo@MNAT.com
*Electronic Mail and Hand Delivery*

Case 19-01232-KCF    Doc 2-2    Filed 04/30/19    Entered 04/30/19 15:48:04    Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18    Page 22 of 94
Case 1:19-mc-00103-UNA    Document 23-2    Filed 04/08/19    Page 22 of 22 PageID #: 543

Paul E. Heath, Esq.
Katherine Drell Grissel, Esq.
**VINSON & ELKINS LLP**
Trammell Crow Center
2001 Ross Avenue, Suite 3900
Dallas, Texas 75201-2975
pheath@velaw.com
kgrissel@velaw.com
***Electronic Mail and First Class Mail***

Natalie D. Ramsey, Esq.
Mark A. Fink, Esq.
Davis Lee Wright, Esq.
**ROBINSON & COLE LLP**
1000 N. West Street, Suite 1200
Wilmington, Delaware 19801
nramsey@rc.com
mfink@rc.com
dwright@rc.com
lkrepto@rc.com
***Electronic Mail and Hand Delivery***

Michael R. Enright, Esq.
Patrick M. Birney, Esq.
Christopher J. Hug, Esq.
280 Trumbull Street
Hartford, Connecticut 06103
menright@rc.com
pbirney@rc.com
***Electronic Mail and First Class Mail***

Rachel C. Strickland, Esq.
Jeffrey B. Korn, Esq.
Daniel I. Forman, Esq.
Jonathan D. Waisnor, Esq.
**WILLKIE FARR & GALLAGHER LLP**
787 Seventh Avenue
New York, New York 10019
rstrickland@willkie.com
jkorn@willkie.com
dforman@willkie.com
jwaisnor@willkie.com
***Electronic Mail and First Class Mail***

Dated: March 29, 2019

YOUNG CONAWAY STARGATT & TAYLOR, LLP

 */s/ Sharon M. Zieg*
Robert S. Brady (No. 2847)
Edwin J. Harron (No. 3396)
Sharon M. Zieg (No. 4196)
Sara Beth A.R. Kohut (No. 4137)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email: rbrady@ycst.com
Email: eharron@ycst.com
Email: szieg@ycst.com
Email: skohut@ycst.com

*Proposed Counsel to the Proposed FCR*

01:24333998.1

Case 19-01232-KCF    Doc 2-2    Filed 04/30/19    Entered 04/30/19 15:48:04    Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18    Page 23 of 94

Case 1:19-mc-00103-UNA   Document 4-14   Filed 04/18/19   Page 1 of 34 PageID #: 544

# EXHIBIT 14

Case 1:19-mc... Case 17-50880-BLS  ...med  Doc 64-1  Filed 04/08/2019  Page 2 of 34  PageID #: 545

# UNITED STATES BANKRUPTCY COURT
## District of Delaware
### 824 Market Street, 3rd Floor
### Wilmington, DE 19801

| | |
|---|---|
| **In Re:** | Chapter:  11 |
| TK Holdings, Inc., et al. | |
| Debtor | Bankruptcy No. 17–11375–BLS |

_____

TK Holdings Inc.

    Plaintiff                                   Adversary No. 17–50880–BLS

    vs.

State of Hawai'i, by its Office of Consumer Protection
, et al.

    Defendant

### *NOTICE OF FILING OF TRANSCRIPT AND OF DEADLINES RELATED TO RESTRICTION AND REDACTION*

A transcript of the proceeding held on 8/16/2017 was filed on 8/23/2017 . The following deadlines apply:

The parties have  7 days to file with the court a *Notice of Intent to Request Redaction* of this transcript. The deadline for filing a *request for redaction* is 9/13/2017 .

If a request for redaction is filed, the redacted transcript is due 9/25/2017 .

If no such notice is filed, the transcript may be made available for remote electronic access upon expiration of the restriction period, which is 11/21/2017 unless extended by court order.

To review the transcript for redaction purposes, you may purchase a copy from the transcriber (see docket for Transcriber's information) or you may view the document at the clerk's office public terminal.

*Una O'Boyle*
_____
Una O'Boyle, Clerk of Court

Date: 8/23/17

(ntc)

Case 1:19-mc-00103-UNA   Doc 4-2   Filed 04/23/19   Page 1 of 1   PageID #: 546

# Notice Recipients

| | | |
|---|---|---|
| District/Off: 0311−1 | User: Brandon | Date Created: 8/23/2017 |
| Case: 17−50880−BLS | Form ID: ntcAP | Total: 2 |

**Recipients submitted to the BNC (Bankruptcy Noticing Center):**

| | | | | | |
|---|---|---|---|---|---|
| ust | U.S. Trustee | Office of the United States Trustee | J. Caleb Boggs Federal Building | 844 King Street, Suite 2207 | Lockbox 35   Wilmington, DE 19801 |
| ust | U.S. Trustee | Office of United States Trustee | J. Caleb Boggs Federal Building | 844 King Street, Suite 2207 | Lockbox 35   Wilmington, DE 19899−0035 |

TOTAL: 2

Case 19-01232-KCF   Doc 2-2   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18   Page 26 of 94

Case 1:19-mc-00103-BLS   Document 6143   Filed 04/08/17   Page 1 of 64 PageID #: 547

```
 1                      UNITED STATES BANKRUPTCY COURT
                             DISTRICT OF DELAWARE
 2

 3  IN RE:                            .  Chapter 11
                                      .
 4  TK HOLDINGS, INC., et al.,        .
                                      .  Case No. 17-11375 (BLS)
 5                                    .
              Debtors.                .
 6  . . . . . . . . . . . . . . . . . .
    TK HOLDINGS INC., et al.,         .  Adv. Pro. No. 17-50880
 7                                    .
                 Plaintiffs,          .
 8                                    .
       - against -                    .
 9                                    .
    STATE OF HAWAII, by its Office    .
10  Of Consumer Protection,          .  Courtroom No. 5
    GOVERNMENT OF THE UNITED STATES   .  824 Market Street
11  VIRGIN ISLANDS, STATE OF NEW      .  Wilmington, Delaware 19801
    MEXICO, ex rel. HECTOR BALDERAS   .
12  Attorney General, et al.,         .  August 16, 2017
                                      .  11:00 A.M.
13               Defendants.          .
    . . . . . . . . . . . . . . . . . .
14
                         TRANSCRIPT OF HEARING
15               BEFORE HONORABLE BRENDAN L. SHANNON
                    UNITED STATES BANKRUPTCY JUDGE
16
    TELEPHONIC APPEARANCES:
17
    For the Debtors:          Marcia Goldstein, Esquire
18                            Theodore Tsekerides, Esquire
                              Matthew Goren, Esquire
19                            Ronit Berkovich, Esquire
                              Konrad L. Cailteux, Esquire
20                            Brett Michael Haywood, Esquire
                              WEIL GOTSHAL & MANGES LLP
21                            767 Fifth Avenue
                              New York, New York 10153
22
                              Mark D. Collins, Esquire
23                            Michael Joseph Merchant, Esquire
                              Amanda Steele, Esquire
24                            Russell Silberglied, Esquire
                              RICHARDS LAYTON & FINGER
25                            920 N. King Street
                              Wilmington, Delaware 19801
```

Case 19-01232-KCF   Doc 2-2   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18   Page 27 of 94
Case 1:19-mc-00103-UNA   Document 46-43   Filed 08/23/17   Page 6 of 43 PageID #: 548

1   ECRO:                    DANA MOORE

2   Transcription Service:   Reliable
                             1007 N. Orange Street
3                            Wilmington, Delaware 19801
                             Telephone:  (302) 654-8080
4                            E-Mail:  gmatthews@reliable-co.com

5   Proceedings recorded by electronic sound recording:
    transcript produced by transcription service.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 19-01232-KCF    Doc 2-2    Filed 04/30/19    Entered 04/30/19 15:48:04    Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18    Page 28 of 94

Case 1:19-mc-00103-UNA-DLS Document 46-43 Filed 08/23/17 Page 6 of 34 PageID #: 549

3

1                                  INDEX

2                                                              Page

3       TELEPHONIC HEARING

4
        RULING                                                  4
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 19-01232-KCF    Doc 2-2    Filed 04/30/19    Entered 04/30/19 15:48:04    Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18    Page 29 of 94

Case 1:19-mc-00103-DLC   Document 46-1   Filed 04/28/17   Page 4 of 43 PageID #: 550

4

1              (Telephonic hearing commenced at 11:00 a.m.)

2              THE COURT:  Good morning, counsel, this is Judge

3    Shannon.  I understand from the operator that all necessary

4    parties are on the call.

5              This is a hearing in the TK Holdings family of

6    cases; case number 17-11375.

7              This is the time that the court has set to issue

8    its ruling on the debtors' request for a preliminary

9    injunction in Adversary Proceeding Number 17-50880.

10             The court conducted a hearing last Wednesday, at

11   which extensive argument was heard and evidence was adduced

12   on behalf of all effected parties.

13             At the conclusion of the hearing, the court took

14   the matter under advisement with a commitment to provide a

15   ruling today.

16             As I said at the end of the hearing, given the

17   significance and complexity of the issues that are before the

18   court, as well as the number of effected parties, it is an

19   understatement to say that I would prefer to address this

20   dispute by way of formal written opinion.

21             But the circumstances of this case do not afford

22   the time that such an opinion would take.  So, I will provide

23   my ruling orally today and I will try to be as clear as I

24   can, but I would appreciate your patience, and I warn you

25   that you may have to bear with me a bit as I go on this

Case 19-01232-KCF   Doc 2-2   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18   Page 30 of 94

Case 1:19-mc-00103-DLC   Document 46-43   Filed 08/23/17   Page 6 of 43 PageID #: 551

5

1  morning.

2       Before I rule, I must take a moment to acknowledge

3  and commend the parties.  The briefing was thorough,

4  excellent and helpful, and the presentations by counsel last

5  week helped greatly to clarify the complex dispute that's

6  before the court.

7       Also, it is not lost on me how much coordination

8  and cooperation was required among the parties to timely

9  provide the court with a manageable and, as I said, excellent

10  set of briefing.

11       In summary, I will grant in part and deny in part

12  the request for a preliminary injunction.  I will enter the

13  requested injunction as to the state actions for a period of

14  ninety (90) days through and including November 15, 2017,

15  including an injunction to cover Takata Corp or TKJP as I

16  find that Bankruptcy Code Section 1521(d) does not preclude

17  me from entering that relief.

18       So, I will enjoin the state actions as they relate

19  to the debtors and the other defendants, therein.

20       I will also grant the motion and enter the

21  requested preliminary injunction for a period of ninety (90)

22  days through and including November 15, 2017 as to all of the

23  individual other than the multidistrict litigation currently

24  pending in the Southern District of Florida.

25       The MDL will not be stayed by this court as to

Case 19-01232-KCF   Doc 2-2   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18   Page 31 of 94

Case 1:19-mc-00103-DLC Document 46443   Filed 04/27/17   Page 6 of 34 PageID #: 552

6

1  non-debtor litigants and, specifically, as to the OEMs for

2  specific reasons that I will discuss in a few minutes.

3          Turning to the issue before the court, we have two

4  broad categories of litigation the debtors would seek to

5  stay.

6          First, the state actions which were commenced by

7  Hawaii, New Mexico, and the U.S. Virgin Islands.  And,

8  second, what we have called the individual actions, which

9  include personal injury and economic loss actions, pending in

10 courts around the country and, in particular, in a

11 multidistrict litigation pending in Federal District Court in

12 Miami.

13         This second category of individual actions breaks

14 down further into personal injury litigation, class actions

15 alleging economic loss or diminution in the value of vehicles

16 on account of the debtors' products, and, finally, litigation

17 against the debtors for damages caused by delay or

18 unavailability of replacement airbags.

19         The operative feature of substantially all of this

20 litigation for our purposes today is that the automobile

21 manufacturers, whom we've collected called the OEMs or the

22 consenting OEMs, are parties with the debtors to these

23 litigations, either by way of having been sued alongside the

24 debtors or having third partied in the debtors after the

25 litigation commenced.

Case 19-01232-KCF   Doc 2-2   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18   Page 32 of 94

Case 1:19-mc-00184-CBM-DCSm Doc 64-3 Filed 04/08/19 Page 10 of 81 PageID #: 553

7

1                And the debtors presently enjoy the benefits of

2     Section 362(a) and the automatic stay.  So most of this

3     litigation is already stayed as to them with the possible

4     exception of the state actions, which are alleged to be

5     exempt from the automatic stay as an exercise of police or

6     regulatory power.

7                What the debtors seek here is to obtain an

8     injunction essentially to wrap the protections of the

9     automatic stay around the consenting OEMs and TKJP while they

10    pursue their reorganization.

11               The background facts are not in material dispute.

12    TKJP, TK Holdings and their affiliates are a multinational

13    Tier I supplier to a host of U.S. and foreign automobile

14    manufacturers.  The debtors manufactured and sold tens of

15    millions of airbag inflator systems containing phase

16    stabilized ammonium nitrate as the propellant.

17               The record reflects that especially under

18    environmental conditions characterized by high heat and

19    humidity, these PSAN inflators may degrade overtime and

20    rupture causing injury or death to the occupants of the

21    vehicle.

22               The debtor has acknowledged, and the court notes,

23    the suffering that has been caused on account of the

24    defective airbag systems and the court has carefully reviewed

25    the declarations of Mr. Rothenberg, Mr. Dean, and Mr. Miner

Case 19-01232-KCF   Doc 2-2   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18   Page 33 of 94
Case 1:19-mc-00103-RBK-JS   Document 64-3   Filed 04/03/2019   Page 11 of 34 PageID #: 554

8

1   [ph] detailing examples of the injuries suffered by their

2   clients.  And I have had the benefit of their presentations

3   last week to provide a human face and context to these

4   lawsuits.

5          I am extremely sympathetic to the circumstances

6   that these claimants face and I am particularly sensitive to

7   the argument raised by the tort claimant's committee and

8   others regarding the potential consequences of a delay in

9   their lawsuits and, frankly, a delay in these injured persons

10  having their day in court.

11         The record reflects that there's been a criminal

12  investigation by federal authorities and, ultimately, a plea

13  arrangement for Takata that, among other things, must be

14  funded by the end of February 2018.  The record reflects that

15  the debtors have filed these cases pursuant to a bankruptcy

16  strategy or business plan that contemplates the sale of

17  substantially all of the debtors' assets to Key Safety

18  Systems pursuant to a plan of reorganization, with these

19  debtors retaining assets and operations related to

20  manufacturing of replacement kits to support the ongoing

21  product recall requirements.

22         The record further reflects that the debtors

23  advised the court at the outset of these cases that they had

24  to obtain the support of a consenting OEMs for their

25

Case 19-01232-KCF   Doc 2-2   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18   Page 34 of 94

Case 1:19-mc-00017-UNA-CBS-Document-64-3 Filed 04/08/19 Page 9 of 48 PageID #: 555

9

1  reorganization strategy.  That support has been memorialized,

2  in part, in an accommodation agreement that is presently

3  scheduled to be presented to the court in September.

4         No plan of reorganization has been filed at this

5  point.  And the debtors have advised the court that they are

6  finalizing documentation relating to the plan and the

7  transaction with Key.

8         And so, we are here today with the debtor

9  requesting injunctive relief out of an expressed concern that

10  the various litigations that I mentioned above may delay,

11  distract from, or disrupt the debtors' intended

12  reorganization strategy.

13         Specifically, the debtors have requested that this

14  court enter a preliminary injunction to enjoin the state

15  actions and all of the individual litigation against TKJP and

16  the OEMs in order to afford them an opportunity to focus on

17  and pursue their reorganization plan.

18         The requested duration of the injunction by the

19  debtors is six months to take them through confirmation on

20  the timeline that was described by the debtors at the outset

21  of these cases.  However, in the absence of a filed plan and

22  related documents, I am not prepared to afford the debtors

23  the full runway that they have requested.

24         From the debtors' representations, I expect the

25  transaction documents and a plan will be filed long before

Case 19-01232-KCF   Doc 2-2   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18   Page 35 of 94

Case 1:19-mc-00103-TLW-LS   Document 46-43   Filed 04/13/17   Page 31 of 343   PageID #: 556

10

1   the expiration of the ninety (90) day stay that I am

2   imposing.  And if the debtors at that time wish to seek a

3   further extension of the stay perhaps to presumably get them

4   through confirmation, then I expect we will have a more

5   complete record upon which all parties may evaluate the

6   proposed reorganization, which lies at the heart of the

7   debtors' request for injunctive relief.

8          As always, the court starts with the determination

9   of its jurisdiction over the pending matter.  All parties

10  have correctly observed that Bankruptcy Code Section 105(a)

11  does not provide, in the words of the court in Combustion

12  Engineering, "an independent source of subject matter

13  jurisdiction."

14         Instead, this court's jurisdiction must be

15  established under 28 U.S.C. Sections 1334 and 157.  And,

16  again, all parties have briefed it, but it bears repeating

17  that bankruptcy Courts possess jurisdiction by referral from

18  the District Court of proceedings arising under Title 11 or

19  arising in or related to cases under Title 11.  Today, our

20  focus is on this court's related to jurisdiction.

21         An analysis of this court's related to

22  jurisdiction must begin with consideration of a Third

23  Circuit's seminal decision in Pacor which articulated an

24  expansive test finding related to jurisdiction if a matter

25  could have any conceivable effect on the reorganization

Case 19-01232-KCF   Doc 2-2   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18   Page 36 of 94

Case 1:19-mc-00103-RBK-JS   Document 46-43   Filed 04/23/17   Page 41 of 43 PageID #: 557

11

1  effort of the debtors.  Subsequent cases have refined and

2  clarified this analysis.

3         At bottom, case law teaches that this court must

4  find an identity of interest between the debtors and the non-

5  debtor defendants and the court must also find that the

6  reorganization process will be detrimentally affected in the

7  absence of relief.

8         As to the state actions, the parties have not

9  contended that this court lacks subject matter jurisdiction

10  over this matter as it relates to the debtors.  The focus of

11  the parties' submissions was largely on whether the state

12  actions are protected from an injunction because they are

13  regulatory or police powers under Section 362(b)(4) or,

14  alternatively, that the debtors have not carried their heavy

15  evidentiary burden for the entry of an injunction on the

16  merits.

17         The court's subject matter jurisdiction to enjoin

18  the state actions as to the OEMs and TKJP, relies on the

19  related to jurisdiction analysis that the court must perform

20  as to the individual actions, which I will discuss in a

21  moment.  And in which I can conclude that the court does, in

22  fact, possess related to jurisdiction to support the entry of

23  the injunctive relief to stay pending litigation against non-

24  debtors.

25

Case 19-01232-KCF   Doc 2-2   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18   Page 37 of 94

Case 1:19-mc-00103-RBS Document 46-3 Filed 08/23/17 Page 51 of 343 PageID #: 558

12

1    Accordingly, the court concludes that it has

2 subject matter jurisdiction to hear the debtors' request as

3 to the state actions, and I will turn to the merits in a

4 moment.

5    This court's jurisdiction to enjoin the

6 prosecution of the individual actions against the consenting

7 OEMs and TKJP has been hotly disputed by the tort claimant's

8 committee, the MDL claimants, the Suarez plaintiffs, and

9 others likely to be affected by the injunction.

10    I do note that the Turk plaintiffs have been

11 dismissed from this litigation consistent with

12 representations that were made in open court last week.

13    The debtors argue that this court possesses

14 related to jurisdiction over the individual actions.  They

15 point to the contractual indemnification obligations owed by

16 the debtors to the consenting OEMs and TKJP and also identify

17 risks of collateral estoppel and record taint in the event

18 the individual actions proceed against the consenting OEMs

19 without the debtors at the table.

20    In addition, the record reflects that TKJP shares

21 an identity of interest with these debtors by virtue of its

22 relationship within the corporate family.  And, finally, the

23 debtors contend that allowing the individual actions to

24 proceed will adversely impact their reorganization at this

25 very early stage by distracting their management and by

Case 19-01232-KCF   Doc 2-2   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18   Page 38 of 94

Case 1:19-mc-00103-DLC   Document 4143   Filed 04/23/17   Page 61 of 343   PageID #: 559

13

1   encouraging the debtors, the consenting OEMs, and the various

2   plaintiffs to focus their efforts on matters pending in

3   numerous forms around the country, rather than directing

4   their energies and attention to the reorganization process in

5   this court.

6          The objectors submit that the court's related to

7   jurisdiction is not so broad as to permit the entry of a stay

8   for the benefit of non-debtors, such as the consenting OEMs

9   and TKJP.  They contend that the indemnification obligations

10  to OEMs, upon which the debtors rely, are not a sufficiently

11  developed connection or obligation upon which to base this

12  court's jurisdiction.

13         For this point, the plaintiffs rely heavily on the

14  decisions in W.R. Grace and in Federal Mogul, which both

15  sides addressed and briefed extensively.

16         Separately, all of the objectors and,

17  particularly, the MDL plaintiffs, note that they are not

18  pursuing the consenting OEMs exclusively on a theory of

19  derivative liability for the debtors' wrongdoing.  Rather,

20  they are also pursuing direct theories and claims alleging

21  that the consenting OEMs acted wrongfully and with knowledge

22  of the defective airbags and the risk that they posed to the

23  public.  They reason that this fact undercuts the identity of

24  interest between the OEMs and the debtors.

25

Case 19-01232-KCF   Doc 2-2   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18   Page 39 of 94

Case 1:19-mc-00103-DLB-Document 46-43 Filed 08/23/17 Page 71 of 343 PageID #: 560

14

1          Finally, the plaintiffs dispute whether the

2    debtors' reorganization will suffer from delay and

3    distraction in the absence of an injunction.  I am satisfied,

4    as I noted, that this court has related to jurisdiction over

5    the individual actions, sufficient to support entry of a

6    ninety (90) stay I mentioned at the outset.

7          I start with the indemnity issue.

8          The record developed at this early stage of the

9    proceeding is sufficient to establish that the debtors have

10   significant exposure on account of their contractual

11   indemnification obligations to the consenting OEMs.  The

12   court received substantial evidence and testimony as to the

13   debtors' contractual obligations to the consenting OEMs, and

14   the record reflects that hundreds of cross-claims have been

15   filed against the debtors by the consenting OEMs based upon

16   theories of indemnification and joint liability.

17         While the issue of the indemnities and their

18   enforceability is not ultimately before me, in its simplest

19   terms, I would be surprised if the situation were otherwise,

20   and if the debtors did not have at least a meaningful

21   prospect of indemnity exposure here.

22         The record is undisputed that these debtors sold

23   part under contract to be installed in vehicles manufactured

24   by the consenting OEMs.  And those parts have been

25   demonstrated to fail and to cause injury.  Yes, I understand

Case 19-01232-KCF   Doc 2-2   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18   Page 40 of 94

Case 1:19-mc-09103-50880-DLS   Document 46143   Filed 04/23/17   Page 16 of 34   PageID #: 561

15

1   that there are other claims and other theories raised by

2   plaintiffs against the consenting OEMs, but literally

3   everything here begins with the delivery and installation of

4   a defective part manufactured by the debtors.

5           I do not accept the objector's contention that the

6   OEMs inability to be indemnified for their own negligent or

7   wrongful acts operates to vitiate the identity of interest

8   that's otherwise created by the contractual indemnity

9   obligations.

10          This observation applies as well to the lemon law

11  litigations where the court acknowledges that in some cases

12  the debtors may not be a main party.  Nevertheless, in each

13  of those cases, the debtors' interest are at issue as the

14  record reflects that the OEMs defenses in each of these cases

15  will certainly revolve around the acts and omissions of the

16  debtors.

17          Plaintiffs rely on W.R. Grace and Federal Mogul,

18  but I do not believe that those two cases require a different

19  conclusion.  As I said, the Pacor decision articulated a

20  broad conceivable effect standard.

21          The Third Circuit's decision in W.R. Grace

22  clarified that standard as it related to indemnity

23  obligations and held that if parties needed to prosecute and

24  prevail in an intervening lawsuit to vindicate a right to

25

Case 19-01232-KCF    Doc 2-2    Filed 04/30/19    Entered 04/30/19 15:48:04    Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18    Page 41 of 94

Case 1:19-mc-00103-DLC  Document 46-43  Filed 08/23/17  Page 91 of 343  PageID #: 562

16

1    indemnity that that was too attenuated a relationship to give

2    rise to a bankruptcy court's related to jurisdiction.

3            In that case, the debtor, who operated an asbestos

4    mine, sought to stay claims brought against the state of

5    Montana.  There was no contractual relationship between

6    Montana and the debtor at issue in the litigation.  And what

7    was alleged was, at best, a common law theory of indemnity

8    that claims by citizens of Montana against the state for

9    failure to warn and protect them from the dangers of the mine

10   could ultimately carry through to the debtor.

11           The Third Circuit found this connection too remote

12   and declined to find related to jurisdiction.

13           In <u>Federal Mogul</u>, the debtor sought to bring into

14   the bankruptcy court thousands of asbestos related state

15   court lawsuits against many defendants, and the court found

16   that there was no jurisdictional predicate for that relief.

17           This case before me today is not analogous to an

18   asbestos case where there are often dozens of potentially

19   responsible parties, each one effectively to the exclusion of

20   the others and a persistent and legitimate question of

21   whether a plaintiff has any actual relationship to a

22   particular defendant.

23           Here, every single claimant knows the vehicle they

24   purchased and can establish the fact that it contains a

25   Takata airbag system.

Case 19-01232-KCF   Doc 2-2   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18   Page 42 of 94

Case 1:19-mc-00103-DLS   Document 46-3   Filed 08/23/17   Page 20 of 34   PageID #: 563

17

1       As to the Federal Mogul decision, I note that the

2   debtors in that case sought to bring a raft of state court

3   personal injury suits into the Bankruptcy Court for

4   disposition.  Here, by contrast, the debtors seek only a

5   brief stay of pending non-bankruptcy litigation.

6       I do not fully accept the MDL plaintiffs'

7   articulation of the "absolute and automatic" indemnification

8   standard that they derive from the W.R. Grace decision.

9       First, that phrasing does not appear in the W.R.

10  Grace decision and is not required by the logic of the

11  ruling.  W.R. Grace stands largely for the proposition that

12  routine theories of common law indemnity or joint liability

13  are too thin a reed upon which to base a bankruptcy court's

14  related to jurisdiction.

15      This case before me is clearly distinguishable

16  from W.R. Grace and Federal Mogul, and I'm satisfied that the

17  debtors' indemnity obligations meet the identity of interest

18  prong of the subject matter jurisdiction analysis.

19      We turn then to the potential impact on the

20  reorganization.  At the hearing, the objecting parties and

21  particularly the tort claimant's committee challenged the

22  debtors' evidence regarding the prospect of disruption and

23  distraction to their reorganization.

24      Specifically, they have pointed to discrepancies

25  between Mr. Caudill's filed declarations and his testimony

Case 19-01232-KCF   Doc 2-2   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18   Page 43 of 94

Case 1:19-mc-00103-DLI-SMG Document 46-43 Filed 04/23/17 Page 11 of 34 PageID #: 564

18

1  taken in deposition.  I do acknowledge that the debtors'

2  case, at least as made through Mr. Caudill's testimony, is,

3  in fact, relatively thin.

4      He acknowledged that he has not actively

5  participated or attending proceedings in the many litigations

6  that are pending.  And it is true that he struggled somewhat

7  in deposition to identify individuals in the organization

8  likely to be drawn away from critical duties to attend to

9  litigation matters.

10     But he also testified in his deposition at page

11 46, among several other places, that the demands of operating

12 the debtors are overwhelming in the present context.  And he

13 noted that while he was not personally focused on these

14 lawsuits, personnel under his supervision such as Mr. Teal,

15 Mr. Bowling, and Mr. Schubert are subject to being engaged

16 with these proceedings and away from their normal duties.

17     Secondly, the court is entitled to take notice of

18 the undisputed landscape of the proceedings before it.  The

19 debtors are engaged, as was noted multiple times at trial, in

20 the largest recall in history, while simultaneously

21 attempting to implement a reorganization strategy around the

22 globe involving dozens of plants and tens of thousands of

23 employees through proceedings that are pending here and in

24 Japan.  And, at the same time, they are a party to literally

25 hundreds of active lawsuits involving not only injured

Case 19-01232-KCF   Doc 2-2   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18   Page 44 of 94

Case 1:19-mc-00103-DLS   Document 6-43   Filed 08/23/17   Page 21 of 43 PageID #: 565

19

1     plaintiffs but also naming the debtors' most important

2     customers and business partners, entities that are absolutely

3     crucial to the reorganization effort as it is presently

4     postured.

5          What the debtors seek and need is a breathing

6     spell to focus the attention of all stakeholders on the

7     reorganization process.   And the record developed thus far

8     supports that need.

9          The objectors contend that the debtors'

10     prepetition negotiations with the OEMs, while conducting the

11     recall and participating in the litigation, is proof that no

12     stay is necessary.   I do not accept that argument.

13          First of all, the overlay of being a debtor-in-

14     possession drastically changes the burdens and demands on a

15     corporate enterprise and its management team.   And, second,

16     the record does not support a finding that the debtors were,

17     in fact, easily able to manage on a prepetition basis, as

18     these cases were commenced well before the completion of

19     documentation critical to their reorganization.

20          So, I'm not satisfied that the debtors'

21     prepetition progress undercuts their request for a stay

22     today.

23          Thus, the court finds that it possesses related to

24     jurisdiction on the grounds that, first, the contractual

25     indemnification obligations between the debtors and the OEMs

Case 19-01232-KCF   Doc 2-2   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18   Page 45 of 94

Case 1:19-mc-00103-DLC Document 46-3 Filed 08/23/17 Page 32 of 43 PageID #: 566

20

1    support a finding that there is an identity of interest

2    between the debtors and the OEMs and TKJP.  And, second, I am

3    satisfied that the continued prosecution of the state actions

4    and the individual actions will adversely impact the debtors'

5    efforts to reorganize.

6            As I mentioned at the outset, I will not stay the

7    multidistrict litigation as it relates to the consenting

8    OEMs.  The record reflects that the MDL has been pending

9    since 2014 and serves to consolidate scores of injury and

10   economic loss actions into a single court in the Southern

11   District of Florida.  The undisputed record further reflects

12   that that litigation is well advanced.  Judge Moreno has

13   announced his intention to commence trials in February and

14   April 2018 and significant discovery has occurred.

15           I acknowledge that the parties disagree as to

16   whether additional discovery will be needed from the debtors.

17   But I know that the MDL has utilized a special master to

18   coordinate and manage the ongoing discovery process among the

19   many parties.

20           On balance, I don't believe that the debtors have

21   carried their burden to obtain a stay of the MDL as to the

22   OEMs.  While certainly a large and complex proceeding, it is

23   effectively a single proceeding in a single court and is,

24   therefore presumably easier or, at least, less burdensome for

25   the debtors to monitor on a post-petition basis.

Case 19-01232-KCF   Doc 2-2   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18   Page 46 of 94

Case 1:19-mc-00103-DLS   Document 46-43   Filed 08/23/17   Page 22 of 34 PageID #: 567

21

1          In addition, the record reflects that there have

2   already been several significant settlements in the MDL and

3   the court notes that the debtors are specifically not asking

4   for the MDL to be stayed as to approval and implementation of

5   those settlements.

6          At bottom, while I do acknowledge that this court

7   possesses jurisdiction to order a stay of the MDL, I am not

8   satisfied that the burden upon the debtors is sufficient to

9   warrant staying a single proceeding that captures scores of

10  suits and embodies a coordinated approach to discovery and

11  trial prep.

12         And I considered this in contrast to the risk and

13  burden associated with hundreds of suits pending in various

14  courts across the country. While the debtors, of course, may

15  continue to enjoy the protection of the automatic stay as to

16  the MDL, it is not too much ask that they monitor and

17  participate in that proceeding as they may see fit.

18         We turn now to the legal standard which is

19  governed by bankruptcy Code Section 105(a) and Rule 7065.

20         The elements for injunctive relief have been

21  extensively briefed and the applicable test is well

22  established.  Courts consider one, the debtors' likelihood of

23  success; two, the risk of irreparable harm; three, the

24  balance of the harms between the debtors and non-moving

25

Case 19-01232-KCF   Doc 2-2   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18   Page 47 of 94

Case 1:19-mc-00103-RMB-DLS  Document 46-3  Filed 08/23/17  Page 22 of 34  PageID #: 568

22

1 parties and; finally, whether public policy supports entry of

2 the injunction.

3        I will first address the state actions.  And for

4 the reasons I will provide and, as I noted, I will enter a

5 preliminary injunction staying the proceedings commenced by

6 New Mexico, the U.S. Virgin Islands, and Hawaii for a period

7 of ninety (90) days to and including November 15, 2017.

8        We are proceeding under the assumption that the

9 matters that were initiated by these state entities are, in

10 fact, police and regulatory actions that are exempted from

11 the automatic stay under Section 362(b)(4), although the

12 debtors have reserved their rights to challenge these

13 assertions at a later point.

14        I start with the proposition that state police

15 power and regulatory actions are not immune from entry of

16 preliminary injunctive relief, notwithstanding Section

17 362(b)(4) which merely provides that such actions are not

18 automatically stayed by virtue of a bankruptcy filing.

19        And this is consistent the holding in _Enron_ which

20 both sides discussed and mentioned in their briefing.

21        The states have correctly noted that the debtors

22 bear a heavy burden to demonstrate entitlement to such

23 relief.  Case law supports this position and common sense,

24 likewise, dictates that a bankruptcy court should be chary of

25

Case 19-01232-KCF    Doc 2-2    Filed 04/30/19    Entered 04/30/19 15:48:04    Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18    Page 48 of 94

Case 1:19-mc-00103-DLC   Document 46-43   Filed 08/23/17   Page 26 of 43   PageID #: 569

23

1  interfering with the exercise of a sovereign entity's police

2  and regulatory power.

3         However, I do find that the debtors carried their

4  burden sufficient for entry of the brief ninety (90) day that

5  I'm granting.  Before turning to the four-part test, I

6  mentioned above, I must observe that the court's ruling on

7  the state action is also informed by the following

8  circumstances that are specific to the case before me.

9         First, the record reflects that these debtors are

10  operating under the strict review and oversight of a federal

11  agency, the National Highway Traffic Safety Administration,

12  and they are conducting under federal direction and

13  compulsion a massive recall.

14         These cases present an unusual and, perhaps,

15  unique posture, at least in my experience.  The threat of

16  injury or loss posed by the debtors' products presents a

17  substantial and identical risk in all 50 states in the U.S.

18  territories.

19         Vehicles with components subject to the recall are

20  literally everywhere.  And, so, while the court acknowledges

21  that the state actions have been commenced to protect the

22  citizens of those particular states or territories which is

23  entirely proper and appropriate action by those authorities.

24  The fact is that there is nothing unique about the threat to

25  the citizens of those two states and the territory.

Case 19-01232-KCF   Doc 2-2   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18   Page 49 of 94

Case 1:19-mc-00103-DLC-Document 46-13 Filed 08/23/17 Page 72 of 343 PageID #: 570

24

1          And that brings me to a fundamental tension

2   between the animating principles of the Bankruptcy Code and

3   the relief that is sought by the states in the state actions.

4          As we discussed at the argument last week, the

5   state actions represent the proverbial race to the

6   courthouse.  Each of the plaintiffs is identically situated

7   to every other non-moving state and territory.  And any

8   relief obtained by those entities in the state actions will

9   necessarily be to the detriment of the citizens of other

10  states.

11         Resources and funds will be committed to

12  facilitate a remedy in New Mexico, in Hawaii, or the U.S.

13  Virgin Islands and those resources will, thus, be unavailable

14  for other states individually or, more importantly, for a

15  coordinated nationwide approach.

16         I, of course, commend the authorities in New

17  Mexico, Hawaii, and the U.S. Virgin Islands for their

18  diligence in acting to protect their citizens.  But it is a

19  core principle of the U.S. Bankruptcy laws that proceedings

20  in other forums may be stayed in order to afford a breathing

21  spell and, more importantly, to provide for consistent

22  treatment of similarly situated stakeholders.  Vindication of

23  that core principle requires the imposition of a temporary

24  stay upon the state actions.

25

Case 19-01232-KCF    Doc 2-2    Filed 04/30/19    Entered 04/30/19 15:48:04    Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18    Page 50 of 94

Case 1:19-mc-00103-RGB Document 6143 Filed 08/23/17 Page 25 of 43 PageID #: 571

25

1          I also note that this conclusion is not affected

2   by TKJP's Chapter 15 filing.  And, specifically, the

3   provisions of Bankruptcy Code Section 1521(d).

4          The record reflects that the court ordered

5   supplemental briefing and I appreciate the submissions that I

6   received on Monday.  I find that Section 1521(d) has no

7   application to the proceeding before me.  It is a bar to a

8   foreign representative seeking to enjoin a state's police

9   power or regulatory action.

10          In this case, however, it is the Chapter 11 debtor

11  that is seeking the relief, not the foreign representative to

12  appear in this court late last week.  Now while the state

13  suggests that I should treat the request by the debtors as

14  functionally a request by TKJP and the foreign

15  representative, I note that I am obliged to respect both the

16  corporate separateness of these Chapter 11 debtors and TKJP,

17  as well as to recognize the distinction between the Chapter

18  15 proceedings and these Chapter 11 proceedings.

19          Turning then to the four-part test as it relates

20  to both the state actions and the individual actions.  The

21  four elements, as I said, are well established.

22          The burden is on the debtor to establish each of

23  the four elements.  And the Third Circuit further teaches in

24  the Revel decision that if the moving party does not carry

25  its burden as to likelihood of success and irreparable harm,

Case 19-01232-KCF   Doc 2-2   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18   Page 51 of 94

Case 1:19-mc-00103-50830-BLS  Doc 46143  Filed 08/23/17  Page 26 of 34  PageID #: 572

26

1   the court should deny the motion without reaching the last

2   two prongs.

3           I start with the likelihood of success.  Case law

4   here teaches that the proper focus is on the debtors'

5   prospects for a successful reorganization and whether the

6   conduct to be enjoined threatens that reorganization.  I am

7   satisfied that the debtors have carried their burden under

8   this prong.

9           The debtors' prospects for a successful

10  reorganization are clearly enhanced if at this critical

11  juncture early in these cases they and their largest

12  customers and other stakeholders are afforded the opportunity

13  to focus on the reorganization efforts.

14          I note that the debtors have requested a six month

15  stay until February 2018.  And it is under this prong that I

16  have reduced the duration of the injunction to ninety (90)

17  days.  Consistent with my comments a few moments ago, in a

18  nutshell, the debtors have asked for a six month stay to

19  implement a comprehensive global transaction and

20  restructuring.

21          But, as I noted earlier, other than the

22  accommodation agreements, no documents relating to the

23  proposed sale or the plan have been filed.  A brief stay to

24  permit that to occur and to allow a breathing spell for the

25  debtors is appropriate.

Case 19-01232-KCF   Doc 2-2   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18   Page 52 of 94

Case 1:19-mc-00103-RGS-DmS   Doc 46-43   Filed 04/28/17   Page 27 of 43   PageID #: 573

27

1          If in several months the debtors seek a further

2    injunction, I assume we will have a plan and a disclosure

3    statement and relevant deal documents on file.  And then all

4    parties, at that point, would have a sufficient basis to

5    evaluate the debtors' intentions, stakeholder support, and

6    prospects for a successful reorganization.

7          As to the second prong, I do find that the debtors

8    have carried their burden that they will suffer irreparable

9    harm in the absence of an injunction.  For the reason that I

10   stated a few moments ago, I find that the task of monitoring

11   hundreds of lawsuits and the prospect of what's been

12   collectively described as record taint including collateral

13   estoppel are material risks for these debtors.

14         The objectors contend that as a matter of law

15   there is no risk of collateral estoppel if the debtors choose

16   to sit out the various lawsuits they're moving forward.  I

17   understand that argument as a technical application of the

18   definition of collateral estoppel.  But as a practical

19   matter, I do not accept that these suits can proceed, where

20   the central feature of every suit is the unintended explosion

21   of the debtors' airbag system, without material effect on the

22   debtors down the line.

23         I will proceed to the balancing of the harms.  As

24   to balancing, I start by observing that a ninety (90) day

25   stay is a presumptively modest imposition in civil

Case 19-01232-KCF   Doc 2-2   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18   Page 53 of 94

Case 1:19-mc-00103-DLC-DULS   Document 46443   Filed 04/23/17   Page 126 of 343   PageID #: 574

28

1    litigation.  I am certainly aware from the record before the

2    court made last week through the submissions, as well as,

3    frankly, the court's long experience that a ninety (90) stay

4    may, in fact, throw off discovery and trial schedules.  But,

5    again, there is nothing truly remarkable there.

6              On the other side of the equation, I consider the

7    potential harm to the debtors' reorganization effort and the

8    functional benefit of requiring all stakeholders to focus

9    their attention on that effort.

10             While it is true, as noted above, that the court

11   has only limited visibility into the debtors' reorganization

12   strategy and plan, I do have a pretty good sense of the

13   negative consequences of a failed restructuring here on all

14   parties: the debtors, their employees, the OEMs, vehicle

15   owners awaiting recall, and the litigants as well.

16   Accordingly, I find that consideration of the balance of

17   harms favors the debtors.

18             The final prong is whether public policy favors

19   imposition of the requested injunction.  I have observed in

20   many other similar cases that this prong rarely plays a

21   significant part in the analysis.  The movant typically

22   offers an anodyne statement that the injunction will promote

23   reorganization and, therefore, is consistent with public

24   policy.

25

Case 19-01232-KCF   Doc 2-2   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18   Page 54 of 94

Case 1:19-mc-00103-DLS   Document 46-3   Filed 08/23/17   Page 29 of 43   PageID #: 575

29

1          This case is different, and the court is obliged

2     to be mindful of the very significant policy considerations

3     that are before it.  On the one side are the claimants, many

4     grievously injured who wish to be pursue their rights and

5     remedies in the forum of their choice.  And also on that side

6     are the states, which are seeking to act to protect their

7     citizens and to enforce their respective statutes.

8          On the other side is the reorganization process

9     which cries out for a coordinated approach to address the

10    crisis that these debtors and other parties face.  As I noted

11    before if, in fact, the debtors' reorganization collapses,

12    the recall process may be put into serious jeopardy and the

13    prospects and options of the many claimants will certainly be

14    harmed.

15         Considering those two admittedly significant

16    considerations, I am satisfied that the entry of a ninety

17    (90) day stay on the terms that I've described is appropriate

18    and warranted and consistent with public policy.

19         Having granted the debtors' request for a

20    preliminary injunction, I turn now to a matter that was the

21    subject of a good deal of discussion at the hearing last

22    Wednesday.

23         Debtors' counsel acknowledged early in the hearing

24    that no one lawsuit posed a significant threat of delay or

25    distraction or consumption of time and resources.  It was the

Case 19-01232-KCF   Doc 2-2   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18   Page 55 of 94

Case 1:19-mc-00103-DLC-DCF   Document 46-1   Filed 08/23/17   Page 30 of 32   PageID #: 576

30

1  accumulated mass of hundreds of litigations pending in scores

2  of forums -- and to use counsel's phrase death by a thousand

3  cuts.

4        And so, the debtors offered or committed to confer

5  with any litigant after entry of the injunction to respond to

6  individual circumstances that might warrant some form of

7  relief from the injunction they had requested.

8        Counsel for the tort claimants fairly observed

9  that the debtors' proposal threatened to turn the burden for

10 injunctive relief on its head.  And I expect that debtors'

11 counsel's reaction to that argument was along the lines of,

12 no good deed goes unpunished.

13       Here's where I come out.

14       For the reasons that I've stated, I'm satisfied

15 that the debtors have carried their burden for the entry of a

16 preliminary injunction staying litigation for ninety (90)

17 days.  As I noted, I do not believe as a practical matter

18 that the imposition of a three month stay in civil litigation

19 is a remarkable or unusual burden on the parties.

20       I am also acutely aware, however, of the suffering

21 and difficult circumstances that many claimants are facing.

22 And I do expect that the debtors to be responsive where

23 circumstances warrant.  And I would suggest that they start

24 by communicating with Mr. Rothenberg regarding the Krasulja

25 litigation.

Case 19-01232-KCF   Doc 2-2   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18   Page 56 of 94

Case 1:19-mc-00103-DLM-JS   Document 46-143   Filed 08/23/17   Page 31 of 43   PageID #: 577

31

1          To conclude, the court is entering a preliminary

2     injunction on the terms that I have just described, effective

3     as of 11:38 a.m. prevailing Eastern time today, August 16th,

4     2017.  And that injunction will expire at 11:59 p.m. on

5     November 15, 2017.

6          I will ask that the parties confer and submit an

7     order consistent with my ruling.  If the parties are unable

8     to agree upon the form of that order, I will make myself

9     available for a teleconference, if necessary.  But,

10    otherwise, I will look for that order to be submitted under

11    certification.

12         I thank you all for your time and your patience

13    this morning.  We are adjourned.

14        (Teleconference concludes at 11:37 a.m.)

15

16

17

18                        CERTIFICATE

19

20    I certify that the foregoing is a correct transcript from the

21    electronic sound recording of the proceedings in the above-

22    entitled matter.

23    /s/Mary Zajaczkowski                    August 30, 2017

24    Mary Zajaczkowski, CET**D-531

25

Case 19-01232-KCF   Doc 2-2   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18   Page 57 of 94

Case 1:19-mc-00103-UNA   Document 4-15   Filed 04/18/19   Page 1 of 4 PageID #: 578

# EXHIBIT 15

Case 19-01232-KCF    Doc 2-2    Filed 04/30/19    Entered 04/30/19 15:48:04    Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18    Page 58 of 94
Case 1:06-mc-00298-UNA    Document 24-15    Filed 05/22/06    Page 2 of 3 PageID #:1699

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MARLENE HOPKINS, individually,:
as Wrongful Death Heir, and as:
Successor-in-Interest to      :
NORMAN HOPKINS, JR., Deceased;:
and MICHELLE HOPKINS, and     :
MICHAEL HOPKINS, as Legal     :
Heirs of NORMAN HOPKINS,      :
Deceased, THE FLINTKOTE       :
COMPANY, THE OFFICIAL         :
COMMITTEE OF THE ASBESTOS     :
PERSONAL INJURY CLAIMANTS,    :
and JAMES J. McMONAGLE as the :
LEGAL REPRESENTATIVE FOR      :
FUTURE ASBESTOS PERSONAL      :
INJURY CLAIMANTS,             :
                              :
          Plaintiffs,         :
                              :
     v.                       :    Civil Action No. 06-298-JJF
                              :
PLANT INSULATION COMPANY;     :
UNIROYAL HOLDING, INC.;       :
IMPERIAL TOBACCO CANADA       :
LIMITED; SULLIVAN & CROMWELL  :
LLP; and DOES 1 through 100,  :
                              :
          Defendants.         :

## MEMORANDUM ORDER

Pending before the Court is an Emergency Motion Of Imperial
Tobacco Canada Limited For Immediate Entry Of A Provisional Order
Or, In The Alternative, An Expedited Hearing Regarding Its
Emergency Petition For An Order Of Transfer Pursuant To 28 U.S.C.
§ 157(b)(5) (D.I. 9).  By its Motion, Imperial Tobacco Canada
Limited ("ITCAAN") requests the Court to enter, on an emergency
basis, a provisional order transferring this case from the United
States District Court for the Northern District of California
(the "California court") to this Court pursuant to 28 U.S.C. §

Case 19-01232-KCF    Doc 2-2    Filed 04/30/19    Entered 04/30/19 15:48:04    Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18    Page 59 of 94

Case 1:06-cv-00298-JJF    Document 24-15    Filed 05/24/06    Page 3 of 4 PageID #: 1380

157(b)(5), because Flintkote's bankruptcy is pending in the
United States Bankruptcy Court for the District of Delaware.
ITCAAN contends that a provisional transfer will protect the
Court's jurisdiction over this action and prevent conflicting
decisions from the California Court on two issues pending there,
i.e. whether to transfer the case to this Court, or whether to
remand this case to the California state courts.  Those issues
are scheduled to be heard by the California court on June 19,
2006.

The Flintkote Company ("Flintkote") has filed a Response to
the Motion contending that this matter does not present an
emergency issue, and a provisional transfer order is not
necessary.  Flintkote contends that pursuant to 28 U.S.C. §
157(b)(5), the Court can transfer this case regardless of whether
the California court remands the action to the California state
courts.  Flintkote also contends that, as a substantive matter,
transfer of this case is not warranted, and therefore a
provisional transfer order is not required.

After reviewing the parties' submissions, the Court
concludes that a provisional transfer order and an expedited
hearing on the underlying transfer petition are not warranted.
While the Court declines to address the merits of the transfer
petition until it has been fully briefed, the Court notes that
Flintkote filed its Answer Brief on May 19, 2006.  The Court will

Case 19-01232-KCF    Doc 2-2    Filed 04/30/19    Entered 04/30/19 15:48:04    Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18    Page 60 of 94

Case 1:06-cv-00098-JJF    Document 24-15    Filed 05/22/06    Page 4 of 5  PageID #: 1581

set a Reply Brief deadline of no later than May 31, 2006, for

ITCAAN so that this matter can be fully briefed and adjudicated

by the Court before the June 19 hearing date scheduled in the

California court.  The Court also notes that the Court may

consider the transfer of this case under Section 157(b)

regardless of the decisions reached by the California court on

the transfer and remand issues, and therefore, the Court is not

persuaded that these proceedings should be characterized as

"emergency" matters.  See In re Pan Am. Corp., 16 F.3d 513 (2d

Cir. 1994).

NOW THEREFORE IT IS HEREBY ORDERED that:

1.    The Emergency Motion Of Imperial Tobacco Canada Limited

For Immediate Entry Of A Provisional Order Or, In The

Alternative, An Expedited Hearing Regarding Its Emergency

Petition For An Order Of Transfer Pursuant To 28 U.S.C. §

157(b)(5) is **DENIED**.

2.    Imperial Tobacco Canada Limited shall file its Reply

Brief to its Emergency Petition For An Order Of Transfer Pursuant

To 28 U.S.C. 175(b)(5) **no later than Wednesday, May 31, 2006.**

_May 22, 2006_
Date

_Josef A. Farnan_
UNITED STATES DISTRICT JUDGE

3

Case 19-01232-KCF    Doc 2-2    Filed 04/30/19    Entered 04/30/19 15:48:04    Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18    Page 61 of 94

Case 1:19-mc-00103-UNA   Document 4-16   Filed 04/18/19   Page 1 of 24 PageID #: 582

# EXHIBIT 16

Case 19-01232-KCF   Doc 2-2   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18   Page 62 of 94
Case 1:19-mc-00103-UNA   Document 4-16   Filed 04/18/19   Page 2 of 24 PageID #: 583



151 Farmington Avenue
Hartford, Connecticut 06115

## THE AETNA CASUALTY AND SURETY COMPANY

### Hartford, Connecticut 06115

These Declarations and Products Liability Insurance Coverage
Part and Endorsements, with the General Provisions for
Liability Policies, complete this

PRODUCTS BODILY INJURY AND PROPERTY DAMAGE LIABILITY POLICY

1. NAMED INSURED            Johnson & Johnson (See Section II)
   AND ADDRESS              New Brunswick, New Jersey

   POLICY NUMBER 38 PK 04 SCA(Y)

2. Policy Period
   From 1-1-73 to 1-1-74  12:01 A.M.
   Standard Time at the address of the        
   named insured as stated herein.

3. The limits of the Company's liability shall be as stated herein, subject
   to all the terms of this policy having reference thereto.

### Limits of Liability

| Coverage | Each Claim | Aggregate per Product | General Aggregate |
|---|---|---|---|
| Bodily Injury and Property Damage Liability Combined | $5,000,000 | $5,000,000 | $5,000,000 |

4. Deductible Amount:   $2,000,000 Each Claim
                        $2,500,000 Per Product Aggregate
                        $3,000,000 General Aggregate

5. Premium subject to audit:
   Flat Charge:
   Total advance and Minimum premium

6. Rates:  See Section VI

7. During the past three years no insurer has cancelled insurance, issued to
   the Named Insured, similar to that afforded herein, unless otherwise stated
   herein:

Countersigned by _____

(3-29-74)

Case 19-01232-KCF   Doc 2-2   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18   Page 63 of 94

Case 1:19-mc-00103-UNA   Document 2  Filed 04/18/19   Page 3 of 24 PageID #: 584

I.   BODILY INJURY LIABILITY - PROPERTY DAMAGE LIABILITY

The Company will pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as Damages because of Bodily Injury or Property Damage to which this insurance applies, caused by an Occurrence, if the Bodily Injury or Property Damage is included within the Products Hazard, and the Company shall have the right and duty to defend any suit against the Insured seeking Damages on account of such Bodily Injury or Property Damage even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the Company shall not be obligated to pay any claim or judgement or to defend any suit after the applicable limit of the Company's liability has been exhausted by payment of judgements or settlement.

Exclusions

This insurance does not apply:

(a)   to any obligation for which the Insured or any carrier as his insurer may be held liable under any Workmen's Compensation, unemployment compensation or disability benefits law, or under any similar law;

(b)   to bodily injury to any employee of the insured arising out of and in the course of his employment by the insured or to any obligation of the insured to indemnify another because of damages arising out of such injury; but this exclusion does not apply to liability assumed by the insured under a contract.

(c)   to loss of use of tangible property which has not been physically injured or destroyed resulting from

(1)   delay in or lack of performance by or on behalf of the named insured of any contract or agreement, or

(2)   the failure of the named insured's product to meet the level of performance, quality, fitness or durability warranted or represented by the named insured;

but this exclusion does not apply to loss of use of other tangible property resulting from the sudden and accidental physical injury to or destruction of the named insured's products after such products have been put to use by any person or organization other than an insured;

(d)   to Property Damage to the Named Insured's products arising out of such products or any part of such products;

(e)   to Damages claimed for the withdrawal, inspection, repair, replacement, or loss of use of the Named Insured's products or of any property of which such products form a part, if such products or property are withdrawn from the market or from use because of any known or suspected defect in or deficiency therein,

(3-29-74)

Case 19-01232-KCF    Doc 2-2    Filed 04/30/19    Entered 04/30/19 15:48:04    Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18    Page 64 of 94

Case 1:19-mc-00103-UNA    Document 4-16    Filed 04/18/19    Page 4 of 24 PageID #: 585

II.  PERSONS INSURED

Each of the following is an Insured under this insurance to the extent set forth below:

(a)  the Named Insured, which shall read:  Johnson & Johnson and any affiliated, associated or subsidiary company in any tier as now or hereafter may be formed, acquired or constituted or any other company over which Johnson & Johnson has or acquires active control or management, so long as Johnson & Johnson or such affiliated, associated or subsidiary company, or any combination thereof, owns in excess of 50% of the stock of such company;

(b)  any officer, director, stockholder or employee thereof while acting on behalf of the Named Insured.

(c)  any person or organization (herein referred to as "Vendor") as an insured, but only with respect to Bodily Injury or Property Damage arising out of the distribution or sale in the regular course of the Vendor's business of the Named Insured's Products subject to the following additional provisions:

(1)  The insurance with respect to Vendors does not apply to:

a.  any express warranty unauthorized by the Named Insured;

b.  Bodily Injury or Property Damage arising out of

(I)  any physical or chemical change in the form of the product made intentionally by the Vendor.

(II)  repacking, unless unpacked solely for the purpose of inspection or testing under instructions from the manufacturer and then repacked in the original container.

(III)  rendering of or failure to render any professional service.

This insurance does not apply to Bodily Injury or Property Damage arising out of the conduct of any partnership or joint venture of which the Insured is a partner or member and which is not designated in this policy as a Named Insured.

III.  LIMITS OF LIABILITY

Regardless of the number of (1) insureds under this policy, (2) persons who sustain Bodily Injury or Property Damage, or (3) claims made or suits brought on account of Bodily Injury or Property Damage, the Company's liability is limited as follows:

The limit of liability stated in the declaration as applicable to "each claim" is the total limit of the Company's liability for all Damages and for all expenses incurred under the Supplementary Payments Provisions (other than salaries of the Company's employees) because of Bodily Injury or Property Damage to any one person.

Case 19-01232-KCF    Doc 2-2    Filed 04/30/19    Entered 04/30/19 15:48:04    Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18    Page 65 of 94

Case 1:19-mc-00103-UNA    Document 4-16    Filed 04/18/19    Page 5 of 24 PageID #: 586

Subject to the above provision respecting "each claim", the limit of
liability stated in the declaration as "aggregate per product" is the
total limit of the Company's liability during the policy period for all
Damages and for all expenses incurred under the Supplementary Payments
Provision (other than salaries of the Company's employees) because of
all Bodily Injury or Property Damage arising out of each product.

Subject to the above provisions respecting "each claim" and "aggregate
per product" the limit of liability stated in the declarations as "general
aggregate" is the total limit of the Company's liability during the policy
period for all Damages and for all expenses incurred under the Supplementary
Payments Provision (other than salaries of the Company's employees) to which
this coverage applies.

Subject to the above provisions respecting "each claim", "aggregate per
product" and "general aggregate" the limit of the Company's liability shall
be the difference between any deductible amount stated in the policy and
the limit of liability stated in the declaration page.

For the purpose of determining the limit of the Company's liability and the
deductible amount each product shall be considered as a separate product
from any other product which contains the same active ingredient or
ingredients plus one or more other active ingredients (active ingredients
do not include fillers, dies or flavoring).  A product shall not be
considered to be a separate product solely because it is produced in various
vehicles, dosages or strengths.  All oral contraceptives shall be con-
sidered as one drug product.

IV.    AMENDMENT TO SUPPLEMENTARY PAYMENTS PROVISION

Any payments made by the Company under the Supplementary Payments Provision
(exclusive of salaries of the Company's employees) shall not be in addition
to the limits of liability stated in the declarations, but shall, for the
purpose of determining such limits of liability, be a part thereof.

V.    WORLDWIDE COVERAGE (INDEMNITY BASIS)

It is agreed that the insurance afforded also applies to Bodily Injury or
Property Damage which occurs, during the policy period, outside the Policy
Territory, provided such Bodily Injury or Property Damage is included in
the Completed Operations Hazard or Products Hazard.

With respect to any claim made or suit instituted outside the Policy
Territory:

(a)    the Insured shall undertake the investigation, settlement and defense of
such claims and suits and keep the Company advised of all such proceedings
and actions, and

(b)    the Company's obligation under this policy shall be limited to
reimbursement of the Insured

(3-29-74)

Case 19-01232-KCF   Doc 2-2   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18   Page 66 of 94

Case 1:19-mc-00103-UNA   Document 4-16   Filed 04/18/19   Page 6 of 24 PageID #: 587

(1) for the amount of damages because of liability imposed upon him
by law on account of Bodily Injury or Property Damage to which
the insurance applies, and

(2) for all reasonable expenses incurred in connection with the
investigation, settlement or defense of such claims or suits, and
the Company's reimbursement obligation for the sum of all damages
imposed on and expenses incurred by the Insured shall be limited
to the amount stated in the policy as the applicable limit of the
Company's liability for damages but the Company may, at its
discretion, participate in the defense or settlement of any such
claim or suit.

VI.   RATES

The "premium subject to audit" portion of this policy shall be adjusted
on the following rates:

| Estimated Sales | Rates Per $1,000 | Estimated Premiums |
|---|---|---|
| Prescription Drugs - ███ | ███ | ███ |
| All other Products - ███ | | |

The premium developed by these rates on audit plus the deductible flat charge
are subject to a policy minimum premium of ███.

AETNA CASUALTY AND SURETY COMPANY

BY _____ 

(3-29-74)

by the provisions of the policy relating to the following:

PRODUCTS LIABILITY INSURANCE

Deductible Endorsement

It is agreed that the insurance applies subject to the following additional
provisions:

1. The Company's obligation under the Bodily Injury Liability and Property
   Damage Coverage to pay damages and to pay expenses incurred under the
   Supplementary Payments Provision (other than salaries of the Company's
   employees) on behalf of the insured applies only to the amount of damages
   and such expenses in excess of the deductible amounts stated in the
   declarations.

2. The deductible amounts stated in the declarations apply as follows:

   a. The deductible amount stated as applicable to "each claim" applies
      to all damages and expenses incurred under the Supplementary Payments
      Provision (other than salaries of the Company's employees) because
      of all Bodily Injury or Property Damage sustained by one person as
      the result of any one occurrence;

   b. The total deductible amount applicable to all Bodily Injury or Property
      Damage to which this insurance applies and arising out of any one type
      of product as defined in Section III shall not exceed the deductible
      amount stated in the declarations as applicable to "Aggregate per
      Product";

   c. The total deductible amount applicable to all Bodily Injury or Property
      Damage to which this insurance applies and arising out of all products
      shall not exceed the deductible amount stated in the declarations as
      applicable to "General Aggregate".

3. The terms of the policy, including those with respect to (a) the Company's
   rights and duties with respect to the defense of suits and (b) the insured's
   duties in the event of an occurrence apply irrespective of the application
   of the deductible amount.

4. The Company may pay any part or all of the deductible amount to effect
   settlement of any claim or suit and the named insured shall reimburse
   the Company for such part of the deductible amount as has been paid by
   the Company.  Such reimbursement shall be made on a monthly basis.

5. The named insured shall pay an additional premium, which shall be charged
   to the named insured each time there is reimbursement under paragraph 4,
   by means of an endorsement to be issued to the policy at that time.  Such
   premium shall be calculated by applying the following factor to each
   reimbursement made in accordance with paragraph 4:

   20.6% of each claim up to $75,000 each claim.

(3-29-74)

Case 19-01232-KCF    Doc 2-2    Filed 04/30/19    Entered 04/30/19 15:48:04    Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18    Page 68 of 94

Ca____00103-UNA    Document 4-16    Filed 04/18/19    Page 8 of 24 PageID #: 589

**Ætna**
LIFE &'CASUALTY

**COMPREHENSIVE AUTOMOBILE
LIABILITY INSURANCE**

CAL
PART

## I.  BODILY INJURY LIABILITY COVERAGE
## PROPERTY DAMAGE LIABILITY COVERAGE

The **company** will pay on behalf of the **insured** all sums which the **insured** shall become legally obligated to pay as damages because of

> **bodily injury** or
> **property damage**

to which this insurance applies, caused by an **occurrence** and arising out of the ownership, maintenance or use, including loading and unloading, of any **automobile**, and the **company** shall have the right and duty to defend any suit against the **insured** seeking damages on account of such **bodily injury** or **property damage**, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the **company** shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the **company's** liability has been exhausted by payment of judgments or settlements.

### Exclusions

**This insurance does not apply:**

(a)  to liability assumed by the **insured** under any contract or agreement;

(b)  to any obligation for which the **insured** or any carrier as his insurer may be held liable under any workmen's compensation, unemployment compensation or disability benefits law, or under any similar law;

(c)  to **bodily injury** to any employee of the **insured** arising out of and in the course of his employment by the **insured** or to any obligation of the **insured** to indemnify another because of damages arising out of such injury;

but this exclusion does not apply to any such injury arising out of and in the course of domestic employment by the **insured** unless benefits therefor are in whole or in part either payable or required to be provided under any workmen's compensation law;

(d)  to **property damage** to

(1)  property owned or being transported by the **insured**, or

(2)  property rented to or in the care, custody or control of the **insured**, or as to which the **insured** is for any purpose exercising physical control, other than **property damage** to a residence or private garage by a **private passenger automobile** covered by this insurance;

(e)  to **bodily injury** or **property damage** due to war, whether or not declared, civil war, insurrection, rebellion or revolution, or to any act or condition incident to any of the foregoing, with respect to expenses for first aid under the Supplementary Payments provision;

(f)  to **bodily injury** or **property damage** arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

## II.  PERSONS INSURED

Each of the following is an **insured** under this insurance to the extent set forth below:

(a)  the **named insured**;

(b)  any partner or executive officer thereof, but with respect to a **non-owned automobile** only while such **automobile** is being used in the business of the **named insured**;

(c)  any other person while using an **owned automobile** or a **hired automobile** with the permission of the **named insured**, provided his actual operation or (if he is not operating) his other actual use thereof is within the scope of such permission, but with respect to **bodily injury** or **property damage** arising out of the loading or unloading thereof, such other person shall be an **insured** only if he is;

(1)  a lessee or borrower of the **automobile**, or

(2)  an employee of the **named insured** or of such lessor or borrower;

(d)  any other person or organization but only with respect to his or its liability because of acts or omissions of an **insured** under (a), (b) or (c) above.

None of the following is an **insured**:

(i)  any person while engaged in the business of his employer with respect to **bodily injury** to any fellow employee of such person injured in the course of his employment;

(ii)  the owner or lessee (of whom the **named insured** is a sublessee) of a **hired automobile** or the owner of a **non-owned automobile**, or any agent or employee of any such owner or lessee;

(iii)  an executive officer with respect to an **automobile** owned by him or by a member of his household;

(iv)  any person or organization, other than the **named insured**, with respect to:

(1)  a motor vehicle while used with any trailer owned or hired by such person or organization and not covered by like insurance in the **company** (except a **trailer** designed for use with a **private passenger automobile** and not being used for business purposes with another type motor vehicle), or

(2)  a **trailer** while used with any motor vehicle owned or hired by such person or organization and not covered by like insurance in the **company**;

(v)  any person while employed in or otherwise engaged in duties in connection with an **automobile business**, other than an **automobile business** operated by the **named insured**.

This insurance does not apply to **bodily injury** or **property damage** arising out of

(1)  a **non-owned automobile** used in the conduct of any partnership or joint venture of which the **insured** is a partner or member and which is not designated in this policy as a **named insured**, or

(2)  if the **named insured** is a partnership, an **automobile** owned by or registered in the name of a partner thereof.

## III.  LIMITS OF LIABILITY

Regardless of the number of

(1)  **insureds** under this policy,

(2)  persons or organizations who sustain **bodily injury** or **property damage**,

(3)  claims made or suits brought on account of **bodily injury** or **property damage** or

(4)  **automobiles** to which this policy applies,

the **company's** liability is limited as follows:

**Bodily Injury Liability Coverage**  The limit of **bodily injury** liability stated in the declarations as applicable to "each person" is the limit of the company's liability for all damages, including damages for care and loss of services, because of **bodily injury** sustained by one person as the result of any one **occurrence**; but subject to the above provision respecting "each person", the total liability of the company for all damages, including damages for care and loss of services, because of **bodily injury** sustained by two or more persons as the result of any one **occurrence** shall not exceed the limit of **bodily injury** liability stated in the declarations as applicable to "each occurrence".

**Property Damage Liability Coverage**  The total liability of the **company** for all **damages** because of all **property damage** sustained by one or more persons or organizations as the result of any one **occurrence** shall not exceed the limit of **property damage** liability stated in the declarations as applicable to "each occurrence".

**Bodily Injury and Property Damage Liability Coverage**  For the purpose of determining the limit of the **company's** liability, all **bodily injury** and **property damage** arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one **occurrence**.

## IV.  POLICY TERRITORY

This insurance applies only to **bodily injury** or **property damage** which occurs within the territory described in paragraph (1) of the definition of **policy territory**.

## V.  ADDITIONAL DEFINITIONS

When used in reference to this insurance (including endorsements forming a part of the policy):

"**automobile business**" means the business or occupation of selling, repairing, servicing, storing or parking **automobiles**;

CAT. 242748
PRINTED IN U.S.A.




"**hired automobile**" means an **automobile** not owned by the **named insured** which is used under contract in behalf of, or loaned to, the **named insured**, provided such **automobile** is not owned by or registered in the name of (a) a partner or executive officer of the **named insured** or (b) an employee or agent of the **named insured** who is granted an operating allowance of any sort for the use of such **automobile**;

"**non-owned automobile**" means an **automobile** which is neither an **owned automobile** nor a **hired automobile**;

"**owned automobile**" means an **automobile** owned by the **named insured**;

"**private passenger automobile**" means a four wheel private passenger or station wagon type **automobile**;

"**trailer**" includes semi-trailer but does not include **mobile equipment**.

**VI. ADDITIONAL CONDITION**

**Excess Insurance—Hired and Non-Owned Automobiles**

With respect to a **hired automobile** or a **non-owned automobile**, this insurance shall be excess insurance over any other valid and collectible insurance available to the **insured**.

## COMPREHENSIVE GENERAL LIABILITY INSURANCE                CGL PART

**I. BODILY INJURY LIABILITY COVERAGE**
**PROPERTY DAMAGE LIABILITY COVERAGE**

The **company** will pay on behalf of the **insured** all sums which the **insured** shall become legally obligated to pay as damages because of

    **bodily injury** or
    **property damage**

to which this insurance applies, caused by an **occurrence**, and the **company** shall have the right and duty to defend any suit against the **insured** seeking damages on account of such **bodily injury** or **property damage**, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the **company** shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the **company's** liability has been exhausted by payment of judgments or settlements.

**Exclusions**

This insurance does not apply:

(a) to liability assumed by the **insured** under any contract or agreement except an **incidental contract**; but this exclusion does not apply to a warranty of fitness or quality of the **named insured's products** or a warranty that work performed by or on behalf of the **named insured** will be done in a workmanlike manner;

(b) to **bodily injury** or **property damage** arising out of the ownership, maintenance, operation, use, loading or unloading of
  (1) any **automobile** or aircraft owned or operated by or rented or loaned to any **insured**, or
  (2) any other **automobile** or aircraft operated by any person in the course of his employment by any **insured**;
but this exclusion does not apply to the parking of an **automobile** on premises owned by, rented to or controlled by the **named insured** or the ways immediately adjoining, if such **automobile** is not owned by or rented or loaned to any **insured**;

(c) to **bodily injury** or **property damage** arising out of
  (1) the ownership, maintenance, operation, use, loading or unloading of any **mobile equipment** while being used in any prearranged or organized racing, speed or demolition contest or in any stunting activity or in practice or preparation for any such contest or activity or
  (2) the operation or use of any snowmobile or trailer designed for use therewith;

(d) to **bodily injury** or **property damage** arising out of and in the course of the transportation of **mobile equipment** by an **automobile** owned or operated by or rented or loaned to any **insured**;

(e) to **bodily injury** or **property damage** arising out of the ownership, maintenance, operation, use, loading or unloading of
  (1) any watercraft owned or operated by or rented or loaned to any **insured**, or
  (2) any other watercraft operated by any person in the course of his employment by any **insured**;
but this exclusion does not apply to watercraft while ashore on premises owned by, rented to or controlled by the **named insured**;

(f) to **bodily injury** or **property damage** arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental;

(g) to **bodily injury** or **property damage** due to war, whether or not declared, civil war, insurrection, rebellion or revolution, or to any act or condition incident to any of the foregoing, with respect to
  (1) liability assumed by the **insured** under an **incidental contract**, or

  (2) expenses for first aid under the Supplementary Payments provision;

(h) to **bodily injury** or **property damage** for which the **insured** or his indemnitee may be held liable
  (1) as a person or organization engaged in the business of manufacturing, distributing, selling or serving alcoholic beverages, or
  (2) if not so engaged, as an owner or lessor of premises used for such purposes,
if such liability is imposed
    (i) by, or because of the violation of, any statute, ordinance or regulation pertaining to the sale, gift, distribution or use of any alcoholic beverage, or
    (ii) by reason of the selling, serving or giving of any alcoholic beverage to a minor or to a person under the influence of alcohol or which causes or contributes to the intoxication of any person;
but part (ii) of this exclusion does not apply with respect to liability of the **insured** or his indemnitee as an owner or lessor described in (2) above;

(i) to any obligation for which the **insured** or any carrier as his insurer may be held liable under any workmen's compensation, unemployment compensation or disability benefits law, or under any similar law;

(j) to **bodily injury** to any employee of the **insured** arising out of and in the course of his employment by the **insured**, or to any obligation of the **insured** to indemnify another because of damages arising out of such injury; but this exclusion does not apply to liability assumed by the **insured** under an **incidental contract**;

(k) to **property damage** to
  (1) property owned or occupied by or rented to the **insured**,
  (2) property used by the **insured**, or
  (3) property in the care, custody or control of the **insured** or as to which the **insured** is for any purpose exercising physical control;
but parts (2) and (3) of this exclusion do not apply with respect to liability under a written sidetrack agreement and part (3) of this exclusion does not apply with respect to **property damage** (other than to **elevators**) arising out of the use of an **elevator** at premises owned by, rented to or controlled by the **named insured**;

(l) to **property damage** to premises alienated by the **named insured** arising out of such premises or any part thereof;

(m) to loss of use of tangible property which has not been physically injured or destroyed resulting from
  (1) a delay in or lack of performance by or on behalf of the **named insured** of any contract or agreement, or
  (2) the failure of the **named insured's products** or work performed by or on behalf of the **named insured** to meet the level of performance, quality, fitness or durability warranted or represented by the **named insured**;
but this exclusion does not apply to loss of use of other tangible property resulting from the sudden and accidental physical injury to or destruction of the **named insured's products** or work performed by or on behalf of the **named insured** after such products or work have been put to use by any person or organization other than an **insured**;

(n) to **property damage** to the **named insured's products** arising out of such products or any part of such products;

(o) to **property damage** to work performed by or on behalf of the **named insured** arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith;

(p) to damages claimed for the withdrawal, inspection, repair, replacement, or loss of use of the **named insured's products** or work completed by or for the **named insured** or of any

Case 19-01232-KCF    Doc 2-2    Filed 04/30/19    Entered 04/30/19 15:48:04    Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18    Page 70 of 94

Case 1:19-mc-00103-UNA Document 4-16 Filed 04/18/19 Page 70 of 24 PageID #: 591

products, work or property are withdrawn from the market or from use because of any known or suspected defect or deficiency therein;

(q) to **property damage** included within:

    (1) the **explosion hazard** in connection with operations iden- tified in this policy by a classification code number which includes the symbol "X";

    (2) the **collapse hazard** in connection with operations iden- tified in this policy by a classification code number which includes the symbol "C";

    (3) the **underground property damage hazard** in connection with operations identified in this policy by a classification code number which includes the symbol "U".

## II. PERSONS INSURED

Each of the following is an **insured** under this insurance to the ex- tent set forth below:

(a) if the **named insured** is designated in the declarations as an individual, the person so designated but only with respect to the conduct of a business of which he is the sole proprietor, and the spouse of the **named insured** with respect to the con- duct of such a business;

(b) if the **named insured** is designated in the declarations as a partnership or joint venture, the partnership or joint venture so designated and any partner or member thereof but only with respect to his liability as such;

(c) if the **named insured** is designated in the declarations as other than an individual, partnership or joint venture, the organization so designated and any executive officer, director or stockholder thereof while acting within the scope of his duties as such;

(d) any person (other than an employee of the **named insured**) or organization while acting as real estate manager for the **named insured**; and

(e) with respect to the operation, for the purpose of locomotion upon a public highway, of **mobile equipment** registered under any motor vehicle registration law,

    (i) an employee of the **named insured** while operating any such equipment in the course of his employment, and

    (ii) any other person while operating with the permission of the **named insured** any such equipment registered in the name of the **named insured** and any person or organization legally responsible for such operation, but only if there is no other valid and collectible insurance available, either on a primary or excess basis, to such per- son or organization;

provided that no person or organization shall be an **insured** un- der this paragaph (e) with respect to:

    (1) **bodily injury** to any fellow employee of such person in- jured in the course of his employment, or

    (2) **property damage** to property owned by, rented to, in charge of or occupied by the **named insured** or the em- ployer of any person described in subparagraph (ii).

This insurance does not apply to **bodily injury or property damage** arising out of the conduct of any partnership or joint venture of which the **insured** is a partner or member and which is not designated in this policy as a **named insured**.

## III. LIMITS OF LIABILITY

Regardless of the number of

(1) **insureds** under this policy,

(2) persons or organizations who sustain **bodily injury** or

(3) claims made or suits brought on account of **bodily injury** **property damage**,

the **company's** liability is limited as follows:

**Bodily Injury** | The total liability of the **company** for
**Liability Coverage** | damages, including damages for care a loss of services, because of **bodily inju** sustained by one or more persons as the result of any one **o currence** shall not exceed the limit of **bodily injury** liability state in the declarations as applicable to "each **occurrence**".

Subject to the above provision respecting "each **occurrence**", th total liability of the **company** for all damages because of

(1) all **bodily injury** included within the **completed operation hazard** and

(2) all **bodily injury** included within the **products hazard** sha not exceed the limit of **bodily injury** liability stated in th declarations as "aggregate".

**Property Damage** | The total liability of the **company** for a
**Liability Coverage** | damages because of all **property damag** sustained by one or more persons organizations as the result of any one **occurrence** shall not excee the limit of **property damage** liability stated in the declarations applicable to "each **occurrence**".

Subject to the above provision respecting "each **occurrence**", t total liability of the **company** for all damages because of **property damage** to which this coverage applies and described any of the numbered subparagraphs below shall not exceed th limit of **property damage** liability stated in the declarations "aggregate":

(1) all **property damage** arising out of premises or operatio rated on a remuneration basis or contractor's equipment rate on a receipts basis, including **property damage** for whic liability is assumed under any **incidental contract** relating such premises or operations, but excluding **property damag** included in subparagraph (2) below;

(2) all **property damage** arising out of and occurring in the cours of operations performed for the **named insured** by independe contractors and general supervision thereof by the **named i sured**, including any such **property damage** for which liabili is assumed under any **incidental contract** relating to suc operations, but this subparagraph (2) does not includ **property damage** arising out of maintenance or repairs premises owned by or rented to the **named insured** or stru tural alterations at such premises which do not invol changing the size of or moving buildings or other structure

(3) all **property damage** included within the **products hazar** and all **property damage** included within the **complete operations hazard.**

Such aggregate limit shall apply separately to the **propert damage** described in subparagraphs (1), (2) and (3) above, and t der subparagraphs (1) and (2), separately with respect to eac project away from premises owned by or rented to the **named i sured.**

**Bodily Injury and** | For the purpose of determining the limit c
**Property Damage** | the **company's** liability, all **bodily injur
Liability Coverage** | and **property damage** arising out of cor tinuous or repeated exposure to sub stantially the same general conditions shall be considered a arising out of one occurrence.

## IV. POLICY TERRITORY

This insurance applies only to **bodily injury or property damag** which occurs within the **policy territory.**

---

## AUTOMOBILE MEDICAL PAYMENTS INSURANCE

**AMP PAR**

### I. AUTOMOBILE MEDICAL PAYMENTS COVERAGE

The **company** will pay all reasonable **medical expense** incurred within one year from the date of the accident:

**Division 1.** to or for each person who sustains **bodily injury,** caused by accident, while **occupying a designated automobile** which is being used by a person for whom **bodily injury** liability insurance is afforded under this policy with respect to such use.

**Division 2.** to or for each **insured** who sustains **bodily injury,** caused by accident, while **occupying** or, while a pedestrian, through being struck by a **highway vehicle.**

### Exclusions

**This insurance does not apply:**

(a) to **bodily injury** to any person or **insured** while employed or otherwise engaged in duties in connection with an **automobile business,** if benefits therefor are in whole or in part either payable or required to be provided under any workmen's com- pensation law;

(b) to **bodily injury** due to war, whether or not declared, civil wa insurrection, rebellion or revolution, or to any act or conditic incident to any of the foregoing;

(c) under Division 1, to **bodily injury** to any employee of th **named insured** arising out of and in the course of employmer by the **named insured,** but this exclusion does not apply to an such **bodily injury** arising out of and in the course of domesti employment by the **named insured** unless benefits therefc are in whole or in part either payable or required to b provided under any workmen's compensation law;

(d) under Division 2, to **bodily injury** sustained while **occupying highway vehicle** owned by any **insured,** or furnished for th regular use of any **insured** by any person or organization othe than the **named insured.**

### II. PERSONS INSURED—DIVISION 2.

Each of the following is an **insured** under this insurance to the ex tent set forth below:

(a) any person designated as **insured** in the schedule;

(b) while residents of the same household as such designated per

Case 19-01232-KCF   Doc 2-2   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18   Page 71 of 94

Case 1:19-mc-00103-UNA   Document 4-16   Filed 04/18/19   Page 11 of 24 PageID #: 592

son, his spouse and the relatives of either, and if such designated person shall die, any person who was an in-sured at the time of such death shall continue to be an insured.

### III. LIMIT OF LIABILITY

The limit of liability for Automobile Medical Payments Coverage stated in the declarations as applicable to "each person" is the limit of the company's liability for all medical expense for bodily injury to any person, including any insured, as the result of any one ac-cident.

When more than one medical payments coverage afforded by this policy applies to the loss, the company shall not be liable for more than the amount of the highest applicable limit of liability.

### IV. ADDITIONAL DEFINITIONS

The additional definitions applicable to automobile bodily injury liability insurance also apply to this insurance, and when used in reference to this insurance (including endorsements forming a part of the policy).

"designated automobile" means an automobile designated in the schedule and includes:

(a) an automobile not owned by the named insured while tem-porarily used as a substitute for an owned automobile designated in the schedule when withdrawn from normal use for servicing or repair or because of its breakdown, loss or destruction; and

(b) a trailer designed for use with a private passenger automobile, if not being used for business purposes with another type automobile and if not a home, office, store, display or passenger trailer;

"highway vehicle" means a land motor vehicle or trailer other than

(a) a farm type tractor or other equipment designed for use prin-cipally off public roads, while not upon public roads,

(b) a vehicle operated on rails or crawler-treads, or

(c) a vehicle while located for use as a residence or premises;

"medical expense" means expenses for necessary medical, surgical, x-ray and dental services, including prosthetic devices, and necessary ambulance, hospital, professional nursing and funeral services;

"occupying" means in or upon or entering into or alighting from.

### V. POLICY PERIOD; TERRITORY

This insurance applies only to accidents which occur during the policy period within the territory described in paragraph (1) or (2) of the definition of policy territory .

### VI. ADDITIONAL CONDITIONS

**Medical Reports; Proof and Payments of Claim**   As soon as practicable the injured person or someone on his behalf shall give to the company written proof of claim, under oath if required, and shall, after each request from the company, execute authorization to enable the company to obtain medical reports and copies of records. The injured person shall submit to physical examination by physicians selected by the company when and as often as the company may reasonably require. The company may pay the injured person or any person or organization rendering the services and such payment shall reduce the amount payable hereunder for such injury. Payment hereunder shall not constitute an admission of liability of any person or, except hereunder, of the company.

**Excess Insurance**   Except with respect to an owned auto-mobile, the insurance under Division 1 shall be excess insurance over any other valid and collectible automobile medical payments or automobile medical expense in-surance.

The insurance under Division 2 shall be excess insurance over any other valid and collectible automobile medical payments or automobile medical expense insurance available to the insured under any other policy.

**Non-Applicability of Subrogation Condition**   The Subrogation Condition does not apply to the Automobile Medical Payments Coverage.

---

# UNINSURED MOTORISTS INSURANCE                                    UM PART

### I. UNINSURED MOTORISTS (Damages for Bodily Injury)

The company will pay all sums which the insured or his legal representative shall be legally entitled to recover as damages from the owner or operator of an uninsured highway vehicle because of bodily injury sustained by the insured, caused by accident and arising out of the ownership, maintenance or use of such uninsured highway vehicle; provided, for the purposes of this coverage, deter-mination as to whether the insured or such representative is legally entitled to recover such damages , and if so the amount thereof, shall be made by agreement between the insured or such representative and the company or, if they fail to agree, by ar-bitration.

No judgment against any person or organization alleged to be legally responsible for the bodily injury shall be conclusive, as be-tween the insured and the company, of the issues of liability of such person or organization or of the amount of damages to which the insured is legally entitled unless such judgment is entered pur-suant to an action prosecuted by the insured with the written con-sent of the company.

#### Exclusions

This insurance does not apply:

(a) to bodily injury to an insured with respect to which such in-sured, his legal representative or any person entitled to payment under this insurance shall, without written consent of the company, make any settlement with any person or organization who may be legally liable therefor;

(b) to bodily injury to an insured while occupying a highway vehicle (other than an insured highway vehicle) owned by the named insured, any designated insured or any relative resident in the same household as the named or designated insured, or through being struck by such a vehicle, but this ex-clusion does not apply to the named insured or his relatives while occupying or if struck by a highway vehicle owned by a designated insured or relatives;

(c) so as to inure directly to the benefit of any workmen's com-pensation or disability benefits carrier or any person or organization qualifying as a self-insure under any workmen's compensation or disability benefits law or any similar law.

### II. PERSONS INSURED

Each of the following is an insured under this insurance to the ex-tent set forth below:

(a) the named insured and any designated insured and while residents of the same household, the spouse and relatives of either;

(b) any other person while occupying an insured highway vehicle; and

(c) any person, with respect to damages he is entitled to recover because of bodily injury to which this insurance applies sustained by an insured under (a) or (b) above.

The insurance applies separately with respect to each insured, ex-cept with respect to the limits of the company's liability.

### III. LIMITS OF LIABILITY

Regardless of the number of insureds under this policy, the com-pany's liability is limited as follows:

(a) The limit of liability stated in the declarations as applicable to "each person" is the limit of the company's liability for all damages because of bodily injury sustained by one person as the result of any one accident and, subject to the above provision respecting "each person", the limit of liability stated in the declarations as applicable to "each accident" is the total limit of the company's liability for all damages because of bodily injury sustained by two or more persons as the result of any one accident.

(b) Any amount payable under the terms of this insurance because of bodily injury sustained in an accident by a person who is an insured under this coverage shall be reduced by

(1) all sums paid on account of such bodily injury by or on behalf of

(i) the owner or operator of the uninsured highway vehicle and

(ii) any other person or organization jointly or severally liable together with such owner or operator for such bodily injury,

including all sums paid under the bodily injury liability coverage of the policy, and

(2) the amount paid and the present value of all amounts payable on account of such bodily injury under any work-men's compensation law, disability benefits law or any similar law.

(c) Any payment made under this insurance to or for any insured shall be applied in reduction of the amount of damages which he may be entitled to recover from any person or organization who is an insured under the bodily injury liability coverage of the policy.

(d) The company shall not be obligated to pay under this in-surance that part of the damages which the insured may be entitled to recover from the owner or operator of an uninsured highway vehicle which represents expenses for medical ser-vices paid or payable under the medical payments coverage of the policy.

Case 19-01232-KCF   Doc 2-2   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18   Page 72 of 94

Case 1:19-mc-00103-UNA   Document 4-16   Filed 04/18/19   Page 12 of 24 PageID #: 593

## IV. POLICY PERIOD; TERRITORY

This insurance applies only to accidents which occur during the policy period and within the United States of America, its territories or possessions, or Canada.

## V. ADDITIONAL DEFINITIONS

When used in reference to this insurance (including endorsements forming a part of the policy):

"**designated insured**" means an individual named in the schedule under **Designated Insured**;

"**highway vehicle**" means a land motor vehicle or trailer other than

(a) a farm type tractor or other equipment designed for use principally off public roads, while not upon public roads,

(b) a vehicle operated on rails or crawler-treads, or

(c) a vehicle while located for use as a residence or premises;

"**hit-and-run vehicle**" means a **highway vehicle** which causes **bodily injury** to an **insured** arising out of physical contact of such vehicle with the **insured** or with a vehicle which the **insured** is **occupying** at the time of the accident, provided:

(a) there cannot be ascertained the identity of either the operator or owner of such highway vehicle;

(b) the **insured** or someone on his behalf shall have reported the accident within 24 hours to a police, peace or judicial officer or to the Commissioner of Motor Vehicles, and shall have filed with the **company** within 30 days thereafter a statement under oath that the **insured** or his legal representative has a cause or causes of action arising out of such accident for damages against a person or persons whose identity is unascertainable, and setting forth the facts or support thereof; and

(c) at the **company's** request, the **insured** or his legal representative makes available for inspection the vehicle which the **insured** was **occupying** at the time of the accident;

"**insured highway vehicle**" means a **highway vehicle**:

(a) described in the schedule as an **insured highway vehicle** to which the **bodily injury** liability coverage of the policy applies;

(b) while temporarily used as a substitute for an **insured highway vehicle** as described in subparagraph (a) above, when withdrawn from normal use because of its breakdown, repair, servicing, loss or destruction;

(c) while being operated by the **named** or **designated insured** or by the spouse of either if a resident of the same household;

but the term "**insured highway vehicle**" shall not include:

(i) a vehicle while used as a public or livery conveyance, unless such use is specifically declared and described in this policy;

(ii) a vehicle while being used without the permission of the owner;

(iii) under subparagraphs (b) and (c) above, a vehicle owned by the **named insured**, any **designated insured** or any resident of the same household as the **named** or **designated insured**; or

(iv) under subparagraphs (b) and (c) above, a vehicle furnished for the regular use of the **named insured** or any resident of the same household;

"**occupying**" means in or upon or entering into or alighting from;

"**state**" includes the District of Columbia, a territory or possession of the United States, and a province of Canada;

"**uninsured highway vehicle**" means:

(a) a **highway vehicle** with respect to the ownership, maintenance or use of which there is, in at least the amounts specified by the financial responsibility law of the **state** in which the **insured highway vehicle** is principally garaged, no **bodily injury** liability bond or insurance policy applicable at the time of the accident with respect to any person or organization legally responsible for the use of such vehicle, or with respect to which there is a **bodily injury** liability bond or **company** writing the sum denies coverage thereunder or is or becomes insolvent; or

(b) a **hit-and-run vehicle**;

but the term "**uninsured highway vehicle**" shall not include:

(i) an **insured highway vehicle**,

(ii) a **highway vehicle** which is owned or operated by a self-insurer within the meaning of any motor vehicle financial responsibility law, motor carrier law or any similar law,

(iii) a **highway vehicle** which is owned by the United States of America, Canada, a **state**, a political subdivision of any such government or an agency of any of the foregoing.

## VI. ADDITIONAL CONDITIONS

**Premium**     If during the policy period the number of **insured highway vehicles** owned by the **named insured** or spouse or the number of dealer's license plates issued to the **named insured** changes, the **named insured** shall notify the **company** during the policy period of any change and the premium shall be adjusted in accordance with the manuals in use by the **company**. If the earned premium thus computed exceeds the advance premium paid, the **named insured** shall pay the excess to the **company**; if less, the **company** shall return to the **named insured** the unearned portion paid by such **insured**.

**Proof of Claim; Medical Reports**     As soon as practicable, the **insured** or other person making claim shall give to the **company** written proof of claim, under oath if required, including full particulars of the nature and extent of the injuries, treatment, and other details entering into the determination of the amount payable hereunder. The **insured** and every other person making claim hereunder shall submit to examinations under oath by any person named by the **company** and subscribe the same, as often as may reasonably be required. Proof of claim shall be made upon forms furnished by the **company** unless the **company** shall have failed to furnish such forms within 15 days after receiving notice of claim.

The injured person shall submit to physical examinations by physicians selected by the **company** when and as often as the **company** may reasonably require and he, or in the event of his incapacity his legal representative, or in the event of his death his legal representative or the person or persons entitled to sue therefor, shall upon each request from the **company** execute authorization to enable the **company** to obtain medical reports and copies of records.

**Assistance and Cooperation of the Insured**     After notice of claim under this insurance, the **company** may require the **insured** to take such action as may be necessary or appropriate to preserve his right to recover damages from any person or organization alleged to be legally responsible for the **bodily injury**; and in any action against the **company**, the **company** may require the **insured** to join such person or organization as a party defendant.

**Notice of Legal Action**     If before the **company** makes payment of loss hereunder, the **insured** or his legal representative shall institute any legal action for **bodily injury** against any person or organization legally responsible for the use of a **highway vehicle** involved in the accident, a copy of the summons and complaint or other process served in connection with such legal action shall be forwarded immediately to the **company** by the **insured** or his legal representative.

**Other Insurance**     With respect to **bodily injury** to an **insured** while **occupying** a **highway vehicle** not owned by the **named insured**, this insurance shall apply only as excess insurance over any other similar insurance available to such **insured** and applicable to such vehicle as primary insurance, and this insurance shall then apply only in the amount by which the limit of liability for this coverage exceeds the applicable limit of liability of such other insurance.

Except as provided in the foregoing paragraph, if the **insured** has other similar insurance available to him and applicable to the accident, the damages shall be deemed not to exceed the higher of the applicable limits of liability of this insurance and such other insurance, and the **company** shall not be liable for a greater proportion of any loss to which this coverage applies than the limit of liability hereunder bears to the sum of the applicable limits of liability of this insurance and such other insurance.

**Arbitration**     If any person making claim hereunder and the **company** do not agree that such person is legally entitled to recover damages from the owner or operator of an **uninsured highway vehicle** because of **bodily injury** to the **insured**, or do not agree as to the amount of payment which may be owing under this insurance, then, upon written demand of either, the matter or matters upon which such person and the **company** do not agree shall be settled by arbitration, which shall be conducted in accordance with the rules of the American Arbitration Association unless other means of conducting the arbitration are agreed to between the **insured** and the **company**, and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction thereof. Such person and the **company** each agree to consider itself bound and to be bound by any award made by the abitrators pursuant to this insurance.

**Trust Agreement**     In the event of payment to any person under this insurance:

Case 19-01232-KCF    Doc 2-2    Filed 04/30/19    Entered 04/30/19 15:48:04    Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18    Page 73 of 94

Case 1:19-mc-00103-UNA    Document 4-16    Filed 04/18/19    Page 13 of 24 PageID #: 594

(a) the **company** shall be entitled to the extent of such payment to the proceeds of any settlement or judgment, that may result from the exercise of any rights of recovery of such person against any person or organization legally responsible for the **bodily injury** because of which such payment is made;

(b) such person shall hold in trust for the benefit of the **company** all rights of recovery which he shall have against such other person or organization because of the damages which are the subject of claim made under this insurance;

(c) such person shall do whatever is proper to secure and shall do nothing after loss to prejudice such rights;

(d) if requested in writing by the **company**, such person shall take, through any representative designated by the **company**, such action as may be necessary or appropriate to recover such payment as damages from such other person or organization, such action to be taken in the name of such person; in the event of a recovery, the **company** shall be reimbursed out of such recovery for expenses, costs and attorneys' fees incurred

by it in connection therewith;

(e) such person shall execute and deliver to the **company** such instruments and papers as may be appropriate to secure the rights and obligations of such person and the **company** established by this provision.

**Payment of Loss**
**by the Company**    Any amount due hereunder is payable.

(a) to the **insured**, or

(b) if the **insured** be a minor to his parent or guardian, or

(c) if the **insured** be deceased to his surviving spouse, otherwise

(d) to a person authorized by law to receive such payment or to a person legally entitled to recover the damages which the payment represents;

provided, the **company** may at its option pay any amount due hereunder in accordance with division (d) hereof.

---

## AUTOMOBILE PHYSICAL DAMAGE INSURANCE

**PHD PART**

### I.  COVERAGE AGREEMENTS

**1.**  The **company** will pay for **loss** to **covered automobiles:**

**Comprehensive**    from any cause except **collision;** but, for the purpose of this coverage, breakage of glass and **loss** caused by missiles, falling objects, fire, theft or larceny, windstorm, hail, earthquake, explosion, riot or civil commotion, malicious mischief or vandalism, water, flood, or (as to a **covered automobile** of the **private passenger type**) colliding with a bird or animal, shall not be deemed loss caused by collision;

**Fire, Lightning or Transportation**    caused by (a) fire or lightning, (b) smoke or smudge due to a sudden, unusual and faulty operation of any fixed heating equipment serving the premises in which the **covered automobile** is located or (c) the stranding, sinking, burning, collision or derailment of any conveyance in or upon which the **covered automobile** is being transported;

**Theft**    caused by theft or larceny;

**Windstorm, Hail, Earthquake or Explosion**    caused by windstorm, hail, earthquake or explosion;

**Combined Additional**    caused by (a) windstorm, hail, earthquake or explosion, (b) riot or civil commotion, (c) the forced landing or falling of any aircraft or its parts or equipment, (d) malicious mischief or vandalism, (e) flood or rising waters, or (f) external discharge or leakage of water;

**Collision**    caused by collision;

provided that, with respect to each **covered automobile,**

(i) under the Comprehensive coverage (except as to **loss** from any of the causes described in the Fire, Lightning or Transportation coverage) and under the Collision coverage, such payment shall be only for the amount of each **loss** in excess of the deductible amount, if any, stated in the schedule as applicable thereto;

(ii) under the Combined Additional coverage, $25 shall be deducted from the amount of each **loss** caused by malicious mischief or vandalism.

**2.**  The **company** will pay:

**Towing**    for towing and labor costs necessitated by the disablement of **covered automobiles,** provided the labor is performed at the place of disablement.

**Supplementary Payments**    In addition to the applicable limits of liability, the **company** will:

(a) with respect to such transportation insurance as is afforded herein, pay general average and salvage charges for which the **named insured** becomes legally liable;

(b) reimburse the **named insured**, in the event of a theft covered by this insurance of an entire **covered automobile** of the **private passenger type** (not used as a public or livery conveyance and not, at time of theft, being held for sale by an automobile dealer), for expense incurred for the rental of a substitute for such **covered automobile** during the period commencing 48 hours after such theft has been reported to the

**company** and the police and terminating, regardless of expiration of the policy period, when such **covered automobile** is returned to use or the **company** pays for the **loss;** but, as to any one such theft, such reimbursement shall not exceed $10 for any one day nor $300 total.

**4.**  Such insurance as is afforded under each coverage applies separately to each **covered automobile,** and a land motor vehicle and one or more trailers or semi-trailers attached thereto shall be held to be separate **covered automobiles** as respects limits of liability and any deductible provsions applicable thereto.

**Exclusions**

**This insurance does not apply:**

(a) to any **covered automobile** while used as a public or livery conveyance, unless such use is specifically declared and described in the schedule;

(b) to damage which is due and confined to:

(i) wear and tear, or

(ii) freezing, or

(iii) mechanical or electrical breakdown or failure,

unless such damage is the result of other **loss** covered by this insurance;

(c) to tires, unless

(i) **loss** be coincident with and from the same cause as other **loss** covered by this insurance; or

(ii) damaged by fire (and, if a **covered automobile** of the **private passenger type,** by malicious mischief or vandalism) or stolen and, as to the **covered automobile, loss** caused by such damage or theft is covered by this insurance;

. (d) to **loss** due to

(i) war, whether or not declared, civil war, insurrection, rebellion or revolution, or to any act or condition incident to any of the foregoing;

(ii) radioactive contamination;

(e) to **loss** to

(i) any device or instrument designed for the recording, reproduction, or recording and reproduction of sound unless such device or instrument is permanently installed in the **covered automobile;**

(ii) any tape, wire, record disc or other medium for use with any device or instrument designed for the recording, reproduction, or recording and reproduction of sound;

(f) to **loss** to a camper body designed for use with a **covered automobile** and not designated in the schedule and premium charged therefor if such **camper body** was owned at the inception of the policy period or the inception of any renewal or extension period thereof;

(g) under the Comprehensive and Theft coverages, to loss or damage due to conversion, embezzlement or secretion by any person in possession of a **covered automobile** under a bailment lease, conditional sale, purchase agreement, mortgage or other encumbrance;

(h) under the Collision coverage, to breakage of glass if insurance with respect to such breakage is otherwise afforded herein;

(i) under the Windstorm, Hail, Earthquake or Explosion and Combined Additional coverages, to **loss** resulting from rain, snow or sleet, whether or not wind-driven.

Case 19-01232-KCF   Doc 2-2   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18   Page 74 of 94

Case 1:19-cv-00103-UNA   Document 4-16   Filed 04/18/19   Page 14 of 24 PageID #: 595

1. The limit of the **company's** liability for **loss** to any one **covered automobile** shall not exceed the least of the following amounts:

   (a) the actual cash value of such **covered automobile**, or if the **loss** is to a part thereof the actual cash value of such part, at time of **loss**; or

   (b) what it would then cost to repair or replace such **covered automobile** or part thereof with other of like kind and quality, with deduction for depreciation; or

   (c) the limit of liability stated in the schedule as applicable to "each **covered automobile**" under the coverage afforded for the **loss** to such **covered automobile**, provided that if such limit of liability is expressed as a stated amount it shall, with respect to a **covered automobile** newly acquired during the policy period and not described in the schedule, be deemed as having been replaced by "actual cash value";

   and (if this insurance is stated in the declarations as being "Fleet Automatic"), subject to the above provisions, shall not in any event exceed the amount, if any, stated in the schedule as the "maximum limit of liability" applicable to "any one **covered automobile**".

2. If this insurance is stated in the declarations as being "Fleet Automatic", the total limit of the **company's** liability for all **loss** directly attributable to a single happening out of which **loss** occurs shall not exceed:

   (a) as to all **covered automobiles** at any one location, the amount, if any, stated in the schedule as the "maximum limit of liability" applicable thereto, subject to the above provisions respecting any one **covered automobile**;

   (b) as to all **covered automobiles**, the amount, if any, stated in the schedule as the "maximum limit of liability" applicable thereto, subject to the above provisions respecting (i) any one **covered automobile** and (ii) any one location.

## III. POLICY PERIOD; TERRITORY; PURPOSES OF USE

This insurance applies only to **loss** which occurs during the policy period, while the **covered automobile** is within the United States of America, its territories or possessions, or Canada, or is being transported between ports thereof and, if a **covered automobile** described in the schedule, is maintained and used at the purposes stated therein as applicable thereto.

## IV. ADDITIONAL DEFINITIONS

When used in reference to this insurance (including endorsements forming a part of the policy):

"**camper body**" means a body designed to be mounted upon a **covered automobile** and equipped as sleeping or living quarters;

"**collision**" means

   (i) collision of a **covered automobile** with another object or with a vehicle to which it is attached, or

   (ii) upset of such **covered automobile**;

"**commercial type**" means (if this insurance is stated in the declarations as being "Fleet Automatic"):

   (i) a land motor vehicle of the truck, pick-up, express, sedan or panel delivery type, including truck-type tractors, trailers and semi-trailers, used for the transportation or delivery of goods or merchandise or for other business purposes, or

   (ii) an altered **private passenger type** vehicle used for retail or wholesale delivery;

"**covered automobile**" means a land motor vehicle, trailer or semi-trailer, including its equipment and other equipment permanently attached thereto (but not including robes, wearing apparel or personal effects), which is either

(a) designated in the schedule, by description or otherwise, as a **covered automobile** to which this insurance applies and is

   (i) owned by the **named insured**, or

   (ii) (if this insurance is stated in the declarations as being "Fleet Automatic") leased to the **named insured** for a term of not less than one year under an agreement expressly prohibiting any right of the lessor or owner to use such vehicle during the term of such lease except either as an operator employed by the **named insured** or for its repair or exchange; or,

(b) if not so designated, such vehicle is newly acquired by the **named insured** during the policy period provided, however, that:

   (i) it replaces a described **covered automobile**, or as of the date of its delivery this insurance applies to all **covered automobiles**, and

(ii) the **named insured** notifies the **company** within 30 days following such delivery date;

but "**covered automobile**" does not include a vehicle owned by or registered in the name of any individual partner or executive officer of the **named insured**, unless specifically stated otherwise by endorsement forming a part of the policy;

"**loss**" means direct and accidental loss or damage;

"**private passenger type**" means a 4-wheel land motor vehicle of the private passenger or station wagon type;

as to "**purposes of use**":

   "**commercial**" means use principally in the business occupation of the **named insured** as stated in the declarations, including occasional use for personal, pleasure, family and other business purposes;

   "**pleasure and business**" means personal pleasure, family and business use.

## V. CONDITIONS

None of the Conditions of the policy shall apply to this insurance except "Premium", "Inspection and Audit", "Subrogation", "Changes", "Assignment", "Cancellation", and "Declarations". This insurance shall also be subject to the following additional Conditions:

**Named Insured's Duties in Event of Loss**  In the event of **loss** the **named insured** shall:

   (a) protect the **covered automobile**, whether or not this insurance applies to the **loss**, and any further loss or damage due to the **named insured's** failure to protect shall not be recoverable under this insurance; reasonable expenses incurred in affording such protection shall be deemed incurred at the **company's** request;

   (b) give notice thereof as soon as practicable to the **company** or any of its authorized agents and also, in the event of theft or larceny, to the police;

   (c) file with the **company**, within 91 days after **loss**, his sworn proof of **loss** in such form and including such information as the **company** may reasonably require and, upon the **company's** request, shall exhibit the damaged property and submit to examination under oath;

   (d) cooperate with the **company** and, upon the **company's** request, shall assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the **named insured** because of **loss** with respect to which this insurance applies; and shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses;

but the **named insured** shall not, except at his own cost, voluntarily make any payment, assume any obligation, offer or pay any reward for recovery of stolen property or incur any expense other than as specifically provided in this insurance.

**Payment for Loss**  With respect to any **loss** covered by this insurance, the **company** may pay for said **loss** in money, or may:

   (a) repair or replace the damaged or stolen property, or

   (b) return at its expense any stolen property to the **named insured**, with payment for any resultant damage thereto, at any time before the **loss** is so paid or the property is so replaced, or

   (c) take all or any part of the damaged or stolen property of the agreed or appraised value;

   but there shall be no abandonment to the **company**.

**Appraisal**  If the **named insured** and the **company** fail to agree as to the amount of **loss**, either may, within 60 days after proof of **loss** is filed, demand an appraisal of the **loss**. In such event the **named insured** and the **company** shall each select a competent appraiser, and the appraisers shall select a competent and disinterested umpire. The appraisers shall state separately the actual cash value and the amount of **loss** and failing to agree shall submit their differences to the umpire. An award in writing of any two shall determine the amount of **loss**. The **named insured** and the **company** shall each pay its chosen appraiser and shall bear equally the other expenses of the appraisal and umpire.

The **company** shall not be held to have waived any of its rights by any act relating to appraisal.

**Action Against Company**  No action shall lie against the **company** unless, as a condition precedent thereto, there shall have been full compliance with all the terms of this insurance nor until 30 days after proof of **loss** is filed and the amount of **loss** is determined as provided in this insurance.

Case 19-01232-KCF    Doc 2-2    Filed 04/30/19    Entered 04/30/19 15:48:04    Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18    Page 75 of 94

Case 1:19-mc-00103-UNA    Document 4-16    Filed 04/18/19    Page 15 of 24 PageID #: 596

**Other Insurance**   If the **named insured** has other insurance against a **loss** covered by this insurance, the **company** shall not be liable under this insurance for a greater proportion of such **loss** than the applicable limit of liability stated in the schedule bears to the total applicable limit of liability of all valid and collectible insurance against such **loss**; provided, however, with respect to any **covered automobile** newly acquired during the policy period and not described in the schedule, this insurance shall not apply to any **loss** against which the **named insured** has other valid and collectible insurance.

**No Benefit to Bailee**   None of the provisions of this insurance shall inure directly or indirectly to the benefit of any carrier or other bailee for hire.

**Terms of Insurance Conformed to Statute**   Terms of this insurance which are in conflict with the statutes of the state wherein this insurance is issued are hereby amended to conform to such statutes.

Case 19-01232-KCF   Doc 2-2   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18   Page 76 of 94

Case 1:19-mc-00103-UNA   Document 4-16   Filed 04/18/19   Page 16 of 24 PageID #: 597



**GENERAL PROVISIONS
FOR LIABILITY POLICIES**

LIFE & CASUALTY

## DEFINITIONS

When used in this policy (including endorsements forming a part hereof):

"**automobile**" means a land motor vehicle, trailer or semi-trailer designed for travel on public roads, (including any machinery or apparatus attached thereto), but does not include **mobile equipment**;

"**bodily injury**" means bodily injury, sickness or disease sustained by any person which occurs during the policy period, including death at any time resulting therefrom;

"**collapse hazard**" includes "structural property damage" as defined herein and **property damage** to any other property at any time resulting therefrom. "Structural property damage" means the collapse of or structural injury to any building or structure due to (1) grading of land, excavating, borrowing, filling, back-filling, tunneling, pile driving, cofferdam work or caisson work or (2) moving, shoring, underpinning, raising or demolition of any building or structure or removal or rebuilding of any structural support thereof. The **collapse hazard** does not include **property damage** (1) arising out of operations performed for the **named insured** by independent contractors, or (2) included within the **completed operations hazard** or the **underground property damage hazard**, or (3) for which liability is assumed by the **insured** under an **incidental contract**;

"**completed operations hazard**" includes **bodily injury** and **property damage** arising out of operations or reliance upon a representation or warranty made at any time with respect thereto, but only if the **bodily injury** or **property damage** occurs after such operations have been completed or abandoned and occurs away from premises owned by or rented to the **named insured**. "Operations" include materials, parts or equipment furnished in connection therewith. Operations shall be deemed completed at the earliest of the following times:

(1) when all operations to be performed by or on behalf of the **named insured** under the contract have been completed,

(2) when all operations to be performed by or on behalf of the **named insured** at the site of the operations have been completed, or

(3) when the portion of the work out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

Operations which may require further service or maintenance work, or correction, repair or replacement because of any defect or deficiency, but which are otherwise complete, shall be deemed completed.

The **completed operations hazard** does not include **bodily injury** or **property damage** arising out of

(a) operations in connection with the transportation of property, unless the **bodily injury** or **property damage** arises out of a condition in or on a vehicle created by the loading or unloading thereof,

(b) the existence of tools, uninstalled equipment or abandoned or unused materials, or

(c) operations for which the classification stated in the policy or in the **company's** manual specifies "including completed operations";

"**elevator**" means any hoisting or lowering device to connect floors or landings, whether or not in service, and all appliances thereof including any car, platform, shaft, hoistway, stairway, runway, power equipment and machinery, or any hydraulic or mechanical hoist used for raising or lowering **automobiles** for lubricating and servicing or for dumping material from trucks; but does not include an **automobile** servicing hoist, or a hoist without a platform outside a building if without mechanical power or if not attached to building walls, or a hod or material hoist used in alteration, construction or demolition operations, or an inclined conveyor used exclusively for carrying property or a dumbwaiter used exclusively for carrying property and having a compartment height not exceeding four feet;

"**explosion hazard**" includes **property damage** arising out of blasting or explosion. The **explosion hazard** does not include **property damage** (1) arising out of the explosion of air or steam vessels, piping under pressure, prime movers, machinery or power transmitting equipment, or (2) arising out of operations performed for the **named insured** by independent contractors, or (3) included within the **completed operations hazard** or the **underground property damage hazard**, or (4) for which liability is assumed by

the **insured** under an **incidental contract**;

"**incidental contract**" means any written (1) lease of premises, (2) easement agreement, except in connection with construction or demolition operations on or adjacent to a railroad, (3) undertaking to indemnify a municipality required by municipal ordinance, except in connection with work for the municipality, (4) sidetrack agreement, or (5) **elevator** maintenance agreement;

"**insured**" means any person or organization qualifying as an insured in the "Persons Insured" provision of the applicable insurance coverage. The insurance afforded applies separately to each **insured** against whom claim is made or suit is brought, except with respect to the limits of the **company's** liability;

"**mobile equipment**" means a land vehicle (including any machinery or apparatus attached thereto), whether or not self-propelled, (1) not subject to motor vehicle registration, or (2) maintained for use exclusively on premises owned by or rented to the **named insured**, including the ways immediately adjoining, or (3) designed for use principally off public roads, or (4) designed or maintained for the sole purpose of affording mobility to equipment of the following types forming an integral part of or permanently attached to such vehicle: power cranes, shovels, loaders, diggers and drills, concrete mixers (other than the mix-in-transit type); graders, scrapers, rollers and other road construction or repair equipment; air-compressors, pumps and generators, including spraying, welding and building cleaning equipment; and geophysical exploration and well servicing equipment;

"**named insured**" means the person or organization named in Item 1, of the declarations of this policy;

"**named insured's products**" means goods or products manufactured, sold, handled or distributed by the **named insured** or by others trading under his name, including any container thereof (other than a vehicle), but "**named insured's products**" shall not include a vending machine or any property other than such container, rented to or located for use of others but not sold;

"**occurrence**" means an accident, including continuous or repeated exposure to conditions, which results in **bodily injury** or **property damage** neither expected nor intended from the standpoint of the **insured**;

"**policy territory**" means:

(1) the United States of America, its territories or possessions, or Canada, or

(2) international waters or air space, provided the **bodily injury** or **property damage** does not occur in the course of travel or transportation to or from any other country, state or nation; or

(3) anywhere in the world with respect to damages because of **bodily injury** or **property damage** arising out of a product which was sold for use or consumption within the territory described in paragraph (1) above, provided the original suit for such damages is brought within such territory;

"**products hazard**" includes **bodily injury** and **property damage** arising out of the **named insured's products** or reliance upon a representation or warranty made at any time with respect thereto, but only if the **bodily injury** or **property damage** occurs away from premises owned by or rented to the **named insured** and after physical possession of such products has been relinquished to others;

"**property damage**" means (1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an **occurrence** during the policy period;

"**underground property damage hazard**" includes underground property damage as defined herein and **property damage** to any other property at any time resulting therefrom. "Underground property damage" means **property damage** to wires, conduits, pipes, mains, sewers, tanks, tunnels, any similar property, and any apparatus in connection therewith, beneath the surface of the ground or water, caused by and occurring during the use of mechanical equipment for the purpose of grading land, paving, excavating, drilling, borrowing, filling, back-filling or pile driving. The **underground property damage hazard** does not include **property damage** (1) arising out of operations performed for the **named insured** by independent contractors, or (2) included within the **completed operations hazard**, or (3) for which liability is assumed by the **insured** under an **incidental contract**.

CAT. 242780
PRINTED IN U.S.A.

(CC-5022) 1-73

Case 19-01232-KCF    Doc 2-2    Filed 04/30/19    Entered 04/30/19 15:48:04    Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18    Page 77 of 94

Case 1:19-mc-00103-UNA    Document 4-16    Filed 04/18/19    Page 17 of 24 PageID #: 598

## SUPPLEMENTARY PAYMENTS

The **company** will pay, in addition to the applicable limit of liability;

(a) all expenses incurred by the **company**, all costs taxed against the **insured** in any suit defended by the **company** and all interest on the entire amount of any judgment therein which accrues after entry of the judgment and before the **company** has paid or tendered or deposited in court that part of the judgment which does not exceed the limit of the **company's** liability thereon;

(b) premiums on appeal bonds required in any such suit, premiums on bonds to release attachments in any such suit for an amount not in excess of the applicable limit of liability of this

policy, and the cost of bail bonds required of the **insured** because of accident or traffic law violation arising out of the use of any vehicle to which this policy applies, not to exceed $250 per bail bond, but the **company** shall have no obligation to apply for or furnish any such bonds;

(c) expenses incurred by the **insured** for first aid to others at the time of an accident, for **bodily injury** to which this policy applies;

(d) reasonable expenses incurred by the **insured** at the **company's** request in assisting the **company** in the investigation or defense of any claim or suit, including actual loss of earnings not to exceed $25 per day.

## NUCLEAR ENERGY LIABILITY EXCLUSION
## (Broad Form)

I. This policy does not apply:

A. Under any Liability Coverage, to **bodily injury** or **property damage**

(1) with respect to which an **insured** under this policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

(2) resulting from the **hazardous properties** of **nuclear material** and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the **insured** is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

B. Under any Medical Payments Coverage, or under any Supplementary Payments provision relating to first aid, to expenses incurred with respect to **bodily injury** resulting from the **hazardous properties** of **nuclear material** and arising out of the operation of a **nuclear facility** by any person or organization.

C. Under any Liability Coverage, to **bodily injury** or **property damage** resulting from the **hazardous properties** of **nuclear material**, if

(1) the **nuclear material** (a) is at any **nuclear facility** owned by, or operated by or on behalf of, an **insured** or (b) has been discharged or dispersed therefrom;

(2) the **nuclear material** is contained in **spent fuel** or **waste** at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an **insured**; or

(3) the **bodily injury** or **property damage** arises out of the furnishing by an **insured** of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any **nuclear facility**, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (3) applies only to **property damage** to such

**nuclear facility** and any property thereat.

II. As used herein:

"**hazardous properties**" include radioactive, toxic or explosive properties,

"**nuclear material**" means **source material**, **special nuclear material** or **byproduct material**;

"**source material**", "**special nuclear material**", and "**byproduct material**" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof,

"**spent fuel**" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a **nuclear reactor**;

"**waste**" means any waste material (1) containing **byproduct material** and (2) resulting from the operation by any person or organization of any **nuclear facility** included within the definition of **nuclear facility** under paragraph (a) or (b) thereof,

"**nuclear facility**" means

(a) any **nuclear reactor**,

(b) any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing **spent fuel**, or (3) handling, processing or packaging **waste**,

(c) any equipment or device used for the processing, fabricating or alloying of **special nuclear material** if at any time the total amount of such material in the custody of the **insured** at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,

(d) any structure, basin, excavation, premises or place prepared or used for the storage or disposal of **waste**,

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"**nuclear reactor**" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

"**property damage**" includes all forms of radioactive contamination of property.

## CONDITIONS

### 1. Premium

All premiums for this policy shall be computed in accordance with the **company's** rules, rates, rating plans, premiums and minimum premiums applicable to the insurance afforded herein.

Premium designated in this policy as "advance premium" is a deposit premium only which shall be credited to the amount of the earned premium due at the end of the policy period. At the close of each period (or part thereof terminating with the end of the policy period) designated in the declarations as the audit period the earned premium shall be computed for such period and, upon notice thereof to the **named insured**, shall become due and payable. If the total earned premium for the policy period is less than the premium previously paid, the **company** shall return to the **named insured** the unearned portion paid by the **named insured**.

The **named insured** shall maintain records of such information as is necessary for premium computation, and shall send copies of such records to the **company** at the end of the policy period and at such times during the policy period as the **company** may direct.

### 2. Inspection and Audit

The **company** shall be permitted but not obligated to inspect the **named insured's** property and operations at any time. Neither the **company's** right to make inspections nor the making thereof nor any report thereon shall constitute an undertaking, on behalf of or for the benefit of the **named insured** or others, to determine or warrant that such property or operations are safe or healthful, or are in compliance with any law, rule or regulation.

The **company** may examine and audit the **named insured's** books and records at any time during the policy period and extensions thereof and within three years after the final termination of this policy, as far as they relate to the subject matter of this insurance.

### 3. Financial Responsibility Laws

When this policy is certified as proof of financial responsibility for the future under the provisions of any motor vehicle financial responsibility law, such insurance as is afforded by this policy for **bodily injury** liability or **property damage** liability shall comply with the provisions of such law to the extent of the coverage and limits of liability required by such law. The **insured** agrees to reim-

Case 19-01232-KCF    Doc 2-2    Filed 04/30/19    Entered 04/30/19 15:48:04    Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18    Page 78 of 94

Case 1:19-mc-00103-UNA    Document 4-1    Filed 04/18/19    Page 18 of 24 PageID #: 599

## CONDITIONS (continued)

burse the **company** for any payment made by the **company** which it would not have been obligated to make under the terms of this policy except for the agreement contained in this paragraph.

**4. Insured's Duties in the Event of Occurrence, Claim or Suit**

(a) In the event of an **occurrence**, written notice containing particulars sufficient to identify the **insured** and also reasonably obtainable information with respect to the time, place and circumstances thereof, and the names and addresses of the injured and of available witnesses, shall be given by or for the **insured** to the **company** or any of its authorized agents as soon as practicable.

(b) If claim is made or suit is brought against the **insured**, the **insured** shall immediately forward to the **company** every demand, notice, summons or other process received by him or his representative.

(c) The **insured** shall cooperate with the **company** and, upon the **company's** request, assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the **insured** because of injury or damage with respect to which insurance is afforded under this policy; and the **insured** shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. The **insured** shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for first aid to others at the time of accident.

**5. Action Against Company**

No action shall lie against the **company** unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy, nor until the amount of the **insured's** obligation to pay shall have been finally determined either by judgment against the **insured** after actual trial or by written agreement of the **insured**, the claimant and the **company**.

Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy. No person or organization shall have any right under this policy to join the **company** as a party to any action against the **insured** to determine the **insured's** liability, nor shall the **company** be impleaded by the **insured** or his legal representative. Bankruptcy or insolvency of the **insured** or of the **insured's** estate shall not relieve the **company** of any of its obligations hereunder.

**6. Other Insurance**

The insurance afforded by this policy is primary insurance, except when stated to apply in excess of or contingent upon the absence of other insurance. When this insurance is primary and the **insured** has other insurance which is stated to be applicable to the loss on an excess or contingent basis, the amount of the **company's** liability under this policy shall not be reduced by the existence of such other insurance.

When both this insurance and other insurance apply to the loss on the same basis, whether primary, excess or contingent, the **company** shall not be liable under this policy for a greater proportion of the loss than that stated in the applicable contribution provision below:

(a) **Contribution by Equal Shares.** If all of such other valid and collectible insurance provides for contribution by equal shares, the **company** shall not be liable for a greater proportion of such loss than would be payable if each insurer contributes an equal share until the **share** of each insurer equals the lowest applicable limit of liability under any one policy or the full amount of the loss is paid, and with respect to any amount of loss not so

paid the remaining insurers then continue to contribute equal shares of the remaining amount of the loss until each such insurer has paid its limit in full or the full amount of the loss is paid.

(b) **Contribution by Limits.** If any of such other insurance does not provide for contribution by equal shares, the **company** shall not be liable for a greater proportion of such loss than the applicable limit of liability under this policy for such loss bears to the total applicable limit of liability of all valid and collectible insurance against such loss.

**7. Subrogation**

In the event of any payment under this policy, the **company** shall be subrogated to all the **insured's** rights of recovery therefor against any person or organization and the **insured** shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. The **insured** shall do nothing after loss to prejudice such rights.

**8. Changes**

Notice to any agent or knowledge possessed by any agent or by any other person shall not effect a waiver or a change in any part of this policy or estop the **company** from asserting any right under the terms of this policy, nor shall the terms of this policy be waived or changed, except by endorsement issued to form a part of this policy.

**9. Assignment**

Assignment of interest under this policy shall not bind the **company** until its consent is endorsed hereon; if, however, the **named insured** shall die, such insurance as is afforded by this policy shall apply (1) to the **named insured's** legal representative, as the **named insured**, but only while acting within the scope of his duties as such, and (2) with respect to the property of the **named insured**, to the person having proper temporary custody thereof, as **insured**, but only until the appointment and qualification of the legal representative.

**10. Three Year Policy**

If this policy is issued for a period of three years, any limit of the **company's** liability stated in this policy as "aggregate" shall apply separately to each consecutive annual period thereof.

**11. Cancellation**

This policy may be cancelled by the **named insured** by mailing to the **company** written notice stating when thereafter the cancellation shall be effective. This policy may be cancelled by the **company** by mailing to the **named insured** at the address shown in this policy, written notice stating when not less than ten days thereafter such cancellation shall be effective. The mailing of notice as aforesaid shall be sufficient proof of notice. The effective date of cancellation stated in the notice shall become the end of the policy period. Delivery of such written notice either by the **named insured** or by the **company** shall be equivalent to mailing.

If the **named insured** cancels, earned premium shall be computed in accordance with the customary short rate table and procedure. If the **company** cancels, earned premium shall be computed pro rata. Premium adjustment may be made either at the time cancellation is effected or as soon as practicable after cancellation becomes effective, but payment or tender of unearned premium is not a condition of cancellation.

**12. Declarations**

By acceptance of this policy, the **named insured** agrees that the statements in the declarations are his agreements and representations, that this policy is issued in reliance upon the truth of such representations and that this policy embodies all agreements existing between himself and the **company** or any of its agents relating to this insurance.

**IN WITNESS WHEREOF,** The Ætna Casualty and Surety Company has caused this policy to be signed by its President and a Secretary at Hartford, Connecticut, and countersigned on the declarations page by a duly authorized agent of the Company.

_Howard G. Moseen_
Secretary

_Donald M. Johnson_
President

NATIONAL ACCOUNT

LIFE & CASUALTY

151 Farmington Avenue
Hartford, Connecticut  06115

THE AETNA CASUALTY AND SURETY COMPANY

Hartford, Connecticut 06115

These Declarations and Products Liability Insurance Coverage
Part and Endorsements, with the General Provisions for
Liability Policies, complete this

PRODUCTS BODILY INJURY AND PROPERTY DAMAGE LIABILITY POLICY



1. NAMED INSURED          Johnson & Johnson (See Section II)
   AND ADDRESS            New Brunswick, New Jersey
                          POLICY NUMBER 38 PK 04 SCA(Y)

2. Policy Period
   From 1-1-73 to 1-1-74  12:01 A.M.
   Standard Time at the address of the
   named insured as stated herein.

SPECIAL HANDLING OCT 1974 42 DIC

3. The limits of the Company's liability shall be as stated herein, subject
   to all the terms of this policy having reference thereto.

                          Limits of Liability

| Coverage | Each Claim | Aggregate per Product | General Aggregate |
|----------|-----------|----------------------|-------------------|
| Bodily Injury and Property Damage Liability Combined | $5,000,000 | $5,000,000 | $5,000,000 |

SEE ANALYSIS SHEET

MATCHED 28

4. Deductible Amount:    $2,000,000 Each Claim
                         $2,500,000 Per Product Aggregate
                         $3,000,000 General Aggregate

5. Premium subject to audit:
   Flat Charge:
   Total advance and Minimum premium

RETURNED BY PREMIUM CONTROL SEP 16 1974 UNPROCESSED

6. Rates:  See Section VI

7. During the past three years no insurer has cancelled insurance, issued to
   the Named Insured, similar to that afforded herein, unless otherwise stated
   herein:

Countersigned by _Peter B. _____

VP 21                    (3-29-74)

Aetna Life Insurance Company / The Aetna Casualty and Surety Company / The Standard Fire Insurance Company

L-490-B

H. O. COPY

Home Office Copy

Case 19-01232-KCF   Doc 2-2   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18   Page 80 of 94

Case 1:19-mc-00103-UNA   Document 4-16   Filed 04/18/19   Page 20 of 24 PageID #: 601

**I.   BODILY INJURY LIABILITY - PROPERTY DAMAGE LIABILITY**

The Company will pay on behalf of the Insured all sums which the Insured
shall become legally obligated to pay as Damages because of Bodily Injury
or Property Damage to which this insurance applies, caused by an Occur-
rence, if the Bodily Injury or Property Damage is included within the
Products Hazard, and the Company shall have the right and duty to defend
any suit against the Insured seeking Damages on account of such Bodily
Injury or Property Damage even if any of the allegations of the suit are
groundless, false or fraudulent, and may make such investigation and
settlement of any claim or suit as it deems expedient, but the Company
shall not be obligated to pay any claim or judgement or to defend any
suit after the applicable limit of the Company's liability has been
exhausted by payment of judgements or settlement.

**Exclusions**

This insurance does not apply:

(a)  to any obligation for which the Insured or any carrier as his insurer
     may be held liable under any Workmen's Compensation, unemployment
     compensation or disability benefits law, or under any similar law;

(b)  to bodily injury to any employee of the insured arising out of and
     in the course of his employment by the insured or to any obligation
     of the insured to indemnify another because of damages arising out
     of such injury; but this exclusion does not apply to liability
     assumed by the insured under a contract.

(c)  to loss of use of tangible property which has not been physically
     injured or destroyed resulting from

     (1)  delay in or lack of performance by or on behalf of the named
          insured of any contract or agreement, or

     (2)  the failure of the named insured's product to meet the level
          of performance, quality, fitness or durability warranted or
          represented by the named insured;

     but this exclusion does not apply to loss of use of other tangible
     property resulting from the sudden and accidental physical injury
     to or destruction of the named insured's products after such products
     have been put to use by any person or organization other than an
     insured;

(d)  to Property Damage to the Named Insured's products arising out of such
     products or any part of such products;

(e)  to Damages claimed for the withdrawal, inspection, repair, replacement
     or loss of use of the Named Insured's products or of any property
     of which such products form a part, if such products or property are
     withdrawn from the market or from use because of any known or
     suspected defect in or deficiency therein,

(3-29-74)

Case 19-01232-KCF    Doc 2-2    Filed 04/30/19    Entered 04/30/19 15:48:04    Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18    Page 81 of 94

Case 1:19-mc-00103-UNA    Document 4-16    Filed 04/18/19    Page 21 of 24 PageID #: 602

## II.    PERSONS INSURED

Each of the following is an Insured under this insurance to the extent set forth below:

(a)    the Named Insured, which shall read:  Johnson & Johnson and any affiliated, associated or subsidiary company in any tier as now or hereafter may be formed, acquired or constituted or any other company over which Johnson & Johnson has or acquires active control or management, so long as Johnson & Johnson or such affiliated, associated or subsidiary company, or any combination thereof, owns in excess of 50% of the stock of such company;

(b)    any officer, director, stockholder or employee thereof while acting on behalf of the Named Insured.

(c)    any person or organization (herein referred to as "Vendor") as an insured, but only with respect to Bodily Injury or Property Damage arising out of the distribution or sale in the regular course of the Vendor's business of the Named Insured's Products subject to the following additional provisions:

(1)    The insurance with respect to Vendors does not apply to:

a.    any express warranty unauthorized by the Named Insured;

b.    Bodily Injury or Property Damage arising out of

(I)    any physical or chemical change in the form of the product made intentionally by the Vendor.

(II)    repacking, unless unpacked solely for the purpose of inspection or testing under instructions from the manufacturer and then repacked in the original container.

(III)    rendering of or failure to render any professional service.

This insurance does not apply to Bodily Injury or Property Damage arising out of the conduct of any partnership or joint venture of which the Insured is a partner or member and which is not designated in this policy as a Named Insured.

## III.    LIMITS OF LIABILITY

Regardless of the number of (1) insureds under this policy, (2) persons who sustain Bodily Injury or Property Damage, or (3) claims made or suits brought on account of Bodily Injury or Property Damage, the Company's liability is limited as follows:

The limit of liability stated in the declaration as applicable to "each claim" is the total limit of the Company's liability for all Damages and for all expenses incurred under the Supplementary Payments Provisions (other than salaries of the Company's employees) because of Bodily Injury or Property Damage to any one person.

Case 19-01232-KCF   Doc 2-2   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18   Page 82 of 94

Case 1:19-mc-00103-UNA   Document 4-16   Filed 04/18/19   Page 22 of 24   PageID #: 693

liability stated in the declaration as "aggregate per product" is the
total limit of the Company's liability during the policy period for all
Damages and for all expenses incurred under the Supplementary Payments
Provision (other than salaries of the Company's employees) because of
all Bodily Injury or Property Damage arising out of each product.

Subject to the above provisions respecting "each claim" and "aggregate
per product" the limit of liability stated in the declarations as "general
aggregate" is the total limit of the Company's liability during the policy
period for all Damages and for all expenses incurred under the Supplementary
Payments Provision (other than salaries of the Company's employees) to which
this coverage applies.

Subject to the above provisions respecting "each claim", "aggregate per
product" and "general aggregate" the limit of the Company's liability shall
be the difference between any deductible amount stated in the policy and
the limit of liability stated in the declaration page.

For the purpose of determining the limit of the Company's liability and the
deductible amount each product shall be considered as a separate product
from any other product which contains the same active ingredient or
ingredients plus one or more other active ingredients (active ingredients
do not include fillers, dies or flavoring). A product shall not be
considered to be a separate product solely because it is produced in various
vehicles, dosages or strengths. All oral contraceptives shall be con-
sidered as one drug product.

IV. AMENDMENT TO SUPPLEMENTARY PAYMENTS PROVISION

Any payments made by the Company under the Supplementary Payments Provision
(exclusive of salaries of the Company's employees) shall not be in addition
to the limits of liability stated in the declarations, but shall, for the
purpose of determining such limits of liability, be a part thereof.

V. WORLDWIDE COVERAGE (INDEMNITY BASIS)

It is agreed that the insurance afforded also applies to Bodily Injury or
Property Damage which occurs, during the policy period, outside the Policy
Territory, provided such Bodily Injury or Property Damage is included in
the Completed Operations Hazard or Products Hazard.

With respect to any claim made or suit instituted outside the Policy
Territory:

(a) the Insured shall undertake the investigation, settlement and defense of
such claims and suits and keep the Company advised of all such proceedin
and actions, and

(b) the Company's obligation under this policy shall be limited to
reimbursement of the Insured

(3-29-74)

Case 19-01232-KCF    Doc 2-2    Filed 04/30/19    Entered 04/30/19 15:48:04    Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18    Page 83 of 94

Case 1:19-mc-00103-UNA    Document 4-16    Filed 04/18/19    Page 23 of 24 PageID #: 604

(1) for the amount of damages because of liability imposed upon him
by law on account of Bodily Injury or Property Damage to which
the insurance applies, and

(2) for all reasonable expenses incurred in connection with the
investigation, settlement or defense of such claims or suits, and
the Company's reimbursement obligation for the sum of all damages
imposed on and expenses incurred by the Insured shall be limited
to the amount stated in the policy as the applicable limit of the
Company's liability for damages but the Company may, at its
discretion, participate in the defense or settlement of any such
claim or suit.

VI.  RATES

The "premium subject to audit" portion of this policy shall be adjusted
on the following rates:

| Estimated Sales | Rates Per $1,000 | Estimated Premiums |
|---|---|---|
| Prescription Drugs – ███ | ███ | ███ |
| All other Products – ███ | | |

The premium developed by these rates on audit plus the deductible flat charge
are subject to a policy minimum premium of $325,624.

AETNA CASUALTY AND SURETY COMPANY

BY _____

(3-29-74)

Case 19-01232-KCF   Doc 2-2   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18   Page 84 of 94

Case 1:19-mc-00103-UNA   Document 4-16   Filed 04/18/19   Page 24 of 24 PageID #: 605

PRODUCTS LIABILITY INSURANCE

## Deductible Endorsement

It is agreed that the insurance applies subject to the following additional provisions:

1. The Company's obligation under the Bodily Injury Liability and Property Damage Coverage to pay damages and to pay expenses incurred under the Supplementary Payments Provision (other than salaries of the Company's employees) on behalf of the insured applies only to the amount of damages and such expenses in excess of the deductible amounts stated in the declarations.

2. The deductible amounts stated in the declarations apply as follows:

   a. The deductible amount stated as applicable to "each claim" applies to all damages and expenses incurred under the Supplementary Payments Provision (other than salaries of the Company's employees) because of all Bodily Injury or Property Damage sustained by one person as the result of any one occurrence;

   b. The total deductible amount applicable to all Bodily Injury or Property Damage to which this insurance applies and arising out of any one type of product as defined in Section III shall not exceed the deductible amount stated in the declarations as applicable to "Aggregate per Product";

   c. The total deductible amount applicable to all Bodily Injury or Property Damage to which this insurance applies and arising out of all products shall not exceed the deductible amount stated in the declarations as applicable to "General Aggregate".

3. The terms of the policy, including those with respect to (a) the Company's rights and duties with respect to the defense of suits and (b) the insured's duties in the event of an occurrence apply irrespective of the application of the deductible amount.

4. The Company may pay any part or all of the deductible amount to effect settlement of any claim or suit and the named insured shall reimburse the Company for such part of the deductible amount as has been paid by the Company. Such reimbursement shall be made on a monthly basis.

5. The named insured shall pay an additional premium, which shall be charged to the named insured each time there is reimbursement under paragraph 4, by means of an endorsement to be issued to the policy at that time. Such premium shall be calculated by applying the following factor to each reimbursement made in accordance with paragraph 4:

(3-29-74)

Case 19-01232-KCF    Doc 2-2    Filed 04/30/19    Entered 04/30/19 15:48:04    Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18    Page 85 of 94

Case 1:19-mc-00103-UNA   Document 4-17   Filed 04/18/19   Page 1 of 4 PageID #: 606

# EXHIBIT 17

Case 19-01232-KCF    Doc 2-2    Filed 04/30/19    Entered 04/30/19 15:48:04    Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18    Page 86 of 94

Case 1:19-mc-00103-UNA    Document 4-17    Filed 04/18/19    Page 2 of 4 PageID #: 607



FARELLA
BRAUN + MARTEL LLP

DAVID B. SMITH, CPCU, ARM
Insurance and Risk Management Consultant
dsmith@fbm.com
D 415.954.4435

February 2, 2016

*By Certified Mail*
*Return Receipt Requested*

Insurance Companies (per attached list)

Re:    Named Insured:  Johnson & Johnson
       Ovarian Cancer Talc Lawsuits

Dear Claims Adjusters:

This firm represents Rio Tinto America, Inc. and various of its subsidiaries (collectively, "Rio Tinto"). We believe that your companies issued various policies of liability insurance to Johnson & Johnson and its subsidiaries ("J&J"). These policies are listed on the attached chart.

Around 160 lawsuits have been filed against J&J, Imerys Talc America ("Imerys Talc"), and others alleging that J&J's products, including Johnson's Baby Powder and other products containing talc, have caused ovarian cancer in women. A sample lawsuit is attached. All the other lawsuits make very similar allegations. Please contact the undersigned if you wish to make arrangements to obtain copies of all the complaints.

Imerys Talc is the successor to Luzenac America, Inc. ("Luzenac"). Luzenac was a subsidiary of Rio Tinto. Imerys Talc and its predecessors are alleged to have supplied talc to J&J for use in its products. Imerys Talc is currently being defended in these lawsuits by Gordon & Rees.

Between 1965 and 1989, Windsor Minerals, Inc. ("Windsor"), which was a wholly owned subsidiary of J&J, supplied talc to J&J for such products. In 1989, Cyprus Mines Corporation ("Cyprus Mines") bought Windsor from J&J by means of a Stock Purchase Agreement ("SPA"). Thus, Windsor's insurance rights transferred to Cyprus by operation of law, and was also supported by an assignment of rights in the SPA. J&J further represented and warranted that Windsor was an insured under J&J's historical insurance program.

In June 1992, Cyprus Mines (at that time a subsidiary of Cyprus Mineral Company) transferred its mining assets, including Windsor, into a new company, Cyprus Talc Corporation, pursuant to an Agreement of Transfer and Assumption ("ATA"). At the same time, Rio Tinto (at that time known as RTZ America, Inc.) bought Cyprus Talc Corporation also by means of a Stock Purchase Agreement. The name of Cyprus Talc was changed to Luzenac America.

Russ Building · 235 Montgomery Street · San Francisco, CA 94104 · T 415.954.4400 · F 415.954.4480

SAN FRANCISCO   ST. HELENA   www.fbm.com

Case 19-01232-KCF    Doc 2-2    Filed 04/30/19    Entered 04/30/19 15:48:04    Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18    Page 87 of 94

Case 1:19-mc-00103-UNA    Document 4-17    Filed 04/18/19    Page 3 of 4 PageID #: 608

Insurance Companies (per attached list)
February 2, 2016
Page 2


FARELLA
BRAUN + MARTEL LLP

    In June 2011, Rio Tinto sold its talc business to Mircal S.A. ("Mircal"), again by means of a
Stock Purchase Agreement. Mircal changed the name to Imerys Talc.[1]

    In all the above described transactions, each purchaser not only bought all the assets of the
acquired company, but also became the beneficiary of the acquired company's insurance assets. Thus,
by both operation of law and by assignment, Imerys Talc is the successor-in-interest to Windsor under
the policies issued to J&J for the period 1965 through 1989, all of which included Windsor as an
insured as a subsidiary of J&J.

    In connection with the sale of Luzenac to Mircal, Rio Tinto made available a number of
liability policies to Imerys Talc. These policies were issued by Zurich America Ins. Co. and Imerys is
currently being defended under them. Our present interest is to obtain an acknowledgement of
coverage, and contribution to the cost of defense, from each applicable policy providing coverage for
these claims.

    We believe the policies issued by your companies provide coverage to Imerys Talc, as
successor to Windsor, for these lawsuits. Would you please search for and provide us with copies of
the identified policies, and any other liability policies (including umbrella and excess) your companies
and/or affiliates or subsidiaries issued to J&J that may provide coverage for the ovarian talc lawsuits.
The information we have of these policies is included on the attached chart in the form of legal
citations to cases that list the policies or is taken from an exhibit to one of the corporate Stock Purchase
Agreements. Please also acknowledge your duty to defend Imerys Talc and your agreement to share in
the ongoing defense costs.

    If you have information or evidence of any other policies issued by any other insurers that may
provide coverage for these lawsuits, please also provide copies. Please feel free to contact me or John
Green (415-954-4492) if you have any questions.

                              Yours sincerely,

                              David B. Smith, CPCU, ARM
                              Insurance and Risk Management Consultant

DBS:dbs
Enclosures

cc:    Zsófia Porter (RTZ) (w/o encls.)
       Angela Elbert, Esq. (counsel for Imerys) (w/o encls.)
       John D. Green, Esq. (w/o encls.)

31773\5177246.1

---

[1] The stock purchase agreements, the ATA and other relevant documents of the transactions are subject to confidentiality
provisions. On your request, and subject to your acknowledgement that your company insured Windsor, we will forward a
confidentiality agreement for you to sign that will allow us to make available all the relevant documents relating to the
corporate transactions.

Case 19-01232-KCF   Doc 2-2   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18   Page 88 of 94

Case 1:19-mc-00103-UNA   Document 4-17   Filed 04/18/19   Page 4 of 4 PageID #: 609

2/2/2016 Letter to Insurance Companies - **Attachment for Seven Addressees**

Travelers Insurance Company, Claims Dept.
Attn:  Tim Mills
6060 South Willow Drive
Greenwood Village, CO  80111


North River Ins. Co.
Crum & Forster Claims Dept.
PO Box 1973
305 Madison Avenue
Morristown, NJ 07962


Liberty Mutual Ins. Co., Claims Dept.
175 Berkeley Street
Boston, MA  02116


First State Ins. Co., Claims Dept.
c/o The Hartford
100 High Street, Suite 800
Boston, MA  02110


Berkshire Hathaway Direct Ins. Co.
Claims Dept.
3024 Harne street
Omaha, NE 68131


Granite State Ins. Co.
c/o AIG, Claims Dept.
175 Water Street,
New York, NY  10038

Case 19-01232-KCF    Doc 2-2    Filed 04/30/19    Entered 04/30/19 15:48:04    Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18    Page 89 of 94

Case 1:19-mc-00103-UNA    Document 4-18    Filed 04/18/19    Page 1 of 6 PageID #: 610

# EXHIBIT 18

Case 19-01232-KCF   Doc 2-2   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18   Page 90 of 94

Case 1:19-mc-00103-UNA   Document 4-18   Filed 04/18/19   Page 2 of 6 PageID #: 611


**TRAVELERS**

**Scott Erikson**
*Director*
*Special Liability Group*
*One Tower Square 0 8FP*
*Hartford, CT 06183*

*Telephone: (860) 954-4898*
*Facsimile: (860) 277-9075*
*serikson@travelers.com*

Sent via U.S. Mail and Email
zsofia.porter@riotinto.com

September 13, 2017

Zsofia Porter
Rio Tinto
P.O. Box 6609
Englewood, CO 80155

> **Re: Ovarian Cancer Talc Lawsuits, [including *Joann Anglin, et al. v. Johnson & Johnson, et al.*, including Imerys Talc America, Inc. FKA Luzenac America, Inc., in the Circuit Court of The City of St. Louis, Missouri, Case No. 1522-CC09792]**
>
> **Policyholder: Johnson & Johnson**
> **Travelers Claim #: E3E9327**

Dear Ms. Porter:

　　　　We write to follow up on our prior communications and in further response to your request on behalf of by Rio Tinto America, Inc. ("Rio Tinto") that Travelers Casualty and Surety Company, formerly known as The Aetna Casualty and Surety Company ("Travelers"), provide defense coverage to, and/or contribute to the defense of, Imerys Talc America f/k/a Luzenac America, Inc. ("Imerys Talc") in the above-referenced lawsuits seeking damages for bodily injury allegedly caused by exposure to talc products (the "talc lawsuits"). As discussed below, we have reviewed the materials you provided. Based on this review, Travelers believes that Imerys Talc Vermont, Inc. ("Imerys Vermont"), as the party that is alleged to have succeeded to any rights under the policies issued by Travelers, and the party that is actually seeking defense coverage in connection with the lawsuits, must be included in any future dialogue.[1] In addition, to the extent Rio Tinto, Imerys Talc or Imerys Vermont seeks coverage

---

[1]　　　The attachment to your letter dated February 8, 2016 includes a reference to a policy allegedly issued by Northbrook Excess & Surplus Ins. Co., which we do not address herein. Travelers presently has no record of the referenced Northbrook policy. Our investigation is continuing and we reserve all rights with respect to the Northbrook policy, to the extent it exists and was issued by Travelers.

Case 19-01232-KCF   Doc 2-2   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18   Page 91 of 94

Case 1:19-mc-00103-UNA   Document 4-18   Filed 04/18/19   Page 3 of 6 PageID #: 612

2

that may impair the limits potentially applicable to Johnson & Johnson, Travelers believes that Johnson & Johnson may need to participate in such discussions as well.

We base these conclusions on the following.

**Rio Tinto's Request For Defense Coverage For Imerys Talc**

Rio Tinto has requested that Travelers defend Imerys Talc under certain policies issued by Travelers to Johnson & Johnson, some of which allegedly insured an entity called Windsor Minerals, Inc. ("Windsor Minerals") as an additional named insured (the "J&J Policies"). In your February 8, 2016 letter and in subsequent communications, you have expressed a belief that "both by operation of law and by assignment," Imerys Talc is the successor-in-interest to Windsor Minerals and thus is entitled to coverage under the J&J Policies.

Based on our review of the information and documents you have provided, to the extent Windsor Minerals has a successor-in-interest – and Travelers cannot presently confirm that to be the case – that entity appears to be Imerys Vermont, and not Imerys Talc or Rio Tinto. In this regard, we note the following:

- On January 6, 1989, Johnson & Johnson sold 100% of the stock of Windsor Minerals (and Windsor Minerals' subsidiary, Western Source, Inc.) to Cyprus Mines Corporation ("Cyprus Mines").[2] From the transaction documents you provided, this transaction included no express assignment of rights under the J&J Policies to Cyprus Mines or any other entity.

- To the contrary, on and after January 6, 1989: (i) Johnson & Johnson retained its own rights in the J&J Policies; and (ii) to the extent Windsor Minerals was an additional insured under certain of the J&J Policies, Windsor Minerals retained its own rights as an additional insured, but only with respect to occurrences prior to the closing date. At no point did Cyprus Mines, the new corporate parent of Windsor Minerals, obtain rights under the J&J Policies pursuant to the transaction documents you have provided to Travelers.

- After the 1989 transaction, Windsor Minerals changed its name to Cyprus Windsor Minerals Corporation ("Cyprus Windsor").

- On June 5, 1992, Cyprus Mines formed a new subsidiary called Cyprus Talc Corporation ("Cyprus Talc"). Cyprus Mines transferred 100% of its beneficial interest in Cyprus Windsor stock to Cyprus Talc. Cyprus Mines also transferred other assets to Cyprus Talc, including Green Mountains Talc Co., Cyprus Industrial Minerals, and certain shares in entities known as DIMTA SA and Nihon Mistron Co. As noted above, Cyprus Mines itself did not acquire any rights under the J&J Policies. Accordingly, Cyprus Mines

---

[2]    Solely for the purpose of this correspondence, Travelers assumes that Western Source, Inc. continued to be a wholly owned subsidiary of Windsor Minerals through the transfers referenced herein.

Case 19-01232-KCF   Doc 2-2   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18   Page 92 of 94

Case 1:19-mc-00103-UNA   Document 4-18   Filed 04/18/19   Page 4 of 6 PageID #: 613

3

could not and did not assign any such rights to Cyprus Talc, the new corporate parent of Cyprus Windsor f/k/a Windsor Minerals, *i.e.*, the entity that was a named insured under the J&J Policies.

- Also on June 5, 1992, Rio Tinto (then known as RTZ America) acquired all of the stock of Cyprus Talc, which in turn owned 100% of the stock of Cyprus Windsor f/k/a Windsor Minerals, as well as other stock and assets. Cyprus Talc thereafter changed its name to Luzenac America, and Cyprus Windsor changed its name back to Windsor Minerals. At no point did Luzenac America f/k/a Cyprus Talc acquire its own rights under the J&J Policies by virtue of these transactions.

- On June 10, 2011, Rio Tinto sold 100% of Luzenac America to Mircal S.A. Since Luzenac America never had any direct rights in the J&J Policies, Mircal did not acquire any such rights, which, at best, were retained with Windsor Minerals.

- Luzenac America thereafter changed its name to Imerys Talc, and Windsor Minerals changed its name to Imerys Talc Vermont, Inc. (*i.e.*, Imerys Vermont).

In sum, it appears that the stock ownership of Windsor Minerals (in addition to other entities, assets and liabilities) had been transferred, from Johnson & Johnson to Cyprus Mines (in 1989), then to Cyprus Talc (in 1992), then to Rio Tinto (f/k/a TMZ America) (also in 1992), and then to Imerys Talc (f/k/a Luzenac America) (in 2011). However, to the extent any entity potentially retained or currently potentially holds any rights as an additional insured under the J&J Policies, that entity would appear to be Imerys Vermont, and not Imerys Talc or Rio Tinto.

Travelers believes that any discussion concerning potential coverage under policies it issued must be between Travelers and its alleged policyholder, and thus while it is prepared to consider further whether there may be potential coverage for the talc claims, such discussions must include Imerys Vermont. We do not believe it is appropriate to have such discussions with Rio Tinto, at least without the involvement of Imerys Vermont, and particularly given that Rio Tinto does not appear to be named as a party in connection with any of these claims.

Additionally, as noted above, because Johnson & Johnson also retained rights under the same policies to which Rio Tinto and/or Imery Vermont seeks coverage, Johnson & Johnson may also need to participate in such discussions to avoid potential disagreements as between Travelers, Imerys Vermont and Johnson & Johnson with respect to the rights, obligations, terms and limitations under such policies. Please advise whether Rio Tinto or Imerys has already communicated with Johnson & Johnson with respect to Rio Tinto's request for coverage under the J&J Policies.

## Rio Tinto's Purported Subrogation and/or Contribution Rights

In some of Rio Tinto's communications, it has also suggested that Rio Tinto is seeking defense coverage for Imerys Talc under a theory of subrogation and/or equitable contribution. We understand this request to be based on certain insurance policies issued to Rio

Case 19-01232-KCF    Doc 2-2    Filed 04/30/19    Entered 04/30/19 15:48:04    Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18 , Page 93 of 94

Case 1:19-mc-00103-UNA    Document 4-18    Filed 04/18/19    Page 5 of 6 PageID #: 614

4

Tinto by Zurich America Insurance Company ("Zurich") when Rio Tinto owned Luzenac America (the "Zurich Policies"). Subrogation claims traditionally are asserted by the insurer of an alleged tortfeasor on whose behalf that insurer has paid against another co-tortfeasor and not against an alleged co-insurer. Although it is not entirely clear, we do not understand Rio Tinto to be seeking to assert such subrogation rights against Travelers.

Moreover, the Zurich Policies appear to be general liability policies that were issued to Rio Tinto when it owned Luzenac America. To the extent any payments have been made under the Zurich Policies, Rio Tinto has not explained why it believes it stands in Zurich's shoes, or even if it does, why Travelers has any obligation under the J&J Policies to contribute to the costs incurred in connection with any such payments. If you would like to provide additional information as to why Rio Tinto's insurance coverage issued by Zurich provides Rio Tinto with a basis to seek defense coverage from Travelers, we are prepared to discuss this issue further.

Similarly, given that Rio Tinto and/or Imerys Vermont presumably have more complete access to the transaction documents and histories than Travelers, if you believe we are mistaken in the above summary of the relevant transactions or their legal implications in terms of the rights, if any, under the J&J Policies, please let us know and we will consider such information.

Although Travelers requires additional information concerning the status of the talc litigation and the coverage requested in order to make a coverage determination, and its investigation is ongoing, for the reasons discussed above we believe such discussions need to be between the parties to the insurance contracts themselves. Rio Tinto does not presently have any rights under those policies for the reasons summarized above.

*    *    *

Travelers reserves all of its rights without limitation with respect to Rio Tinto's demand for defense coverage for talc claims against Imerys Talc, and nothing herein should be construed as an admission or as a waiver or limitation of any of Travelers' rights, claims or defenses.

Please do not hesitate to contact us with any questions.

Sincerely,

Scott Erikson

Case 19-01232-KCF   Doc 2-2   Filed 04/30/19   Entered 04/30/19 15:48:04   Desc
Exhibit C - Nolan Decl. Exhs. 13 to 18   Page 94 of 94

Case 1:19-mc-00103-UNA   Document 4-18   Filed 04/18/19   Page 6 of 6 PageID #: 615

5

Cc:    Mr. John Green
       Farella Braun & Martel LLP
       235 Montgomery Street
       San Francisco, CA 94104

       Gerald Begley – Senior Counsel, SLG